# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

## CONCISE SUMMARY OF THE CASE

Pursuant to 3rd Cir. LAR 33.3, counsel are required to file a concise summary of the case within **14** days of the date of docketing of the Notice of Appeal. Total statement is limited to no more than 2 pages, single-spaced.  Counsel may utilize this form or attach a 2 page statement encompassing the information required by this form.

SHORT CAPTION: Steven Plavin v. Group Health Incorporated

USCA NO.: 18-2490

LOWER COURT or AGENCY and DOCKET NUMBER:
Middle District of Pennsylvania, Case No. 3:17-cv-01462

NAME OF JUDGE: Judge Robert D. Mariani

Specify who is suing whom, for what, and the subject of this action.  Identify (1) the nature of the action; (2) the parties to this appeal; (3) the amount in controversy or other relief involved; and (4) the judgment or other action in the lower court or agency from which this action is taken:

This is a putative class action brought by City of New York employees and retirees against Group Health Incorporated, alleging that GHI misled these consumers about the scope of out-of-network coverage under the health insurance plan it offered. Plaintiff Steven Plavin, a retired NYPD officer, brought this action on behalf of himself and all others similarly situated, alleging that GHI violated New York General Business Law Sections 349 and 350 and New York Insurance Law Section 4336. Plaintiff also brought a claim for unjust enrichment. The amount in controversy exceeds $5 million. The District Court granted GHI's motion to dismiss. Plaintiff appealed.

LIST and **ATTACH** a copy of each order, judgment, decision or opinion which is involved in this appeal.  If the order(s) or opinion(s) being appealed adopt, affirm, or otherwise refer to the report and recommendation of a magistrate judge or the decision of a bankruptcy judge, the report and recommendation or decision shall also be attached.

Opinion and Order Granting Motion to Dismiss and Dismissing Complaint with Prejudice, dated June 22, 2018

Provide a short statement of the factual and procedural background, which you consider important to this appeal:

GHI offered a health insurance plan to City of New York employees and retirees. GHI falsely marketed the plan as providing comprehensive out-of-network coverage while failing to disclose that reimbursement rates for virtually every out-of-network service would be just a fraction of the actual cost of that service, meaning that members were certain to incur enormous out-of-pocket costs if they used out-of-network providers. GHI also concealed its reimbursement schedule, which was based in large part on static rates for medical services set in 1983.

GHI's conduct caught the attention of the New York Attorney General, which investigated these unfair business practices and made findings of repeated violations of the law in an Assurance of Discontinuance GHI entered into in 2014. As the Attorney General recognizes and as this case alleges, GHI's conduct violated New York General Business Law Sections 349 and 350, which protect consumers from deceptive business practices and false advertising. This case also alleges that GHI's conduct violates New York Insurance Law Section 4226, which similarly imposes liability for insurers' deceptive advertising. This case also alleges that GHI has been unjustly enriched as a result of its misconduct.

Plaintiff and other City employees and retirees suffered damages as a result of GHI's misconduct. They directed the City to pay to GHI insurance premiums on their behalf, and also directly paid GHI for an (illusory) optional Rider that purported to cover more out-of-network costs than under the regular plan. They suffered additional financial consequences when GHI paid just a fraction of the costs incurred for out-of-network medical services.


Identify the issues to be raised on appeal:

The District Court erred in ruling that (1) the New York General Business Law claims fail to allege consumer-oriented conduct or material misrepresentations; (2) the New York Insurance Law claim fails to allege material misrepresentations; and (3) that the unjust enrichment claim should be precluded because its allegations are based on benefits pursuant to a contract. Because the District Court erred in ruling that Plavin's claims must be dismissed, it also erred in ruling that (4) the putative class action claims also fail.

The District Court also erred in summarily concluding that (5) no leave to amend should be granted because amendment would be futile.


This is to certify that this Concise Summary of the Case was electronically filed with the Clerk of the U.S. Court of Appeals for the Third Circuit and a copy hereof served to each party or their counsel of record

this _____ 19th day of _____ July ,20_____ 18 .


s/ William Christopher Carmody
_____
Signature of Counsel

Rev. 07/2015

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEVEN PLAVIN, on behalf of himself   :
and all others similarly situated,       :
                             :
        **Plaintiff,**            :
        v.                      :       **3:17-CV-1462**
                             :       **(JUDGE MARIANI)**
**GROUP HEALTH INCORPORATED,**   :
                             :
        **Defendant.**           :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

This case is a putative class action against Defendant Group Health Incorporated

("Group Health") brought by Plaintiff Steven Plavin, alleging unjust enrichment and

violations of New York's General Business Law and Insurance Law based on Group

Health's marketing statements about coverage benefits for its health insurance plan, which

was bargained for and sponsored by Plavin's employer, the City of New York. Group Health

moved for dismissal of the Complaint, arguing that all claims are time barred, and in the

alternative, that the General Business Law claims fail to allege consumer-oriented conduct

or material misrepresentations, that the Insurance Law claim fails to allege material

misrepresentations, and that the unjust enrichment claim should be precluded because it is

quasi-contractual, duplicative of other claims, and fails to adequately allege the requisite

elements. Doc. 31. For the reasons that follow, Defendant's motion will be granted.

1

Case 3:17-cv-01462-RDM   Document 55   Filed 06/22/18   Page 2 of 41

## II. FACTUAL ALLEGATIONS

Group Health is a not-for-profit corporation that offers health insurance plans to consumers through their employers. Doc. 1 ¶ 14. Plavin is a retired New York City police officer and a current resident of Pennsylvania. *Id.* ¶ 13. Prior to retirement, he was offered a choice of eleven health plans by his employer. *Id.* ¶¶ 19-20. Plavin enrolled in Group Health's preferred provider organization ("PPO") plan in 1984 and has chosen to re-enroll in the same plan since then. *Id.* ¶ 13. The Group Health plan did not require payment of out-of-pocket premiums from members, and it provided coverage for out-of-network services as well as in-network services. *Id.* ¶ 20. Plavin alleges that "[c]osts being equal, PPO plans are generally preferred by consumers because they provide coverage for services rendered by almost any provider, whether in-network or out-of-network." *Id.* Plavin alleges that "[b]y promoting itself as a PPO plan providing comprehensive in-network and out-of-network coverage that also did not require out-of-pocket premiums," the Group Health plan appeared to be an attractive plan to New York City employees, and as a result, the plan "had the highest enrollment of any health plan offered to NYC employees and retirees." *Id.* ¶ 25.

The open enrollment period for current New York City ("NYC") workers occurs every year, and the period for NYC retirees is every two years. *Id.* ¶ 21. Prior to open enrollment, New York City employees and retirees receive the NYC Summary Program Description, which includes a summary of each of the eleven plans offered, as drafted by the respective

2

insurers. *Id.* ¶ 22. Plavin alleges that the "Summary Program Description (the

"Description") is the only document distributed to NYC employees and retirees" prior to

enrollment. *Id.* ¶ 24. In addition to the Description, Group Health also offered a Summary

of Benefits & Coverage on its website. *Id.* ¶ 24. Besides these two documents,

"[p]rospective members were not provided with any certificate of insurance or schedule of

reimbursement rates, and such documents were not available on [Group Health's] (or its

parent EmblemHealth's) website." *Id.*

Plavin alleges that both the Description and the Summary of Benefits & Coverage

misled members by suggesting that it offered substantial reimbursement rates for out-of-

network services, and that there is only a "mere possibility that reimbursements might be

less than the actual fee charged by out-of-network providers." *Id.* ¶¶ 4-5. The materials

disclosed that reimbursements for out-of-network services would be made according to the

"NYC Non-Participating Provider Schedule of Allowable Charges" (the "Schedule"), which

states, in relevant part:

> The rate at which you will be reimbursed for particular service is contained
> within the Schedule. These reimbursement rates were originally based on
> 1983 procedure allowances and some have been increased periodically. *The
> reimbursement levels as provided by the Schedule may be less than the fee
> charged by the non-participating provider.* Please note that certain non-
> participating provider reimbursement levels may be increased if you have the
> optional rider. *The subscriber is responsible for any difference between the
> fee charged and the reimbursement as provided by the Schedule.* A copy of
> the Schedule is available for inspection at [Group Health].

Doc. 13-1 (Complaint Exhibit A) at 1 (emphasis added).  Plavin alleges that

"[n]othing in the two documents indicated that reimbursement rates for virtually every out-of-

network service would be a fraction of the actual cost of that service."  Doc. 1 ¶ 5.  The

Complaint concedes that the Description disclosed that reimbursement levels "may be less

than the fee charged by the [out-of-network] provider," but alleges that it was presented as

"a mere possibility—not a certainty—that members would be required to pay out-of-pocket

for out-of-service services."  *Id.* ¶ 31.  The Complaint further alleges that Group Health "did

not explain that the reimbursement rates were extraordinarily low when measured against

other reimbursement methodologies typically used by PPOs."  *Id.* ¶ 32.  In addition, Plavin

alleges that the Description's statements about the 1983 Schedule were misleading,

because "out of thousands of procedures and services listed [in the Schedule], only a tiny

number had been adjusted."  *Id.*  Finally, Plavin alleges that contrary to Group Health's

representations, the Schedule was never made available to its members.  *Id.* ¶ 7.

In addition to alleging misrepresentations regarding the reimbursement rates, Plavin

also alleges that Group Health misleadingly touted the plan's "Catastrophic Coverage"

feature.  The Complaint alleges that the feature is advertised as covering "100% of the

Catastrophic Allowed Charge as determined by [Group Health]" for out-of-network expenses

in excess of $1500.  *Id.* ¶ 6.  *Compare* Doc. 13-1 at 1 (Description describing Catastrophic

Coverage as follows: "If you choose non-participating providers for predominantly in-hospital

care and incur $1,500 or more in covered expenses[,] you are eligible for additional

4

Catastrophic Coverage"). However, Plavin alleges that the term "Catastrophic Allowed Charge" simply meant "the same thing as 'Allowed Charge' does," that is, it "provides for reimbursement of the exact same Allowed Amount set forth in the Schedule that [Group Health] was already required to pay regardless of whether the member was above or below the $1,500 'Catastrophic Coverage' threshold." *Id.* ¶ 10. Plavin claims that labeling the "Catastrophic Coverage" as a key benefit was misleading, because it "provides for reimbursement of the exact same Allowed Amount set forth in the Schedule that [Group Health] was already required to pay regardless of whether the member was above or below the $1,500 'Catastrophic Coverage' threshold"; in other words, it "added literally nothing to the basic coverage." *Id.*

The Complaint also alleges that there were misleading examples set forth in the Summary of Benefits & Coverage, which was made available on Group Health's website, including examples of out-of-network procedures that required "0% co-insurance" and a hypothetical illustrating how coverage might be calculated. *Id.* ¶¶ 31-32. Plavin alleges that the coverage calculation hypothetical was misleading because it showed a 66% reimbursement rate, while the actual "[r]eimbursement rates across all services averaged roughly 23% of actual cost ... [and] for some types of services, reimbursement rates were as low as 9% of actual cost" *Id.* ¶ 19. Finally, the Complaint takes issue with the optional rider, which was offered for an additional fee under the plan, under which reimbursement rates would be based on an "enhanced schedule for certain services [that] increases the

5

reimbursement of the basic program's non-participating provider fee schedule, on average, by 75%." *Id.* ¶ 7. Plavin has purchased the optional rider since he became a member of the Group Health plan in 1984. *Id.* ¶¶ 13, 41. He alleges that Group Health failed to disclose that the rider only applied to in-patient services, not out-patient services, when the latter category accounted for "65% of total out-of-network charges." *Id.* ¶ 11.

Most of the Complaint's misrepresentation allegations are based on a settlement agreement arising out of the New York Attorney General's investigation, i.e. an Assurance of Discontinuance. According to the Complaint, the Attorney General's Office found that Group Health failed to "accurately describe limitations of out-of-network reimbursement" rates, misrepresented "the frequency with which the Schedule was updated," failed to "sufficiently describe the circumstances by which members unknowingly encounter out-of-network providers," and failed "to make the Schedule available to members." *Id.* ¶ 39. The Complaint also alleges that the Attorney General found that Group Health's materials "do not accurately set forth the potentially wide gap between the out-of-network reimbursement and out-of-network charges, and potentially substantial out-of-pocket amounts for which [Group Health] Plan members will be responsible," and that "it was deceptive for [Group Health] to merely suggest that it is only a possibility that members will be required to pay for out of network services." *Id.* ¶ 9.

With respect to Plavin's personal injuries, the Complaint alleges that he submitted four out-of-network medical services received by his wife from February 2013 to July 2014.

6

*Id.* ¶ 41. For a July 2014 procedure, Group Health "did not pay Mr. Plavin until February 2015," when it "ultimately paid just $32" for a medical treatment billed at $98. *Id.* Plavin does not allege when the other three procedures were ultimately reimbursed. Based on these four concrete injuries, Plavin brings claims against Group Health for unjust enrichment (Count I), violations of New York's General Business Law ("GBL") §§ 349 and 350 (Counts II and III), and New York Insurance Law § 4226 (Count IV). Plavin filed this action on behalf of himself and "[a]ll persons who were members of Group Health Incorporated's Comprehensive Benefit Plan from 2011 to 2015." *Id.* ¶ 42. On October 6, 2017, Group Health filed a motion to dismiss all claims, arguing that all the claims are time barred, and that in the alternative, Plavin failed to state a claim as to all causes of action. Doc. 31-1.

## III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations,

alterations, and quotations marks omitted). A court "take[s] as true all the factual allegations

in the Complaint and the reasonable inferences that can be drawn from those facts, but . . .

disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707

F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted).

Thus, "the presumption of truth attaches only to those allegations for which there is

sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President

of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S.

at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same

presumption." *Id.*

      "Although the plausibility standard 'does not impose a probability requirement,' it

does require a pleading to show 'more than a sheer possibility that a defendant has acted

unlawfully.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal

citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal,* 556 U.S. at

678). "The plausibility determination is 'a context-specific task that requires the reviewing

court to draw on its judicial experience and common sense.'" *Id.* at 786-87 (quoting

*Iqbal,* 556 U.S. 679).

## IV. ANALYSIS

### A. Plavin's GBL Claims Are Not Conclusively Time-Barred

Group Health argues that all of Plavin's claims are time-barred because they

"accrued when he first subscribed to the [Group Health] plan in 1984." Doc. 31-1 at 10. .

Doc. 31-1 at 9-14. Alternatively, Group Health argues that the claims could have accrued in

2004, when Plavin first started submitting claims for out-of-network services, "which put him

on additional notice of the obvious fact that reimbursement rates under the [Group Health]

Plan were a 'fraction' of the providers' bills for those services." *Id.* at 14. In support, Group

Health attached an affidavit from a company representative to its motion, which avers that

"[s]ince May of 2004, individuals under Mr. Plavin's plan [i.e. Plavin and his family members]

have submitted hundreds of claims for out-of-network services for which they have received

reimbursement." Doc. 31-3 ¶ 6. Group Health contends that the Court may consider the

affidavit because it is "integral to or explicitly replied upon in the complaint," citing to a case

involving a motion for judgment on the pleadings. *See* Doc. 31-1 at 14 (citing *Yatsonsky v.

State Farm Fire & Cas. Co.*, 2016 WL 1660863, at *4 (M.D. Pa. Apr. 27, 2016)).

However, the instant motion is a motion to dismiss, not one for judgment on the

pleadings. It is well established that "[a]s a general matter, a district court ruling on a motion

to dismiss may not consider matters extraneous to the pleadings" unless they are "integral

to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114

F.3d 1410, 1426 (3d Cir. 1997). Plavin's alleged injuries arise from four medical claims

9

submitted by him in 2013 and 2014. The Complaint makes no references to any claims Plavin submitted in 2004. Furthermore, the type of assertions contained in the affidavit—details regarding the Plaintiff's medical claims and whether or how much he was reimbursed—is exactly the type of subject matter that should properly be explored during discovery. The document is therefore neither integral to nor explicitly relied upon in the Complaint. Thus, the Court will not consider when Plavin first started submitting out-of-network claims to Group Health based on the extraneous affidavit. Instead, for statute of limitations purposes, the proper inquiry before the Court is whether Plavin's claims accrued in 1984, when he first enrolled in the Group Health policy, i.e. 1984, or in or after 2014, when he submitted specific claims to Group Health and received lower reimbursement rates than expected. On the face of the Complaint, Plavin alleged four specific instances of claim submissions, only one of which may be timely—he alleges that pursuant to a medical claim he submitted for a July 2014 procedure, he was not reimbursed by Group Health until February 2015, which would be within three years of August 2017, when the instant suit was filed. Doc. 1 ¶ 41.

The statute of limitations for GBL claims is three years. *Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 210 (2001); *see also Gristede's Foods, Inc. v. Unkechauge Nation*, 532 F. Supp.2d 439, 452 (E.D.N.Y.2007) ("Since *Gaidon* [], New York courts have uniformly applied a three-year statute of limitations to section 349 and section 350 [of the GBL] cases."). While the accrual of GBL claims "is not dependent upon any date when

10

discovery of the alleged deceptive practice is said to occur," it is dependent on "when a plaintiff is *injured* by the actions alleged to have violated the Statute." *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 461 (S.D.N.Y. 2014) (internal citations omitted). Pursuant to *Gaidon*, the seminal New York Court of Appeals case on this issue, accrual of GBL claims' statute of limitations "first occurs when plaintiff has been injured by a deceptive act or practice violating section 349 [of the GBL]." *Id.* at 210. Plavin argues that even though he enrolled in the same Group Health policy year after year since 1984, his claim did not accrue until his "expectations were actually not met" because the suit involves allegations "that a defendant deceptively marketed a benefit so as to give a consumer false expectations." Doc. 41 at 9 (quoting *Enzinna v. D'Youville College*, 922 N.Y.S.2d 729, 730 (N.Y. App. Div. 2011)). Plavin argues that in one of the four claim submissions specifically pled in the Complaint, his expectations were not met until he was informed of the reimbursement rate of his claim until February 2015, and "that is when he suffered injury under the GBL." *Id.* at 11.

In *Gaidon*, the Court of Appeals stated that where "the gravamen of the complaints of General Business Law § 349 violations was not false guarantees of policy terms, but deceptive practices inducing unrealistic expectations ... plaintiffs suffered no measurable damage until the point in time when those expectations were actually not met." *Gaidon*, 96 N.Y.2d at 211-12. *Gaidon* dealt with a particular type of insurance contracts: so-called "vanishing premiums," which were advertised as policies that, after a certain period of time,

11

would no longer require premium payments because the policy's "continuing interest/
dividend rate performance [would] fully offset premiums at the projected date." *Id.* at 211.
The *Gaidon* court held that because the plaintiffs' claims were not premised on any false
statements apparent in the policies themselves, but on "deceptive practices inducing
unrealistic expectations" about the plan's benefits, they did not suffer injury until "they were
*first called upon* to pay additional premiums beyond the date by which they were led to
believe that policy dividends would be sufficient to cover all premium costs." *Id.*

Based on the distinction delineated by *Gaidon*, Plavin's claims cannot be defeated
on statute of limitations grounds because he does not allege a "false guarantee of policy
terms," but rather, that Group Health created "unrealistic expectations" regarding the
benefits of its reimbursement coverage of out-of-network expenses.  Viewing the facts in a
light most favorable to the Plavin, the Complaint does not allege any false statements in the
policy itself.  In fact, the Complaint alleges that Plavin never received a copy of the policy.
Doc. 1 ¶¶ 7, 24.  Rather, the "gravamen" of Plavin's claims is that he was provided with
misleading marketing statements by Group Health, which, while not false on their face,
nevertheless induced him into believing that reimbursement levels for out-of-network claims
would be higher than the ones he ultimately received. *See, e.g., id.* ¶¶ 31, 32 (alleging that
while the Description stated that "[t]he reimbursement levels, as provided by the Schedule,
*may* be less than the fee charged by the non-participating provider," it "did not explain that
the reimbursement rates were extraordinarily low when measured against other

12

reimbursement methodologies typically used by PPOs"); *id.* ¶¶ 5, 7, 32 (alleging that the

Description stated the Schedule would be "updated periodically" when in fact it "had been

left virtually untouched since1983" and that "that, out of thousands of procedures and

services listed therein, only a tiny number had been adjusted [since 1983]").

   To be sure, this case presents more nebulous allegations than those found in

*Gaidon*. In the case of "vanishing premium" policies, plaintiffs are injured at the specified

time when the premiums would allegedly "vanish" but did not. Here, the alleged deception

only induced general expectations about the policy's overall reimbursement benefits. Thus,

rather than being associated with a "date certain", Plavin's expectations would neither be

confirmed or disavowed until he submits an out-of-network claim for reimbursement, for

which he receives less coverage than he expected. However, this case is more analogous

to cases involving the "induc[ement of] unrealistic expectations" rather than cases involving

"false guarantees of policy terms," especially since no policy terms have been alleged to be

demonstrably false on their face. *Gaidon*, 96 N.Y.2d at 211-12. Thus, Plavin's claim did not

accrue on the date he enrolled in the plan because he is not alleging facially misleading

statements from Group Health, but rather, misrepresentations about the nature and scope

of the benefits that he would receive if and when he decides to submit an out-of-network

claim.

   Group Health relies heavily on *Schandler v. New York Life Ins. Co.*, 2011 WL

1642574 (S.D.N.Y. Apr. 26, 2011). But *Schandler*, unlike here, concerned false statements

13

on the face of the policy. There, the promotional materials explicitly promised that the plan

would provide "convalescent care and home health care available to you and your spouse

*regardless of your age*," when in fact, the plan "did not provide broad convalescent facility

benefits' regardless of age and specifically, the Plan restricted nursing home benefits based

on the insured's age." *Id.* at *2, *4 (emphasis added). The plaintiff in *Schandler* further

alleged that the policy "was delivered to her" and that it "'*expressly* contradicted'

Defendants' marketing claims." *Id.* (emphasis added). Based on the allegations, the court

found that "the gravamen of Schandler's complaint is that she was falsely promised certain

policy terms and thus, Schandler's injury occurred when she was delivered a policy without

these terms." *Id. See also Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 461

(S.D.N.Y. 2014) (holding that plaintiff's GBL claim accrued at the time he purchased the

vehicle with allegedly defective brake systems, because "Defendant's misrepresentations or

omissions were about the *nature of the product itself*, rather than a benefit from purchasing

the product separate from the product's inherent function") (emphasis added).

Here, to the contrary, Plavin does not allege that he was delivered a policy that

contradicted Group Health's marketing claims. Indeed, he claims to have never received

the policy. Doc. 1 ¶ 7. Furthermore, Plavin presumably received marketing statements

from Group Health since he first enrolled in the policy in 1984, but he would not have been

able to learn that Group Health's out-of-network coverage was not as comprehensive as he

had expected until he submitted out-of-network claims. The Complaint alleges that the

14

marketing materials suggested that there was only "a mere possibility that members would be subject to reimbursement shortfalls for out-of-network services," when in reality, "it was a virtual certainty that reimbursements would be *dramatically less* than the actual fees charged by out-of-network providers *in all cases.*" *Id.* ¶ 9 (emphasis added). Thus, the marketing materials are not alleged to contain any express falsities—in fact, the Description is undoubtedly correct in its statement that reimbursement levels "may be less than the fee charged by the non-participating provider." Doc. 13-1 at 1. Rather, Plavin alleges that the marketing materials, though notionally correct, created unrealistic expectations as to what the out-of-network coverage may entail.

Putting aside the contents of Group Health's extraneous affidavit, it is not apparent on the face of the Complaint when—or how many times—Plavin was forced to pay substantial out-of-pocket amounts to make up for the Group Health plan's reimbursement shortfalls. As stated above, only *one* of the four claim submissions specifically pled in the Complaint included the time when Group Health ultimately reimbursed Plavin. Coincidentally, the time of reimbursement for that claim would fall just within the statute of limitations period. *See id.* ¶ 41 (alleging that for a $98 procedure, Group Health "did not pay Mr. Plavin until February 2015," when it "ultimately paid just $32"). At least with respect to this procedure, it is plausible that Plavin could not have known that his expectations about out-of-network reimbursements were unrealistic until Group Health reimbursed his claim. Following *Gaidon*, courts have held that plaintiffs' injuries occur when defendants'

15

representations "proved false," that is, when plaintiffs were first called upon to do something

contrary to their expectations, not when "plaintiffs *could have known* defendants'

representations might have been false," that is, when they first received the representations

from defendants. *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 2007 WL

1601491, at *15 (S.D.N.Y. June 4, 2007) (holding that "plaintiffs here were injured for

purposes of section 349 [of the GBL] when they learned—contrary to defendants'

representations—that [a gasoline additive] was present in their wells at a level plaintiffs

knew or should have known was hazardous"), *reconsideration granted on other grds. See

also Enzinna*, 922 N.Y.S.2d at 730 (holding that "plaintiffs were not injured when they

initially enrolled in defendant's Doctor of Chiropractic program and began paying tuition.

Rather, the injury occurred when plaintiffs graduated and allegedly learned that their

degrees did not render them 'eligible for licensure examination in all states,' as stated in

defendant's promotional catalog").

　　　The Court maintains reservations that the February 2015 reimbursement would have

been the first time Plavin learned that his expectations regarding reimbursement levels were

not met. Nevertheless, it is the *only* claim for which the Complaint not only pleaded when

claim was first submitted, but also when it was ultimately reimbursed by Group Health. On

this allegation, it is plausible that Plavin first learned that the plan's out-of-network coverage

would be less than he had expected in February 2015. Thus, the Complaint has plausibly

pleaded a timely GBL claim.[1]

## B. While Timely, the GBL Claims Fail to Allege Consumer-Oriented Conduct.

However, while timely, the Complaint has not adequately pled consumer-oriented

conduct by Group Health. Thus, Plavin has failed to plead a claim under Sections 349 and

350 of the GBL. Section 349 of the GBL prohibits "[d]eceptive acts or practices in the

conduct of any business, trade or commerce or in the furnishing of any service in this state."

N.Y. G.B.L. § 349. Similarly, Section 350 provides that "[f]alse advertising in the conduct of

any business, trade or commerce or in the furnishing of any service in this state is hereby

declared unlawful." N.Y. G.B.L. § 350. "The Second Circuit has applied the same

interpretation to section 350 [as section 349]. Indeed, courts have noted that the standards

under both sections are substantively identical." *Gristede's Foods, Inc. v. Unkechauge*

*Nation*, 532 F. Supp. 2d 439, 450–51 (E.D.N.Y. 2007) (internal citation omitted). *See also*

*Goshen v. Mut. Life Ins. Co. of New York*, 98 N.Y.2d 314, 324 (2002) ("The standard for

recovery under General Business Law § 350, while specific to false advertising, is otherwise

identical to section 349.").

---

[1] Group Health argues that the New York Insurance Law § 4226 claim is similarly time-barred
under the theory that Plavin's injury accrued in 1984. For the same reasons discussed above, Plavin's
injury did not necessarily arise when he first enrolled in the plan, but rather, when his expectations based
on the marketing materials' representations were not met. *Compare Russo v. Mass. Mut. Life Ins. Co.*, 711
N.Y.S.2d 254, 255–56 (N.Y. App. Div. 2000) (a pre-*Gaidon* case holding that limitations period accrued at
time of plaintiff received the policy for both GBL and Insurance Law § 4226 claims), *with Gaidon* (reversing
*Russo's* accrual analysis and holding that the limitations period only began to accrue when plaintiffs'
unrealistic expectations were not met). Though *Gaidon* only addressed the GBL claims, it was because
they were the only claims remaining on appeal. Thus, it is reasonably inferred from *Gaidon* that its accrual
analysis would apply with equal force to Insurance Law § 4226 claims.

In order to assert a claim under the GBL, "'a plaintiff must allege that a defendant

has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3)

plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" *Hu v. Herr*

*Foods, Inc.*, 251 F. Supp. 3d 813, 819 (E.D. Pa. 2017) (quoting *Orlander v. Staples, Inc.*,

802 F.3d 289, 300 (2d Cir. 2015)). The element of "consumer-oriented conduct" aims to

reflect the original purpose of GBL, which "is directed at wrongs against the consuming

public." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85

N.Y.2d 20, 24 (1995). A plaintiff "need not show that the defendant committed the

complained-of acts repeatedly...but instead must demonstrate that the acts or practices

have a *broader impact on consumers at large*." *Id.* at 25 (emphasis added). "Private

contract disputes, unique to the parties, for example, would not fall within the ambit of the

statute." *Id.*

Here, the alleged deception arises out of a private contract negotiated between

Group Health, a health insurance company, and the City of New York, Plavin's former

employer. Doc. 1 ¶ 2. Group Health's benefits plan was "one of 11 health plans that New

York City offers to its 600,000 employees and retirees." *Id.* Plavin cites the sheer number

of employees affected as support for his argument that the conduct is "consumer-oriented."

Doc. 41 at 15 ("[Group Health's] practice of misrepresenting the benefits of its health plan to

hundreds of thousands of City employees and retirees indisputably has a broad impact on

the public interest in New York.") (internal quotation marks omitted). But the fact that a

large class of members is affected does not automatically transform the plan into something

that has "a broader impact on consumers at large." *Oswego*, 85 N.Y.2d at 25.  Plavin was

only able to receive the benefits of Group Health's plan by virtue of being an employee of

the City of the New York, which bargained with Group Health on behalf of its employees—

and *only* its employees—on the terms of employee benefit plans.  Indeed, the fact that the

City had a large number of employees only suggests that the City would have been a

powerful party in negotiations with insurance companies such as Group Health.  Though

Plavin himself was not a party to the contract at issue, he was a third-party beneficiary of a

contract between two sophisticated institutions in this case, not a mere consumer of the

public.  In *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308 (1995), the Court of Appeals

distinguished between such a sophisticated contractual policy and generic transactions that

provide standard services "supplied to the consuming public at large, and in which the

parties occupied disparate bargaining positions":

> The case before us involves complex insurance coverage and proof of loss in
> which each side was knowledgeable and received expert representation and
> advice…Although relief under the statute is not necessarily foreclosed by the
> fact that the transaction involved an insurance policy, this was not the
> 'modest' type of transaction the statute was primarily intended to reach.  It is
> essentially a 'private' contract dispute over policy coverage and the
> processing of a claim which is unique to these parties, not conduct which
> affects the consuming public at large.

*Id.* at 321 (internal citations omitted).  *Cf. Oswego*, 85 N.Y.2d at 26 (finding

consumer-oriented conduct when "defendant Bank dealt with plaintiffs' representative *as

any customer entering the bank* to open a savings account, furnishing the Funds with

19

standard documents presented to customers upon the opening of accounts") (emphasis added).

It is true that the plaintiff in *New York University* happened to be party to the contract at issue, whereas here, there is the added wrinkle that Plavin was not a direct party to the policy, but rather, an intended beneficiary while the City of New York contracted with Group Health on his behalf.  The contract was aimed to benefit only a circumscribed class of individuals.  *See* Doc. 1 ¶¶ 19, 26 (alleging that "[i]ndividuals and their families are eligible for this City-sponsored health insurance based *solely* on their employment with the City," and that "[t]he insurance at issue was and is issued *exclusively* to NYC employees and retirees pursuant to contracts with the City") (emphasis added).  Put another way, a member of the public cannot approach Group Health and gain membership in the same plan that Plavin received.  Indeed, according to the NYC Administrative Code, public employers of New York City *must* negotiate the terms of their employees' wages and benefits with employees' unions.  *See* New York City Code § 12-307(a) ("public employers and certified or designated employee organizations *shall* have the duty to bargain in good faith on wages (including but not limited to wage rates, pensions, *health and welfare benefits,* uniform allowances and shift premiums), hours (including but not limited to overtime and time and leave benefits), [and] working conditions…") (emphasis added).  This provision would obligate the City to bargain in good faith to attempt to reach an agreement with employees' unions on wages and health benefits, which occurred here, as manifested by the City's

20

making available 11 different health plans for selection by its employees and retirees. *See*

Doc. 1 ¶¶ 2, 20. Thus, the Group Health plan cannot have been intended to be available to

the public at large, because it is an exclusive plan that is the product of negotiations

between the City and Group Health covering only City employees, retirees, and their eligible

dependents.

Plavin cites several insurance cases that hold to the contrary, but all of those cases

involved insurance policies that were offered directly to the public generally. *See Wilner v.*

*Allstate Ins. Co.*, 893 N.Y.S.2d 208, 216 (2010) (finding consumer-oriented conduct when

plaintiffs alleged that the provision at issue "is not unique to the plaintiffs, but is contained in

every Allstate Deluxe Plus Homeowners' Policy," which was available to purchase for all

members of the public); *Riordan v. Nationwide Mut. Fire Ins. Co.*, 756 F. Supp. 732, 739

(S.D.N.Y. 1990) (finding that a homeowners policy plaintiffs purchased directly from

Nationwide, which was offered to the public, may be subject to a GBL claim, and noting that

the allegations involve "the services Nationwide provides to the public on a grand scale");

*Icahn Sch. of Med. at Mount Sinai v. Health Care Serv. Corp.*, 234 F. Supp. 3d 580, 586–87

(S.D.N.Y. 2017) (finding consumer-oriented conduct when plaintiff-hospital, which was not

in a contractual relationship with defendant-insurer, pleaded that it passed on defendant's

alleged misrepresentations to all patients insured under defendant's health plans "so that

patients could consider this [payment] information in determining whether to proceed with

treatment").

21

Plavin also relies on *Krahling v. Merck & Co.*, 44 F. Supp. 3d 581 (E.D. Pa. 2014), a case that does not concern insurance policies, for the proposition that Group Health's alleged misrepresentations "to hundreds of thousands of City employees and retirees indisputably has a 'broad impact' on the 'public interest' in New York." Doc. 41 at 15 (quoting *Krahling*, 44 F. Supp. 3d at 605). However, *Krahling* illustrates precisely why Plavin's allegations do not fall within the ambit of conduct directed to the "public at large." *Krahling* was a qui tam action in which a vaccine manufacturer was alleged to have misled the government regarding the efficacy of its mumps vaccine. Significantly, it was "the sole manufacturer licensed by the FDA to sell Mumps Vaccine…in the United States." *Krahling*, 44 F. Supp. 3d at 587. In holding that such fraudulent conduct to be consumer-oriented, the court noted that defendant allegedly made false representations to both public consumers and government agencies, and "[t]he fact that the deception concerns a matter of public health—the state's ability to protect against Mumps outbreaks—further magnifies New York's interest." *Id.* at 605. Unlike a vital vaccine that is provided to almost all children of the nation,[2] the Group Health plan in this case was the result of a privately bargained-for contract negotiated not for the benefit of the public at large, but only for a certain class of individuals. Because there is no indication in the Complaint that the plan would have been available to anyone who was not an employee of the City of New York, and because it is

---

[2] *See* Centers for Disease Control and Prevention, MEASLES, MUMPS, AND RUBELLA (MMR) VACCINATION ("All 50 states and the District of Columbia (DC) have state laws that require children entering childcare or public schools to have certain vaccinations."), available at https://www.cdc.gov/vaccines/vpd/mmr/public/index.html (last visited June 7, 2018).

undisputed that Plavin's receipt of benefits from Group Health arises from a contractual

policy, Plavin's GBL claims fail to plead consumer-oriented conduct. *See, e.g., Sichel v.*

*Unum Provident Corp.*, 230 F. Supp. 2d 325, 330 (S.D.N.Y. 2002) (finding that plaintiff failed

to allege consumer-oriented conduct when the case was "essentially a private contract

dispute over policy coverage and the processing of a claim," and noting that the "Complaint

does not include any facts tending to establish a national policy, or an extensive scheme

that had a broad impact on consumers at large") (internal citations omitted).

### C. The GBL Claims Separately Fail to Allege Materially Misleading Statements

Not only has the Complaint failed to allege consumer-oriented conduct, but it has

also failed to allege a material deception actionable under the GBL. As stated above, the

second and third elements of a GBL claim requires a showing that the defendant's

statements were "materially misleading" and that "plaintiff suffered injury as a result of the

allegedly deceptive act or practice." *Hu*, 251 F. Supp. 3d at 819. Whether a statement is

misleading within the definition GBL § 349 is an "objective" standard, under which the

statement must be "likely to mislead a reasonable consumer acting reasonably under the

circumstances." *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007)

(quoting *Oswego*, 85 N.Y.2d at 26). "There can be no claim for deceptive acts or practices,

however, when the alleged deceptive practice was fully disclosed." *Chiste v. Hotels.com*

*L.P.*, 756 F. Supp. 2d 382, 404 (S.D.N.Y. 2010) (quoting *Watts v. Jackson Hewitt Tax Serv.*

*Inc.*, 579 F.Supp.2d 334, 346 (E.D.N.Y.2008)).

23

Plavin alleges four categories of misleading statements by Group Health: (1) that the

Description did not adequately explain that out-of-network reimbursements levels would

only be at "a fraction of actual costs"; (2) that the examples used in the Summary of Benefits

& Coverage to illustrate coverage calculation showed a higher reimbursement rate than the

plan's actual average reimbursement rates; (3) that the Catastrophic Coverage featured in

the plan was meaningless because it purported to provide coverage that Group Health "had

already agreed to reimburse"; and (4) that the optional rider did not significantly increase

reimbursement rates. *See* Doc. 1 *generally*.

Many of these allegations are virtually the same as those found in the New York

Attorney General Office's 2014 Assurance of Discontinuance with Group Health.  At the

outset, the Court notes that the objective standard of "a reasonable consumer acting

reasonably under the circumstances" cannot be equated to the consumer that the Attorney

General is charged to protect.  *See People ex rel. Spitzer v. Applied Card Sys., Inc.*, 27

A.D.3d 104, 106 (N.Y. App. Div. 2005) (noting that New York Executive Law provision

empowering the Attorney General to investigate deceptive business conduct "was meant to

protect not only the average consumer, but also 'the ignorant, the unthinking and the

credulous'") (quoting *People v General Elec. Co.*, 302 A.D.2d 314, 314 (N.Y. App. Div.

2003)).  Additionally, over-reliance on the Assurance of Discontinuance would be imprudent

given that it specifically states that Group Health "neither admits nor denies the [Attorney

General's] findings." Doc. 31-4 at 9.[3]

Applying the proper standard to the allegations, the reasonable consumer would not have been materially misled by Group Health's statements about out-of-network coverage. While Plavin bemoans that out-of-network reimbursement rates were "a fraction of actual costs" and averaged only "23% of actual costs[s]" for out-of-network services (Doc. 1 ¶ 29), the marketing materials never purported to state *how much* reimbursement the insured would receive, or even provided a general range of reimbursement rates for the reader. Instead, the Description states that "[t]he reimbursement levels…may be less than the fee charged by the nonparticipating provider" and that "[t]he subscriber is responsible for any difference between the fee charged and the reimbursement." Doc. 13-1 at 1.

Thus, Plavin does not allege any *explicit* misrepresentations so much as complain that the marketing materials should have contained more information about out-of-network coverage. *See, e.g.,* Doc. 1 ¶ 39 (alleging that Group Health did not "*sufficiently describe the circumstances by which members unknowingly encounter out-of-network providers*") (emphasis added). Plavin stresses the fact that the Schedule, on which out-of-network reimbursement rates would be based, was "left virtually untouched since 1983" even though it was advertised as "updated periodically." *Id.* ¶¶ 5, 7. However, this characterization does

---

[3] Unlike Group Health's attached affidavit from a company representative, the Assurance of Discontinuance is explicitly relied upon and quoted extensively by the Complaint, especially with respect to the alleged misrepresentations at the core of Plaintiffs' claims. *See, e.g.,* Doc. 1 ¶¶ 1, 3, 39-40. Thus, the Assurance may be properly considered by the Court at this stage of proceedings. *In re Burlington Coat Factory,* 114 F.3d at 1426 (the problem "raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated '[w]here plaintiff has actual notice ... and has relied upon these documents in framing the complaint.'") (quoting *Watterson v. Page,* 987 F.2d 1, 3–4 (1st Cir.1993)).

not accurately reflect the actual text of the Description, which disclosed that "[t]he rate at
which you will be reimbursed for a particular service is contained within the Schedule.
These reimbursement rates were originally based on 1983 procedure allowances and *some*
have been increased periodically." Doc. 13-1 at 1. Thus, the Description clearly states that
reimbursement rates would be based on "1983 procedure allowances" and that only some,
not all, procedure rates would be increased. Tellingly, the Complaint never alleges what
Plavin *personally expected* the reimbursement rates to be, but only laments that the plan
covered "a fraction of actual costs of services." Doc. 1 ¶ 29. *See Weinstein v. eBay, Inc.*,
819 F. Supp. 2d 219, 228 (S.D.N.Y. 2011) (dismissing GBL claim and noting that "[t]ellingly,
Plaintiff does not allege that she *personally believed* she was purchasing tickets directly
from the Yankees online box office or that she did not understand that Stubhub [a resale
website] is an online marketplace for the resale of tickets by other fans") (emphasis added).
Reading between the lines of the Complaint, it appears that Plavin personally expected that
Group Health to cover a substantial amount (if not all) of out-of-network expenses on a PPO
plan for which he paid zero dollars in out-of-pocket premiums since he first enrolled in 1984.
*Id.* ¶ 2.

First, the Court notes that this is an unreasonable assumption. No reasonable
consumer would have assumed that a PPO plan, which provided coverage for both in-
network and out-of-network services, yet did not require any out-of-pocket premiums from
members, would be so generous as to provide substantial coverage for out-of-network

expenses without more explicit language to that effect.  According to the Complaint,

prospective members did not choose the Group Health plan primarily due to promises of

substantial or total reimbursement of out-of-network claims, but because it was "one of only

two PPO plans offered and the only one of those [two PPO plans] that did not require out-of-

pocket premiums."  Doc. 1 ¶ 20; *see also id.* ¶ 25 (alleging that the plan "had the highest

enrollment of any health plan offered to NYC employees and retirees" because of these

benefits).  More to the point, such an assumption is not a reasonable interpretation of the

Description's actual statements, which disclosed that reimbursement levels "may be less

than the fee charged by the non-participating provider"; that they would be pegged to

procedure allowances from more than thirty years ago; and that only "some [of the

allowances] have been increased periodically."[4]  Doc. 13-1 at 1.

Next, the Complaint takes issue with the fact that some examples in the Summary of

Benefits & Coverage listed specific medical events that require "0% co-insurance" for non-

participating providers, and the fact that the hypothetical calculation example in the

Summary illustration how coverage would be calculated showed "a 66% reimbursement,"

---

[4] The Complaint also alleges that Group Health "lied to members and prospective members in stating that the Schedule was available for inspection at [Group Health's] offices and further denied access when requested via email and phone."  Doc. 1 ¶ 27.  This allegation appears to be wholly lifted from Assurance of Discontinuance.  *See* Doc. 31-4 at 4.  Notably, the Complaint does not allege anywhere that Plavin *personally* sought to inspect the Schedule, nor does it allege anything Plavin would have done differently (or what other members would have done differently, for that matter) if the Schedule had been available.  In any event, the unavailability of the Schedule is not central to Plavin's GBL claims, which chiefly complains of the fact that Group Health unduly suggested that its plan offered higher levels of reimbursement rates despite never promising or otherwise referring to a specific range of reimbursement rates in its marketing materials.

when in practice, "the average reimbursement was 23%." Doc. 1 ¶ 32. The Court cannot

countenance such a twisted reading of the Summary. These "0% co-insurance" examples

are displayed in a table showing certain select medical procedures detailing how much

costs are incurred by members for both participating providers (in network providers) and

non-participating providers (out-of-network providers). In fact, the Complaint fails to

mention that a majority of the treatment examples are either listed as "not covered," or as

"20% co-insurance [needed]," or listed the various co-pay or deductible requirements for

non-participating providers. Doc. 13-2 at 10-12. Indeed, only a fraction of the treatment

examples list "0% co-insurance". Nowhere does the Summary state that *all* out-of-network

medical procedures would require 0% co-insurance. In fact, such a belief would be

demonstrably baseless, as the table contains many example treatments that are either not

covered or require additional out-of-pocket payment.

Further, the calculation example in the Summary (showing a 66% reimbursement

rate) cannot be imputed to the actual average cost of out-of-network expenses across the

spectrum of all potential services. It is clearly a hypothetical designed to illustrate how

coverage may be calculated. Doc. 1¶ 32 (alleging the example was misleading because it

states: "For example, if an out-of-network hospital charges $1,500 for an overnight stay and

the allowed amount is $1,000, you may have to pay the $500 difference" and alleging that

the "decision to use a single example showing a 66% reimbursement when the average

reimbursement was 23% was deceptive and misleading"). No reasonable person would

read this theoretical example about an overnight stay in a hospital to mean that the actual

reimbursement rates for all medical services would average to around 66%.

In addition, along the side of coverage examples, the Summary states in bold "**This

is not a cost estimator.**" Doc. 13-2 at 7, 15 (emphasis in original). On the following page,

titled "Questions and answers about the Coverage Examples," the questions "Does the

Coverage Example predict my own care needs?" and "Does the Coverage Example Predict

my future expenses?" appear at the center of the page. *Id.* at 16. Both are answered by a

resounding "**No.**" stated in bold and underlined, followed by explanations that "[t]treatments

shown are just examples" that that "Coverage Examples are **not** cost estimators,"

respectively. *Id.* (emphasis in original). A reasonable prospective member would not

extrapolate from these statements the idea that the coverage examples reflected actual

average reimbursements costs across all medical expenses.

Similarly, the allegations regarding the optional rider do not amount to materially

misleading statements. The Complaint alleges that Group Health should have disclosed

that the optional rider "applied only to in-patient out-of-network services, not out-patient

services." Doc. 1 ¶ 37. However, the Description already disclosed that "*certain* non-

participating provider reimbursement levels may be increased if you have the optional rider"

and that the rider provides coverage based on an "[e]nhanced schedule for *certain services*

[which] increases the reimbursement of the basic program's non-participating provider fee

schedule, on average, by 75%." Doc. 1 ¶ 36 (emphasis added). Inherent in these

29

statements is the caveat that only certain services, not all services, would increase
reimbursement levels for out-of-network expenses.

As for the allegations regarding Catastrophic Coverage, the Complaint chastises
Group Health for not disclosing the fact that it "added literally nothing to the basic coverage,
despite being one of six key benefits highlighted on the Summary Program Description."
Doc. 1 ¶ 10; *see also id.* ¶ 34 (alleging that "[t]here was nothing 'additional' about this
coverage and it did not provide any protection against catastrophic situations"). This
allegation is unavailing. The Description does not hold out "Catastrophic Coverage" as
conferring *additional* benefits to the plan. It is, as the Complaint concedes, an integral
feature of the plan itself. Furthermore, the Description states that "Catastrophic Coverage"
is only applicable to expenses over $1,500 for "non-participating providers for predominantly
in-hospital care," which is a narrowly defined category of expenses. Doc. 13-1 at 1. The
Complaint fails to demonstrate how this fairly narrow feature could "confuse NYC
employees and retirees, induce them to select the [Group Health] Plan, and cause them to
incur substantial out-of-pocket costs that [Group Health] led them to believe they were
protected against." Doc. 1 ¶ 35.

In sum, the Complaint has not plausibly alleged how the statements from the
Description and the Summary would be *materially* misleading to the reasonable prospective
member choosing among the eleven plans offered by the City of New York. *Id.* ¶ 2. "The
mere fact that an insurer may make a misleading representation does not require or even

30

lead to the necessary conclusion that the misleading representation is material or even
likely to cause harm." *Ross v. AXA Equitable Life Ins. Co.*, 680 F. App'x 41, 45 (2d Cir.
2017) (holding that insureds failed to plead injury-in-fact because they "fail[ed] to allege that
they would not have purchased the life insurance and annuity riders provided by AXA and
MLIC had they known of AXA's and MLIC's alleged shadow insurance practices. Appellants
also fail to allege, or even suggest, that consumers generally would not have purchased
AXA's and MLIC's life insurance and annuity riders had they known about the alleged
shadow insurance practices").

The lack of materiality in the alleged misrepresentations is evidenced by the
Complaint's allegations regarding the Assurance of Discontinuance. The Complaint touts
the Assurance of Discontinuance's settlement terms as support for the argument that the
statements at issue were misleading, and alleges that as part of the settlement with the
Attorney General, Group Health agreed to make certain changes to its marketing materials,
including that:

> (a) it now expressly states that reimbursement rates "are not related to usual
> and customary rates or to what the provider may charge but are set at a fixed
> amount based on GHI's 1983 reimbursement rates"; (b) GHI deleted
> statement[s] that certain rates had been updated periodically and replaced it
> with a statement that "[m]ost of the reimbursement rates have not increased
> since that time"; (c) GHI deleted the statement that the reimbursement rates
> "may be less than the fee charged" and replaced it with a statement that
> reimbursement rates "will likely be less (and in many instances much less)
> than the fee charged by the out-of-network provider"; (d) GHI added multiple
> examples of what members would typically pay out-of-pocket for out-of-
> network services, each showing very low reimbursement rates and
> substantial out-of-pocket costs; (e) GHI specified that the Enhanced OON

31

Rider applies only to some surgical and in-hospital services; (f) GHI
announced set forth new rules and procedures for surprise billings; and (g)
GHI eliminated the deceptive description of Catastrophic Coverage.

Doc. 1 ¶ 40. Compared to the marketing materials' original statements, which are
discussed above, the changes hardly alter the meaning of the statements in a significant,
material way. The Court does not find that reasonable people would have found these
changes so meaningful that they would not have been "induced" into choosing the plan had
they been provided these slightly altered statements. This is especially true given the
Complaint's own allegation that most members chose Group Health's plan not primarily due
to these selective statements and examples, but because it was "one of only two PPO plans
offered and the only one of those two that did not require the payment of out-of-pocket
premiums." *Id.* ¶ 20.

While more farfetched interpretations of the marketing materials could have
supported the reading advocated by the Complaint, "the applicable legal standard is
whether a reasonable consumer, not the least sophisticated consumer, would be misled by
Defendants' actions." *Weinstein*, 819 F. Supp. 2d at 228 (holding that "no reasonable
consumer could plausibly think that StubHub tickets [for Yankees games] come directly from
the Yankees" when plaintiff "went to the Yankees website and followed a hyperlink to the
StubHub website [and in] so doing, she left the Yankees website and was redirected to an
entirely new website with a different URL"). Thus, GBL claims separately fail because the
Complaint has not alleged materially misleading statements.

Because the Complaint forecloses the theory that the conduct is "consumer-oriented" given its allegation that members "are eligible for this City-sponsored health insurance based *solely* on their employment with the City" (Doc. 1 ¶ 19), and because it has not demonstrated the materially misleading nature of any of the documents at issue, whose validity are uncontested, the Court finds that leave to amend would be futile. The GBL claims will be dismissed with prejudice.

### D. The Insurance Law Claim Fails to Plead Misleading Statements

Count III of the Complaint alleges a claim under New York Insurance Law § 4226, which provides in relevant part:

> (a) No insurer authorized to do in this state the business of life, or accident and health insurance, or to make annuity contracts shall:
>
> (1) issue or circulate, or cause or permit to be issued or circulated on its behalf, any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of its policies or contracts.

N.Y. Ins. Law § 4226. The parties devoted little independent analysis to the claim. *See, e.g.,* Doc. 31-1 at 23 n. 5 (Group Health's brief relegating the claim to a footnote, arguing that dismissal is warranted "[f]or the same reasons" that the Complaint fails to plead a GBL claim); Doc. 41 (Plavin's response brief failing to address the claim altogether aside from statute of limitations arguments). This is presumably due to the dearth of case law analyzing the provision. However, it appears that the parties agree that the requisite "misrepresentations" would be subject to the same "objective" standard as that of the GBL

33

claims. This is consistent with the few cases that address the substantive elements of

§ 4226. *See, e.g., Phillips v. Am. Int'l Grp., Inc.*, 498 F. Supp. 2d 690, 699 (S.D.N.Y. 2007)

(dismissing GBL § 349 and N.Y. Ins. Law § 4226 on the same grounds that plaintiff failed to

allege any specific statements that were misleading). Thus, for the same reasons that

Plavin failed to plead any materially misleading statements sufficient to sustain a GBL claim,

the Insurance Law § 4226 claim also fails.

Furthermore, some courts have found that § 4226 requires the added element of

*scienter* absent in the GBL statutory provisions. *See* N.Y. Ins. Law § 4226(d) ("Any such

insurer that knowingly violates any provision of this section...shall, in addition to any other

penalty provided in this chapter, be liable to a penalty ...[which] may be sued for and

recovered by any person aggrieved for his own use and benefit."). *See also Brach Family*

*Found., Inc. v. AXA Equitable Life Ins. Co.*, 2016 WL 7351675, at *4 (S.D.N.Y. Dec. 19,

2016) (applying the "heightened pleading requirements of Rule 9(b)" to the claim because

"the statute does require knowledge of the falsity of its representation" and because the

"allegations here sound in fraud"). There are no allegations in the Complaint that support a

theory that Group Health acted with nefarious intent. As discussed above, the Description

and the Summary fully discloses that reimbursement levels may be "less than the fee

charged by the non-participating provider"; that the coverage examples were not "cost

estimators"; that the Catastrophic Coverage only applied to expenses over $1,500 for "non-

participating providers for predominantly in-hospital care"; and that the optional rider only

34

increased "certain" out-of-network reimbursement levels. These disclosures undermine the notion that Group Health knowingly and willfully violated New York Insurance Law by presenting misleading statements in its marketing materials. Accordingly, the Insurance Law claim will be also be dismissed with prejudice.[5]

### E. The Unjust Enrichment Claim Cannot Lie When the Allegations Arise from Contractual Obligations

Finally, the unjust enrichment claim must fail because its allegations are premised on benefits that Group Health is *contractually obligated* to provide under the policy negotiated by his employer. Before delving into the elements of the claim, the Court notes that the parties have not addressed any potential choice of law issues. While New York GBL and New York Insurance Law claims clearly require application of New York law, unjust enrichment, a claim in equity, does not necessitate the application of New York law simply because the other claims are based on New York statutes.

"[T]he first step in a choice of law analysis under Pennsylvania law is to determine whether an actual conflict exists between the laws of the competing states." *Aqua Pharmaceuticals, LLC v. Park Irmat Drug Corp*, 2018 WL 2288287, at *5 (E.D. Pa. May 17, 2018). "An actual conflict exists if 'there are relevant differences between the laws.'" *Id.*

---

[5] Group Health also moved to strike the "Complaint's requests for 'treble damages pursuant to [the GBL Claims] and for a 'penalty in the amount of all premiums paid to [Group Health] for the insurance that was in effect during the Class Period'" pursuant to GBL § 349 and Insurance Law § 4226. Doc. 31-1 at 29-30. Because the GBL and Insurance Law claims will be dismissed, Group Health's motion to strike certain damages requested under those same claims will be dismissed as moot. In any event, the Court notes that as a general matter, a motion to dismiss is a judicial device used to eliminate causes of action, not types of damages.

(quoting *McDonald v. Whitewater Challengers, Inc.*, 116 A.3d 99, 106 (Pa. Super Ct. 2015).

"If two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law

analysis is unnecessary. Thus, the first part of the choice of law inquiry is best understood

as determining if there is an actual or real conflict between the potentially applicable laws."

*Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007). "If there is no conflict, then

the district court sitting in diversity may refer interchangeably to the laws of the states whose

laws potentially apply." *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006).

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1)

that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good

conscience require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)

(internal quotation marks omitted). "The essence of such a claim is that one party has

received money or a benefit at the expense of another." *Id.* (internal quotation marks

omitted). "To establish a claim for unjust enrichment under Pennsylvania law, a plaintiff

must allege facts demonstrating (1) a benefit conferred on the defendant by the plaintiff, (2)

appreciation of such benefit by the defendant, and (3) acceptance and retention of such

benefit under circumstances such that it would be inequitable for the defendant to retain the

benefit without payment to the plaintiff." *iRecycleNow.com v. Starr Indem. & Liab. Co.*, 674

F. App'x 161, 162 (3d Cir. 2017) (internal quotation marks omitted). Thus, both standards

require the plaintiff having conferred a benefit on the defendant, in such a way that

defendant's retention of the benefit would be inequitable.

36

In addition, both New York and Pennsylvania law hold that an unjust enrichment claim, which is a law in equity, will be "precluded by the existence of a valid and enforceable written contract governing the particular subject matter." *Bristol Vill., Inc. v. Louisiana-Pac. Corp.*, 916 F. Supp. 2d 357, 366–67 (W.D.N.Y. 2013) (collecting cases). *See also Lomma v. Ohio Nat'l Life Assurance Corp.*, 283 F. Supp. 3d 240, 265 (M.D. Pa. 2017) ("Because it is undisputed that the relationship between the parties is governed by an express written contract, Plaintiffs' claims for unjust enrichment and promissory estoppel must necessarily fail."). Accordingly, no true conflict exists because there is no appreciable difference between the relevant New York and Pennsylvania law on the unjust enrichment claim. Under both states' case law, the unjust enrichment claim must fail because an express contract governs the parties' relationship in this case.

Plavin argues that the claim is not precluded because he never expressly "executed any contract with [Group Health]." Doc. 41 at 21. In his brief, Plavin cites to a statement contained in the plan's Certificate of Insurance, which is an exhibit attached to Group Health's opening brief, which states "[t]his booklet is your Certificate of Insurance. It is evidence of your coverage *under the Group Contract between [Group Health] and the City of New York*. It is not a contract between you and [Group Health]." *Id.* (emphasis added). Not only is this an extraneous document not properly before the Court, but even if the Court were to rely on the document, its reference to Plavin's "coverage under the Group Contract between [Group Health] and the City of New York" only reinforces the fact that Plavin is an

37

intended third-party beneficiary of an existing contract. Contrary to Plavin's argument, the relevant inquiry is not whether Plavin has *personally* executed a contract with Group Health, but rather, whether there exists a valid contract that governs Plavin and Group Health's relationship. "[T]he existence of a valid and binding contract governing the subject matter at issue in a particular case *does* act to preclude a claim for unjust enrichment even against a third party non-signatory to the agreement." *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 166 (E.D.N.Y. 2012) (dismissing unjust enrichment claim when "[t]here is no dispute whatsoever as to whether a valid and enforceable contract in this case exists. Rather, the dispute is whether Family may be liable as a non-signatory. This alone is insufficient to sustain the unjust enrichment claim").

Neither party disputes that the policy at issue is the result of a contract negotiated between Plavin's employer and Group Health. Plavin, by virtue of having been an employee of New York City, enjoyed health benefits as a third party beneficiary to the City's contract with Group Health. In fact, the Complaint alleges that the City paid all premiums on Plavin's policy and that employees were "eligible for this City-sponsored health insurance based solely on their employment with the City." Doc. 1 ¶¶ 2, 19. Thus, Plavin is a third-party beneficiary of a contract between his employer and Group Health, and as such, has recourse as a matter of law without having to resort to claims in equity. *See Benefit Tr. Life Ins. Co. v. Union Nat. Bank of Pittsburgh*, 776 F.2d 1174, 1177 (3d Cir. 1985) ("Plaintiffs in this case have a direct contractual relationship with the insurance company. They are the

38

third party beneficiaries of the policies which establish the carrier's obligation to pay ...

Therefore, under Pennsylvania law no basis exists for an action of unjust enrichment in

these circumstances."); *Nat'l Westminster Bank PLC v. Grant Prideco, Inc.*, 261 F. Supp. 2d

265, 273, 275 (S.D.N.Y. 2003) (finding plaintiff to be "an intended third-party beneficiary of

the agreement" and holding that "Plaintiff's unjust enrichment claim against the GPI

Defendants and Active fails because [t]he existence of a valid and enforceable written

contract governing a particular subject matter ordinarily precludes recovery... for events

arising out of the same subject matter").

Where "there is a relationship in the form of a promise to, or for the benefit of, the

plaintiff, he 'has a right to recover on the promise .... [t]he existence of that right, however,

precludes a claim of unjust enrichment.'" *Benefit Tr. Life Ins.*, 776 F.2d at 1177(quoting *Gee

v. Eberle*, 420 A.2d 1050, 1060 (Pa. Super. Ct. 1980).  The unjust enrichment claim is

therefore precluded due to the existence of a contract for the benefit of the Plaintiff.

Because the Complaint concedes that Plavin was only eligible for the plan by virtue of

having been a New York City employee, and because it is undisputed that the contract

between the City and Group Health intended to confer a benefit to the City's class of

employees, leave to amend the Complaint would be futile as to this claim.  Thus, the unjust

enrichment claim will be dismissed with prejudice.[6]

---

[6] Group Health also argues that Plavin failed to state an unjust enrichment claim because it is duplicative of other claims and because he has failed to plead the requisite elements of the claim.  Because the unjust enrichment claim will be dismissed on other grounds, the Court declines to reach Group Health's alternative arguments on unjust enrichment.

## F. The Class Claims Fail

Because Plavin is the only named Plaintiff in this case, and having ruled that his claims must be dismissed, the putative class action claims must also fail. *See Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline*, 263 F.R.D. 205, 210 (E.D. Pa. 2009) ("[W]hen the named plaintiff lacks a cause of action, the Court should dismiss the action before proceeding to class certification.") (citing *Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163, 1169–70 (3d Cir.1987); *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 634 (3d Cir. 2017) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.") (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

## V. Conclusion

For the reasons stated above, Defendant's motions to dismiss the Complaint (Doc. 31) will be granted. As discussed above, given that the purportedly misleading statements underlying Plaintiff's GBL, Insurance Law, and unjust enrichment claims are apparent on the face of the Complaint and its exhibits, and the fact that Plaintiff's claims are based on Defendant's contractual obligations arising from a policy negotiated between his employer and Defendant, the Court finds that an amendment would be futile. *Turner v. Spaley*, 501 F. App'x 101, 103 n. 1 (3d Cir. 2012) ("We conclude that the District Court did not err in declining to allow Turner an opportunity to amend her complaint because, as discussed

40

below, Turner's underlying claims lack merit."); *In re New Jersey Title Ins. Litig.*, 683 F.3d

451, 462 (3d Cir. 2012) (finding that the District Court did not abuse its discretion by denying

Appellants leave to amend their complaint when amendment would have been futile).  A

separate Order shall issue.

Robert D. Marian
United States District Judge

## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEVEN PLAVIN, on behalf of himself    :
and all others similarly situated,    :
   :
        Plaintiff,    :
     v.    :      3:17-CV-1462
   :      (JUDGE MARIANI)
GROUP HEALTH INCORPORATED,    :
   :
        Defendant.    :

## ORDER

AND NOW, THIS 22nd DAY OF JUNE, 2018, for the reasons set forth in this

Court's accompanying memorandum opinion, **IT IS HEREBY ORDERED THAT**:

1. The Defendant's Motion to Dismiss Plaintiff's Complaint (Doc. 31) is **GRANTED.**

2. The Complaint (Doc. 1) **is DISMISSED WITH PREJUDICE**.

3. The Clerk of the Court is directed to **CLOSE** the case.



Robert D. Mariani
United States District Judge

1