**18-2490**

IN THE

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

◆◆

STEVEN PLAVIN,

*Plaintiff-Appellant,*

—v.—

GROUP HEALTH INCORPORATED,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**BRIEF FOR PLAINTIFF-APPELLANT
AND JOINT APPENDIX
VOLUME I OF II
(Pages A1 to A45)**

WILLIAM CHRISTOPHER CARMODY
ARUN SUBRAMANIAN
HALLEY W. JOSEPHS
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas,
    32nd Floor
New York, New York 10019
(212) 336-8330

MICHAEL F. COSGROVE
J. TIMOTHY HINTON, JR.
HAGGERTY HINTON & COSGROVE LLP
203 Franklin Avenue
Scranton, Pennsylvania 18503
(570) 344-9845

*Attorneys for Plaintiff-Appellant*

# CORPORATE DISCLOSURE STATEMENT

As an individual person, Plaintiff Appellant is not required to file a

Corporate Disclosure Statement pursuant to FRAP 26-1.

Dated:        New York, New York
              October 10, 2018

                              Respectfully submitted,

                              SUSMAN GODFREY L.L.P.

By: *s/ William Christopher Carmody*
                              William Christopher Carmody
                              Arun Subramanian
                              Halley W. Josephs
                              SUSMAN GODFREY L.L.P.
                              1301 Avenue of the Americas, 32nd Floor
                              New York, NY  10019-6023
                              Tel.: 212-336-8330
                              Fax: 212-336-8340
                              bcarmody@susmangodfrey.com
                              asubramanian@susmangodfrey.com
                              hjosephs@susmangodfrey.com

                              J. Timothy Hinton, Jr., Esq. (PA ID 61981)
                              Michael F. Cosgrove, Esq. (PA ID 47349)
                              HAGGERTY HINTON & COSGROVE LLP
                              203 Franklin Avenue
                              Scranton, PA 18503
                              Tel: (570) 344-9845
                              timhinton@haggertylaw.net
                              mikecosgrove@haggertylaw.net

                              *Attorneys for Plaintiff-Appellant and the*
                              *Class*

# **TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ...................................................... 4

STATEMENT OF THE ISSUES.......................................................... 4

STATEMENT OF RELATED CASES ................................................. 5

STATEMENT OF THE CASE............................................................. 6

    I.    Factual Background............................................................ 6

    II.    Procedural History............................................................ 10

SUMMARY OF ARGUMENT ........................................................... 12

ARGUMENT .................................................................................. 16

    I.    Standard of Review with Respect to the General Business
        Law, Insurance Law, Unjust Enrichment, and Class Claims.............. 16

    II.    The District Court Erred in Dismissing the Consumer-
        Protection Claims Under New York General Business Law
        Sections 349 and 350........................................................... 17

        A.    The District Court Erroneously Concluded that GHI's
            Conduct Against New York City Employees and
            Retirees is Not "Consumer-Oriented" ...................... 18

            1.    The District Court's Novel "General Public"
                Analysis is Contrary to New York Caselaw and
                the GBL's Broad Scope................................ 18

            2.    The District Court Erred in Viewing Plavin's
                Claims as a Private Contract Dispute Unique to
                One Insured, When in Fact the Claims Concern
                Deceptive Marketing of Insurance to Multiple
                Insureds........................................................ 24

i

3.    The New York Attorney General's Investigation and Assurance of Discontinuance Support a Finding that Plavin Adequately Alleged Consumer-Oriented Conduct ............................30

B.    The District Court Ignored Binding New York Law and Prejudged the Merits in Concluding that GHI's Marketing Materials are Not Materially Misleading ...............32

1.    The District Court Erred in Deciding GHI's Conduct Was Not "Materially Misleading" as a Matter of Law Based on Disclaimers ............................33

2.    The District Court Erred in Suggesting that Reliance is an Element of a GBL Claim and that Omissions are Not Actionable .................................35

3.    As Confirmed by *Gaidon*, the Allegations are Sufficient to Support a Claim of "Materially Misleading" Statements .................................36

4.    The District Court's Opinion Failed to Draw Reasonable Inferences in Plavin's Favor .......................39

III.    The District Court Erred in Dismissing the New York Insurance Law Section 4226 Claim .....................................42

IV.    The District Court Erred in Dismissing the Unjust Enrichment Claim .....................................................46

V.    The District Court Erred in Dismissing the Class Claims .................48

VI.    The District Court Erred in Concluding Amendment Would Be Futile .....................................................48

A.    Standard of Review ....................................................48

B.    Argument .................................................................48

Conclusion .................................................................50

ii

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Accredited Aides Plus, Inc. v. Program Risk Mgmt., Inc.*,
  46 N.Y.S.3d 246 (N.Y. App. Div. 2017)......................................................22, 23

*Am. Med. Assoc. v. United Healthcare Corp.*,
  No. 00-2800, 2003 WL 22004877 (S.D.N.Y. Aug. 22, 2003) ..........................30

*Brach Family Found., Inc. v. AXA Equitable Life Ins. Co.*,
  2017 WL 5151357 (S.D.N.Y. Nov. 3, 2017), *reconsideration
  denied*, 2018 WL 3632500 (S.D.N.Y. July 30, 2018) .......................................44

*Brach Family Found., Inc. v. AXA Equitable Life Ins. Co.*,
  No. 16-740, 2016 WL 7351675 (S.D.N.Y. Dec. 19, 2016)................................44

*Buonasera v. Honest Co.*,
  208 F. Supp. 3d 555 (S.D.N.Y. 2016) ...............................................................32

*Cilente v. Phoenix Life Ins. Co.*,
  No. 600313/08, 2014 WL 70336 (N.Y. Sup. Ct. 2014), *aff'd as
  modified*, 134 A.D.3d 505 (N.Y. App. Div. 2015) .............................................45

*Cohen v. JP Morgan Chase & Co.*,
  498 F.3d 111 (2d Cir. 2007) ...............................................................................32

*Dervan v. Gordian Grp. LLC*,
  No. 16-1694, 2017 WL 819494 (S.D.N.Y. Feb. 28, 2017) ...............................46

*Dormitory Auth. v. Samson Constr. Co.*,
  94 N.E.3d 456 (N.Y. 2018)..........................................................................25, 47

*Eidelman v. Sun Prods. Corp.*,
  No. 16-3914, 2017 WL 4277187 (S.D.N.Y. Sept. 25, 2017) ............................33

*Elacqua v. Physicians' Reciprocal Insurers*,
  860 N.Y.S.2d 229 (N.Y. App. Div. 2008)....................................................21, 22

*In re Evergreen Mut. Funds Fee Litig.*,
  423 F. Supp. 2d 249 (S.D.N.Y. 2006) ...............................................................32

*Fellner v. Tri-Union Seafoods, L.L.C.*,
   539 F.3d 237 (3d Cir. 2008) ............................................................16

*Fermin v. Pfizer, Inc.*,
   215 F. Supp. 3d 209 (E.D.N.Y. 2016) ..............................................38

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*,
   485 N.E.2d 208 (N.Y. 1985) .............................................................25

*In re Frito Lay N. Am., Inc. All Nat. Litig.*,
   No. 12-2413, 2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013) .............38

*Gaidon v. Guardian Life Ins. Co. of Am.*,
   725 N.E.2d 598 (N.Y. 1999) .....................................................*passim*

*Genesco Entm't v. Koch*,
   593 F. Supp. 743 (S.D.N.Y. 1984) ...................................................26

*Giordano v. City of N.Y.*,
   274 F.3d 740 (2d Cir. 2001) .............................................................13

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
   774 N.E.2d 1190 (N.Y. 2002) ..........................................................18

*Grayson v. Mayview State Hosp.*,
   293 F.3d 103 (3d Cir. 2002) .............................................................48

*Hart v. Moore*,
   587 N.Y.S.2d 477 (N.Y. Sup. Ct. 1992) ...........................................30

*Hoover v. HSBC Mortg. Corp.*,
   9 F. Supp. 3d 223 (N.D.N.Y. 2014) .................................................23

*Karlin v. IVF Am., Inc.*,
   712 N.E.2d 662 (N.Y. 1999) ............................................................27

*Koch v. Acker, Merrall & Condit Co.*,
   967 N.E.2d 675 (N.Y. 2012) ...........................................14, 34, 36, 46

*Koch v. Greenberg*,
   626 F. App'x 335, 340 (2d Cir. 2015) ........................................19, 20

*U.S. ex rel. Krahling v. Merck & Co.*,
  44 F. Supp. 3d 581 (E.D. Pa. 2014) ....................................................27

*Kucher v. Domino's Pizza, Inc.*,
  No. 16-2492, 2017 WL 2987214 (S.D.N.Y. Feb. 13, 2017) ..............................31

*Kurschner v. Mass. Cas. Ins. Co.*,
  No. 08-0011, 2009 WL 537504 (E.D.N.Y. Mar. 3, 2009) ................................26

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  27 F. Supp. 3d 447 (S.D.N.Y. 2014) ........................................16, 46

*M.V.B. Collision, Inc. v. Allstate Ins. Co.*,
  728 F. Supp. 2d 205 (E.D.N.Y. 2010) ..............................................22

*McCracken v. Verisma Sys., Inc.*,
  131 F. Supp. 3d 38 (W.D.N.Y. 2015)................................................23

*McTernan v. City of York, Pa.*,
  577 F.3d 521 (3d Cir. 2009) ................................................15, 16

*Millennium Health, LLC v. EmblemHealth, Inc.*,
  240 F. Supp 3d 276, 285-86 (S.D.N.Y. 2017)............................20, 21, 24, 50

*Monga v. Security Mut. Life Ins. Co.*,
  No. 2000/05164, 2002 WL 31777872 (N.Y. Sup. Ct. 2002) ..........................21

*N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*,
  953 N.Y.S.2d 96 (N.Y. App. Div. 2012)..........................17, 18, 19, 28

*N.Y. v. Feldman*,
  210 F. Supp. 2d 294 (S.D.N.Y. 2002) ..............................................18

*Nat'l Convention Servs., L.L.C. v. Applied Underwriters Captive Risk
    Assur. Co.*,
  239 F. Supp. 3d 761 (S.D.N.Y. 2017) ..............................................48

*New York Univ. v. Cont'l Ins. Co.*,
  662 N.E.2d 763 (N.Y. 1995)....................................................28, 29

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,
  647 N.E.2d 741 (N.Y. 1995)............................................14, 18, 20, 32

*Pelman ex rel. Pelman v. McDonald's Corp.*,
  396 F.3d 508 (2d Cir. 2005) .................................................................44

*Phillips v. Cty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ...........................................................16, 42

*Riordan v. Nationwide Mut. Fire Ins. Co.*,
  756 F. Supp. 732 (S.D.N.Y. 1990), *aff'd*, 977 F.2d 47 (2d Cir.
  1992) .................................................................................................17

*Russo v. Mass. Mut. Life Ins. Co.*,
  711 N.Y.S.2d 254 (N.Y. App. Div. 2000), *rev'd in part on other
  grounds sub nom.*, Gaidon v. Guardian Life Ins. Co. of Am.
  (*Gaidon II*), 750 N.E.2d 1078 (N.Y. 2001) .................................43, 44

*Schmidt v. Skolas*,
  770 F.3d 241 (3d Cir. 2014) .................................................................26

*People ex rel. Schneiderman v. Orbital Pub. Grp., Inc.*,
  21 N.Y.S.3d 573 (N.Y. Sup. Ct. 2015)...................................31, 34, 42

*Sichel v. UNUM Provident Corp.*,
  230 F. Supp. 2d 325 (S.D.N.Y. 2002) ...........................................28, 29

*Small v. Lorillard Tobacco Co.*,
  720 N.E.2d 892 (N.Y. 1999)................................................................17

*People ex rel. Spitzer v. Applied Card Sys., Inc.*,
  805 N.Y.S.2d 175 (N.Y. App. Div. 2005)...........................................41

*People ex rel. Spitzer v. Gen. Elec. Co.*,
  756 N.Y.S.2d 520 (N.Y. App. Div. 2003) ...........................................41

*Stutman v. Chemical Bank*,
  731 N.E.2d 608 (N.Y. 2000)................................................................32

*Unibell Anesthesia, P.C. v. Guardian Life Ins. Co. of Am.*,
  658 N.Y.S.2d 14 (N.Y. App. Div. 1997)..............................................42

*V.S. v. Muhammad*,
  595 F.3d 426 (2d Cir. 2010) ................................................................13

*Verzani v. Costco Wholesale Corp.*,
No. 09-2117, 2010 WL 3911499 (S.D.N.Y. Sept. 28, 2010) ...........................38

*Weinstein v. eBay Inc.*,
819 F. Supp. 2d 219 (S.D.N.Y. 2011) ..............................................................39

*West v. AT&T Co.*,
311 U.S. 223 (1940)...........................................................................................13

*Wilner v. Allstate Ins. Co.*,
893 N.Y.S.2d 208 (N.Y. App. Div. 2010) .........................................................28

*Wilson v. Nw. Mut. Ins. Co.*,
625 F.3d 54 (2d Cir. 2010) .........................................................................14, 18

**Statutes**

28 U.S.C. § 1291 ..................................................................................................4

28 U.S.C. § 1332(d) ..............................................................................................4

New York Executive Law § 63 ...........................................................................41

New York General Business Law Section 349................................................*passim*

New York General Business Law Section 350................................................*passim*

New York Insurance Law § 4226 ....................................................................*passim*

NYC Administrative Code § 12-126 ....................................................................8

**Other Authorities**

Fed. R. Civ. P. 8(a)......................................................................................15, 44

Fed. R. Civ. P. 9(b) .....................................................................................15, 44

Fed. R. Civ. P. 12(b)(6).....................................................................5, 10, 16, 42

Fed. R. Civ. P. 15(a)(3)......................................................................................49

**INTRODUCTION**

Plaintiff Steven Plavin brought this lawsuit on behalf of hundreds of thousands of public employees and retirees of the City of New York—including police officers like himself, teachers, and other government workers—alleging that GHI misled these public employees about the scope of out-of-network coverage under its "Comprehensive" Benefits Plan ("GHI Plan").   The class action Complaint alleges that GHI painted a broadly unrealistic picture of the out-of-network reimbursements available to these public employees—failing to disclose that on average, GHI reimbursed out-of-network services at a rate of just 23%, and that reimbursements could be as low as 9% for some procedures. GHI also concealed the fact that reimbursements were based on a hidden reimbursement schedule that had been virtually untouched since 1983 and would cover just a fraction of out-of-network charges.   If this isn't misleading, consumer-oriented conduct, then nothing is.   Accordingly, the lawsuit alleges that GHI's deceptive conduct violated New York General Business Law ("GBL") Sections 349 and 350 and New York Insurance Law Section 4226, and caused GHI to be unjustly enriched.

GHI's deception did not escape the government's notice.  The New York Attorney General ("NYAG") investigated this very conduct and expressly found that GHI's practices "constitute repeated violations of . . . General Business Law

§§ 349 and 350," two of the primary claims asserted here.  The NYAG made these findings in an Assurance of Discontinuance ("AOD"), which is a settlement agreement that GHI signed after the Government's investigation into the company's misdeeds against City employees and retirees (i.e., Plaintiff and the putative class members).  Among numerous other findings of wrongdoing, the Government stated that "GHI does not sufficiently describe the limitations of GHI Plan's reimbursement of out-of-network providers and the resulting financial consequences to members and prospective members," "GHI does not explain that the reimbursement rates are comparatively low when measured against other reimbursement methodologies nor does it explain that members are likely to incur substantial out-of-pocket expenses when they use out-of-network providers," and "GHI's documents misrepresent the Schedule's updating of allowances or 'reimbursement amounts.'"

Despite this record, the District Court dismissed Plavin's original Complaint with prejudice, concluding that as a matter of law, New York's broad consumer protection laws *do not protect* members of employer-sponsored benefit programs because they are not the "public at large."  This is not the law in New York.  For example, the District Court concluded *as a matter of law* that Plaintiff and the putative class—consisting of hundreds of thousands of public employees and retirees—are not "consumers" within the meaning of New York's consumer

2

protection laws and Defendant's deceptive marketing of a purported PPO insurance plan with "comprehensive" out-of-network benefits to these employees was not "consumer-oriented."

As additional grounds for dismissal, the District Court categorized Plavin's lawsuit as a private contract dispute based on a contract between GHI and the City of New York—a contract that the Court has never seen, Plavin never received, and that is not in the record. While the City's contract with GHI may have been the product of private contract negotiations between sophisticated parties, Plavin's relationship with GHI was not. It was the product of Plavin—along with 311,880 other NYC employees and non-Medicare retirees (plus their family members)— receiving GHI's deceptive marketing materials touting its "comprehensive" out of network coverage, electing the GHI Plan, never receiving a policy or reimbursement schedule, and then finding out that GHI was reimbursing just a fraction of those charges.

If the District Court's rulings are permitted to stand, they will narrow New York's consumer protection laws in ways that contradict the legislature's broad statutory mandate and decades of interpretation by New York courts, and they will leave no recourse for members of employer-sponsored insurance plans when the insurer fails to deliver a policy or other express contract. For these reasons, and

3

those discussed further below, the opinion and order of the District Court should be reversed and the case remanded for further proceedings.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332(d) because this is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), where Plavin is a citizen of Pennsylvania and GHI is a citizen of New York; the total number of members of the proposed Class is greater than 100; more than two-thirds of all of the members of the proposed Class in the aggregate are citizens of a state other than Pennsylvania, where the action was originally filed; and the total claims of the individual members of the proposed Class in this action are in excess of $5,000,000 in the aggregate, exclusive of interest and costs. This Court has jurisdiction under 28 U.S.C. § 1291 as an appeal from a final decision of the District Court dismissing all claims with prejudice dated June 22, 2018. A1–42. Plavin timely appealed on July 5, 2018. A43–45.

## STATEMENT OF THE ISSUES

The issues presented, to be evaluated under a *de novo* standard of review, are:

1. Whether the District Court erred in holding that GHI's conduct was not "consumer oriented," where the conduct was directed at a broad group of similarly-situated insureds who procured health insurance for personal use? (Raised at A395–98; Ruled On at A17–23.)

4

2. Whether the District Court erred in holding, on a Rule 12(b)(6) motion to dismiss, that no reasonable consumer could have been misled by GHI's conduct? (Raised at A383–84, A398–401; Ruled On at A23–33.)

3. Whether the District Court erred in dismissing Plavin's claim without leave to amend under New York Insurance Law Section 4226 for failure to plead misleading statements or knowledge? (Raised at A394, A398–401, A411–12; Ruled On at A33-35.)[1]

4. Whether the District Court erred in dismissing the unjust enrichment claim based on a contract that is not part of the record, and where Plavin disputes the existence of a contract that covers of the scope of his claims? (Raised at A402–10; Ruled On at A35–39.)

The issue presented, to be evaluated under an abuse of discretion standard of review, is:

5. Whether the District Court abused its discretion in dismissing all claims with prejudice?  (Raised at A413; Ruled On at A40-41.)

### STATEMENT OF RELATED CASES

There are no related cases.  This case has not previously been before the Third Circuit.

---

[1] As the District Court recognized, GHI failed to separately analyze the adequacy of Plavin's § 4226 claim in its motion to dismiss; rather, it argued that this claim should be dismissed "[f]or the same reasons" that the Complaint failed to plead a GBL claim. *See* A33-34.

5

## STATEMENT OF THE CASE

### I.    Factual Background

GHI offers one of eleven health insurance plans made available to over 600,000 City of New York ("City") employees and retirees.  A54-55 (Compl. ¶¶ 1, 2).  During the relevant period, the GHI Comprehensive Benefit Plan (the "GHI Plan") was one of only two preferred provider organization ("PPO") plans that purported to provide "comprehensive coverage" for out-of-network medical services.  A55 (*Id.* ¶ 2).  (The other plans were HMOs, which typically provide coverage only for in-network services.  A60 (*Id.* ¶ 20).)

GHI created and distributed to City employees and retirees two documents prior to each year's enrollment period.  A55–56, A60 (*Id.* ¶¶ 5, 21).  Those documents, a Summary Program Description and online Summary of Benefits & Coverage, falsely depicted the plan as a true PPO plan that gave members the "freedom to choose any provider worldwide" with extensive out-of-network coverage, while alluding only to the mere possibility that reimbursements might be less than the actual fee charged by out-of-network providers.  A55 (*Id.* ¶ 4); *see* A80–83 (Summary Program Description); A84–99 (Summary of Benefits). GHI never delivered a policy, Certificate of Insurance, or reimbursement "schedule" to Plan Members at any point after enrollment.  A61–62 (Compl. ¶¶ 24, 27).  GHI

concealed the reimbursement schedule from insureds and denied access to the schedule when requested via email and phone. A56, A62 (*Id.* ¶¶ 7, 27).

GHI never told a single current or prospective Plan Member that reimbursement rates for virtually every out-of-network service would be just a fraction of the actual cost of that service. A55–58, A63–64 (*Id.* ¶¶ 5–11, 31–32). GHI told members out-of-network reimbursements would be based on a "schedule" that was "periodically updated" but in fact was left virtually untouched since 1983. A55–57, A62–64 (*Id.* ¶¶ 5, 7–8, 27–29, 31–32). GHI also promoted "additional" "Catastrophic Coverage" where GHI promised to pay "100% of the Catastrophic Allowed Charge as determined by GHI" in the event that a member's out-of-network expenses exceeded $1,500. A56–57, A64–65 (*Id.* ¶¶ 6, 10, 33–35). Although GHI represented it as an additional benefit and highlighted it as one of key six benefits in the Summary, in reality it provided the same amount that GHI already agreed to pay regardless of the $1,500 threshold and provided no benefit at all. *Id.*

GHI also sold, for an additional fee, an optional rider (the "Enhanced OON Rider" or "Rider") that provided an "enhanced schedule for certain services [that] increases the reimbursement of the basic program's [out-of-network] fee schedule, on average, by 75%." A56 (*Id.* ¶ 6). GHI failed to disclose in the marketing materials provided prior to plan selection that the Rider enhanced reimbursements

7

for inpatient services only and provided nothing for out-patient services.  A58 (*Id.* ¶ 11) (noting out-patient services accounted for 65% of out-of-network charges during the Class Period); A65–66 (*Id.* ¶¶ 36–38).

GHI's unlawful scheme was lucrative.  A58, A61–62, A66 (*Id.* ¶¶ 12, 25, 38).  GHI had the highest enrollment of any health plan offered to City employees and retirees; as of 2012, 311,880 employees and non-Medicare retirees were enrolled, and membership totaled approximately 994,500 inclusive of family members.  A61–62 (*Id.* ¶ 25).  From 2011 to 2015, GHI earned an average of $172 million per year for administering the GHI Plan and $3 million per year on the optional Rider (after rebates to the City).[2]  A58, A61–62, A66 (*Id.* ¶¶ 12, 25, 38).

GHI's deceptive conduct caught the attention of state authorities.  The New York Attorney General ("NYAG") investigated GHI's conduct, including its extraordinarily low rates of reimbursement for the out-of-network claims of the hundreds of thousands of City employees and retirees enrolled in the GHI Plan.  A66 (*Id.* ¶ 39).   The NYAG's investigation and resulting Assurance of

---

[2] As part of their compensation and retirement packages, City employees and retirees are entitled to their choice of City-sponsored health insurance plans.  The City pays either the entire premium or a large portion thereof depending on the plan the employee/retiree chooses.  The amount the City contributes to each insurance policy is set by NYC Administrative Code § 12-126.  When selecting a plan, employees and retirees direct compensation to which they are legally entitled to the insurer whose plan they select.  A60 (Compl. ¶ 19).

Discontinuance ("AOD") covered some, but not all of the deceptive practices that are the subject of this lawsuit. *Id.*

For example, the NYAG focused on GHI's failure to make the Schedule available to current and prospective Plan Members, its failure to accurately describe the limitations of out-of-network reimbursement and resulting financial consequences to current and prospective members, and its misrepresentation of the frequency with which the 1983 reimbursement schedule is updated. A66 (*Id.* ¶ 39); A163–83 (AOD ¶¶ 8–17, 21–22). The NYAG determined that these practices harmed consumers, i.e., City employees and retirees, A163–83 (AOD ¶¶ 7, 13, 19, 20, 27, 34, 35), and constituted repeated violations of GBL §§ 349 and 350, A174 (*id.* ¶ 26). As a result of the investigation, GHI entered into an AOD, in which it agreed to make changes to its marketing materials. A66–67 (*Id.* ¶¶ 39–40); A174–75 (AOD ¶¶ 27–29). The AOD did not address the consequences of the illusory Catastrophic Coverage and worthless Rider. *See* A65–66 (Compl. ¶¶ 36–38). This AOD was one of four settlements GHI entered with the NYAG relating to its administration of the GHI Plan in a four-year period. A55 (*Id.* ¶ 3).

Plaintiff Steven Plavin is a retired New York City police officer who has enrolled and re-enrolled in the GHI Plan since 1984, paying for the Rider each time. A58 (*Id.* ¶ 13). Plavin, his wife, and his children are all covered by the GHI

plan. *Id.*  In 2014, Plavin's wife received numerous medical services that GHI deemed out-of-network and paid just a fraction of the expenses for, leaving Plavin with significant financial responsibility.  A67 (*Id.* ¶ 41).  GHI saddled Plavin with out-of-network costs at various points through 2015.  *Id.*  For example, for a July 2014 out-of-network procedure, GHI did not inform Plavin until February 2015 that he was on the hook for a substantial percentage of the costs for that claim.  *Id.*

## II.    Procedural History

The Complaint was filed in the United States District Court for the Middle District of Pennsylvania (where Plavin resides) on August 16, 2017, alleging that GHI misled consumers about the out-of-network reimbursements under the health insurance plan it offered to City employees and retirees, resulting in violations of: (1) New York General Business Law ("GBL") § 349; (2) New York GBL § 350; (3) New York Insurance Law § 4226; and giving rise to a claim of (4) unjust enrichment.  A54–75.

GHI moved to dismiss under Fed. R. Civ. P. 12(b)(6).  A102–44.  On June 22, 2018, the Court dismissed all claims with prejudice, and without leave to amend, under Rule 12(b)(6).  A1–42.

The Court correctly held that Plavin adequately alleged timely claims under the GBL and Insurance Law and on a theory of unjust enrichment, rejecting GHI's

10

argument that these claims are time-barred under the applicable statutes of limitations.  A9–17.

Nevertheless, on the GBL §§ 349 and 350 claims, the Court concluded that GHI's conduct was not "consumer oriented" because the insurance was offered to hundreds of thousands of City employees and retirees rather than to every member of the general public, and was (according to the Court) purportedly based on a private contract between GHI and the City.  A17–23.  Reaching the merits of the materially misleading nature of GHI's statements, the Court concluded, as a matter of law, that no reasonable consumer could have been misled by GHI's statements.  A23–33.  To do so, the Court weighed the misrepresentations against purported disclaimers in the marketing materials.  Finally, the Court discounted the NYAG's investigation of GHI's conduct and express finding that the conduct violated GBL §§ 349 and 350.

The District Court dismissed Plavin's Insurance Law § 4226 claim on the same ground that Plavin could not plead materially misleading statements as a matter of law.  A33–34.  The Court further concluded that Plavin failed to allege "scienter" or reliance, but did not provide leave to amend.  A34–35.

On the unjust enrichment claim, the District Court—without reviewing the contract at issue, which Plavin never received and was never submitted to the Court by either party—concluded that Plavin was a third-party beneficiary of the

alleged contract between GHI and the City.  A35–39.  The Court did not reach GHI's arguments that the unjust enrichment claim should be dismissed as duplicative of the GBL claims or because Plavin failed to allege the elements of unjust enrichment.  A39 n.6.

With respect to the class claims, the District Court dismissed those based on its findings that Plavin's causes of action must be dismissed.  A40.

The District Court dismissed as moot GHI's premature request to strike Plavin's request for treble damages under the GBL and penalty damages under Insurance Law § 4226.  A35 n.5.

Finally, the District Court concluded in a single sentence that leave to amend would be futile and dismissed all claims with prejudice.  A40–41.

This appeal followed.

## SUMMARY OF ARGUMENT

The Complaint alleges that between 2011 and 2015, Defendant GHI misled consumers—public employees including police officers like Plavin—about the scope of out-of-network reimbursements under its Comprehensive Benefits Plan ("GHI Plan").  GHI's conduct violated New York General Business Law ("GBL") Sections 349 and 350 and Insurance Law § 4226, and caused GHI to be unjustly enriched.  The Complaint contains detailed allegations of GHI's misconduct affecting hundreds of thousands of consumers of health insurance that readily

satisfy the applicable pleading standards. The New York Attorney General has already concluded, in a settlement agreement with GHI, that GHI's misconduct is actionable under GBL §§ 349 and 350 because GHI told consumers they were getting "comprehensive" coverage for out-of-network services, but GHI based reimbursements on a secretive reimbursement schedule that had been hardly touched since 1983 and would cover just a fraction of the charges.

The District Court's opinion dismissing all of Plavin's claims with prejudice should be reversed for the following reasons: On the GBL claims, the District Court dismissed based on five conclusions that find no support in the statute or case law.[3] ***First***, the District Court grafted a "general public" rule onto the "consumer-oriented conduct" element, determining that GHI's conduct is not consumer-oriented because it offered the insurance plan to City employees and retirees (who number in the hundreds of thousands) rather than to every member of the general public. There is no support for this rule. Under New York law, all that is required to satisfy this element is to show "that the conduct at issue 'potentially

---

[3] This Court is bound by the decisions of New York's highest court (the New York Court of Appeals) interpreting state law. *Giordano v. City of N.Y.*, 274 F.3d 740, 754 (2d Cir. 2001) ("[T]he New York Court of Appeals['] . . . construction of New York State law binds this Court.") (citing *West v. AT&T Co.*, 311 U.S. 223, 237 (1940) (federal courts are bound to apply state law as interpreted by the state's highest court)); *see also V.S. v. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010) ("This Court is bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion.").

13

affect[s] similarly situated consumers.'" *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741, 745 (N.Y. 1995)).

**Second**, the District Court concluded—based on an assumption that Plavin is a third-party beneficiary of a contract that appears nowhere in the record—that Plavin's claims amount to a "private contract" dispute. That holding is also in conflict with New York law. *See id.*

**Third**, the District Court resolved disputed issues of fact surrounding the fact-intensive "materially misleading" element by citing alleged disclaimers in GHI's marketing materials as grounds to conclude, *as a matter of law*, that no reasonable consumer could have been misled by GHI's statements. New York's highest court has already held that it is improper for a court to dismiss a GBL claim based on disclaimers. *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 676 (N.Y. 2012).

**Fourth**, the District Court concluded that Plavin failed to allege reliance, but under New York law reliance is not an element of a GBL claim. *Id.* The Court's Opinion also erroneously suggested that omissions are not actionable under the GBL, but that conflicts with black-letter New York law holding that a "deceptive act or practice" is a "representation *or omission* likely to mislead a reasonable consumer acting reasonably under the circumstances." *Gaidon v. Guardian Life*

14

*Ins. Co. of Am.*, 725 N.E.2d 598, 604 (N.Y. 1999) (emphasis added and internal quotation marks omitted).

**Fifth**, in reviewing the misleading statements, the District Court resolved numerous issues of fact against Plavin and drew all possible inferences in the light *least* favorable to Plavin—the opposite of what federal courts require at the motion to dismiss stage. *See McTernan v. City of York, Pa.*, 577 F.3d 521, 526 (3d Cir. 2009).

On the New York Insurance Law § 4226 claim, the District Court erred in dismissing this claim on the grounds that GHI's misrepresentations were not materially misleading (for the same reasons it dismissed the GBL claims) and that Plavin failed to allege "scienter" or reliance.  Contrary to the District Court's conclusion, there is no fraudulent or "nefarious intent" requirement; rather, the "knowledge" requirement under § 4226 may be alleged generally under either Fed. R. Civ. P. 8(a) or Fed. R. Civ. P. 9(b) and the Complaint meets either standard. Moreover, the plain text of § 4226 confirms that there is no reliance requirement.

With respect to unjust enrichment, the District Court based its dismissal on a contract that Plavin never received, the Court has never seen, and which is not in the record.  Unjust enrichment is an equitable claim that courts routinely permit to proceed where the existence, validity, or scope of a contract covering the claims is disputed.  Here, Plavin brings this claim because there is no express contract that

Plavin can enforce against GHI to vindicate his claims. On this record, dismissal of this claim was error. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 483 (S.D.N.Y. 2014) ("[T]he predicate for dismissing quasi-contract claims is that [an enforceable] contract at issue clearly covers the dispute between the parties.") (internal quotation marks omitted).

Finally, the Court erred in dismissing these claims with prejudice, when it should have allowed Plavin to amend his pleadings to address any curable deficiencies.

## ARGUMENT

### I. Standard of Review with Respect to the General Business Law, Insurance Law, Unjust Enrichment, and Class Claims

A district court's decision on a motion to dismiss under Rule 12(b)(6) is subject to *de novo* review. *McTernan v. City of York, Pa.*, 577 F.3d 521, 526 (3d Cir. 2009). "[A]ll well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiffs, and all [reasonable] inferences must be drawn in favor of them." *Id.*; *see Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 242 (3d Cir. 2008). This Court's role in reviewing dismissal on a Rule 12(b)(6) motion is to "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (internal quotation marks omitted).

## II.    The District Court Erred in Dismissing the Consumer-Protection Claims Under New York General Business Law Sections 349 and 350

New York General Business Law Sections 349 and 350 are consumer protection laws that broadly protect against "those acts or practices which undermine a consumer's ability to evaluate his or her market options and to make a free and intelligent choice.  In this sense, the deception itself is the harm that the statute seeks to remedy: [c]onsumers have the right to an honest market place." *N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 953 N.Y.S.2d 96, 102 (N.Y. App. Div. 2012) (internal quotation marks omitted).    These laws "appl[y] to virtually all economic activity."  *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 897 (N.Y. 1999).  There is no exception for insurance companies' deceptive acts or practices, *see Riordan v. Nationwide Mut. Fire Ins. Co.*, 756 F. Supp. 732, 739–40 (S.D.N.Y. 1990), *aff'd*, 977 F.2d 47 (2d Cir. 1992) ("[T]here is nothing in [the legislative history or case law] or in the statute itself which indicates a legislative intent to exclude the insurance industry from the statute's remedial scope."), as confirmed by the NYAG's investigation and Assurance of Discontinuance specifically identifying GHI's conduct as violating GBL §§ 349 and 350.  A66–67 (Compl. ¶¶ 39–40); A168–74 (AOD ¶¶ 1, 23–26).

A plaintiff asserting a claim under GBL §§ 349 or 350 "must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly

17

deceptive act or practice." *Autobahn*, 953 N.Y.S.2d at 101 (internal quotation marks omitted); *see Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 n.1 (N.Y. 2002).

## A. The District Court Erroneously Concluded that GHI's Conduct Against New York City Employees and Retirees is Not "Consumer-Oriented"

Conduct is "consumer oriented" if it "ha[s] a broader impact on consumers at large." *Oswego*, 647 N.E.2d at 744. This requirement is "construed liberally" because the GBL is "broadly applicable, extending far beyond the reach of common law fraud." *N.Y. v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002). A plaintiff need not allege that the deceptive conduct is persistent or repetitive—though Plavin does so here. *See Oswego*, 647 N.E.2d at 744. Further, the conduct at issue need not be directed at every member of the public. Rather, "[t]he 'consumer-oriented' requirement may be satisfied by showing that the conduct at issue 'potentially affect[s] similarly situated consumers.'" *Wilson*, 625 F.3d at 64 (quoting *Oswego*, 647 N.E.2d at 745) (alteration in original).

### 1. The District Court's Novel "General Public" Analysis is Contrary to New York Caselaw and the GBL's Broad Scope

The District Court's Opinion erred in dismissing Plavin's GBL claims by creating an unprecedented rule that significantly narrows the scope of New York's broad consumer protection laws. The District Court held, *as a matter of law*, that conduct is "consumer-oriented" only if the service or deceptive conduct at issue is

directed to the general public in its entirety.  A18–23.  In the District Court's view, GHI's deceptive conduct was not "consumer-oriented" because GHI offered insurance to Plavin and the putative class by virtue of their employment with the City, "[t]he contract was aimed to benefit only a circumscribed class of individuals," and "a member of the public cannot approach [GHI] and gain membership in the same plan that Plavin received."  A20; *see* A21 ("the [GHI] plan cannot have been intended to be available to the public at large, because it is an exclusive plan that is the product of negotiations between the City and [GHI]").

The District Court's new rule finds no support in the case law or the plain language of the statute.  The relevant inquiry is whether Plavin alleges conduct that is "standardized such that [it] potentially affect[ed] similarly situated consumers," *Autobahn*, 953 N.Y.S.2d at 103, *not* whether the insurance plan was available to every member of the public or the deceptive conduct was directed to the "public at large."  A21–22.

The Second Circuit considered and rejected that exact same argument in *Koch v. Greenberg*, in which a purchaser of 2,600 bottles of high-end wine at auction brought GBL §§ 349 and 350 claims against the seller based on his misrepresentations about the provenance of 24 of those bottles.  626 F. App'x 335, 340 (2d Cir. 2015).  On appeal from a jury verdict in the purchaser's favor, the Second Circuit rejected the seller's claims that his conduct was not "consumer

19

oriented" because "the wine was a high-end collectible because it sold at immodest prices, precluding the involvement of the general public." *Id.* at 340. The Second Circuit rejected the seller's "general public" argument, explaining that "consumer-oriented conduct within the meaning of the NYGBL is broadly interpreted and requires merely that the conduct at issue 'have a broader impact on consumers at large,'" and "so long as the conduct at issue can 'potentially affect similarly situated consumers,' the requirement of consumer-oriented conduct is met." *Id.* (quoting *Oswego*, 647 N.E.2d at 745). The Court concluded that the evidence showed "consumer-oriented" conduct "given that the defendant provided wine to be sold at auction to other consumers similarly situated to [plaintiff, i.e., other auction-goers]." *Id.*

The district court in *Millennium Health, LLC v. EmblemHealth, Inc.*[4] also rejected the argument that "the statute covers only 'deceptive acts directed to the public at large.'" 240 F. Supp. 3d 276, 285–86 (S.D.N.Y. 2017). "New York courts have consistently held that harm to insureds may form the basis of a § 349 claim," particularly where "the unlawful conduct alleged 'was not an isolated incident, but a routine practice that affected many similarly situated insureds.'" *Id.* (quoting *Elacqua v. Physicians' Reciprocal Insurers*, 860 N.Y.S.2d 229, 231 (N.Y.

---

[4] Group Health Incorporated, the Defendant here, is a subsidiary of EmblemHealth, Inc. *See* Dist. Ct. Dkt. 30 (GHI disclosure statement).

App. Div. 2008)).  Applying these standards, the court concluded that the plaintiff, a clinical drug testing services provider, satisfied the consumer-oriented conduct element (despite not even being a consumer itself)[5] by alleging that the defendant insurer misrepresented to insureds that it would cover the costs of drug testing but then refused to pay over 27,000 claims for urine drug testing.  *Id.* at 281, 285–86.  The court determined that allegations of "harm to numerous insureds," and not to the "public at large," suffice under New York law.  *Id.* at 286.[6]

Indeed, countless courts have found a defendant's conduct to be consumer-oriented under GBL §§ 349 and 350 when it is directed at members of a discrete, pre-existing group, or as the result of a pre-existing contract with either the consumer or a third party.  In *Elacqua*, for example, a group of physicians sued their medical malpractice insurer under the GBL for failing to inform insureds of their right to select counsel in malpractice lawsuits.  860 N.Y.S.2d at 230–31.  Because the GBL contains no "general public" requirement, the appellate court properly reversed the dismissal of plaintiffs' GBL claims following a bifurcated trial on liability, concluding plaintiffs adequately alleged the insurer's practice was consumer-oriented where it "was not an isolated incident, but a routine practice

---

[5] Section 349(h) of the GBL permits "any person who has been injured by reason of any violation of this section" to bring a lawsuit.

[6] *Cf. Monga v. Security Mut. Life Ins. Co.*, No. 2000/05164, 2002 WL 31777872, at *8 (N.Y. Sup. Ct. 2002) (concluding complaint alleged consumer-oriented conduct where insurance policy "was also sold to many other consumers").

that affected many similarly situated insureds"—even though medical malpractice insurance is (obviously) available only to medical professionals. *Id.* at 231 (remanding for trial on damages).

In *M.V.B. Collision*, an auto repair shop brought a GBL § 349 claim against Allstate Insurance Company for a deceptive "practice of dissuading or preventing consumers from using Mid Island" and declaring cars that Allstate insureds sought to have repaired at Mid Island a "total loss" to avoid paying Mid Island for repairs. *M.V.B. Collision, Inc. v. Allstate Ins. Co.*, 728 F. Supp. 2d 205, 213–14, 221 (E.D.N.Y. 2010). The court concluded that "a rational trier of fact could find . . . that this practice had a broad impact on consumers at large, *i.e.*, any Allstate customer who brought his car to Mid Island." *Id.* (denying defendant's motion for summary judgment on GBL claim). As with *Elacqua*, the deceptive conduct was directed only at members of a preexisting group (i.e., individuals who had already enrolled in Allstate's auto insurance plan and who needed work on their cars), and not the "public at large."

And in *Accredited Aides Plus, Inc.*, a New York appellate court concluded that plaintiffs sufficiently alleged a group self-insured trust that provided worker's compensation coverage to employees whose employers joined the trust engaged in consumer-oriented activity by distributing "materially misleading information about the trust to employers," which "jeopardized the worker's compensation

22

benefits of New York employers and their employees." *Accredited Aides Plus, Inc. v. Program Risk Mgmt., Inc.*, 46 N.Y.S.3d 246, 257 (N.Y. App. Div. 2017) (internal quotation marks omitted) (reversing trial court's dismissal of complaint for failure to allege consumer-oriented conduct).

In sum, the District Court's conclusion that conduct must be directed at every member of the general public and not based on membership in a pre-existing group, is not only inconsistent with cases from state and federal courts in New York—it has been repeatedly ***rejected*** by those courts.[7]  If permitted to stand, the District Court's ruling will carve out a wide range of deceptive conduct from the GBL's reach and artificially divide consumers based on how they became exposed to a defendant's deceptive conduct (e.g., through the workplace, a professional association, a membership plan, or a pre-existing contractual relationship).  In this case, upholding the Court's conclusion would mean barring any employee insured through an employer-sponsored plan from ever asserting a GBL claim.  More broadly, it would also mean barring any individual who is subjected to deceptive

---

[7] For additional examples, see *McCracken v. Verisma Sys., Inc.*, 131 F. Supp. 3d 38, 46–47 (W.D.N.Y. 2015) (denying motion to dismiss patients' GBL § 349 claim against hospital and medical records provider who charged patients excessive amounts for copies of medical records, despite the fact that the conduct was directed at only consumers who had already received treatment from the medical provider); and *Hoover v. HSBC Mortg. Corp.*, 9 F. Supp. 3d 223, 253–54 (N.D.N.Y. 2014) (denying motion to dismiss borrowers' GBL § 349 claim against mortgage lenders and insurers who "force-placed" excessive flood insurance coverage on its borrowers, but not the general public, in kickback scheme).

conduct or marketing through his membership in a particular group from asserting a GBL claim.  This is not the law.  All that is required is allegations sufficient to show that a defendant's conduct had a broad impact on "numerous insureds."  *See Millennium Health, LLC*, 240 F. Supp. 3d at 286.  With 994,500 members enrolled in the GHI Plan, this test is unquestionably met.

> **2.    The District Court Erred in Viewing Plavin's Claims as a Private Contract Dispute Unique to One Insured, When in Fact the Claims Concern Deceptive Marketing of Insurance to Multiple Insureds**

Animating the District Court's "general public" analysis was its view that this case involves a private contract dispute.  According to the District Court, because the original source of Plavin's relationship with GHI was a contract between GHI and the City of New York, and Plavin is purportedly a "third-party beneficiary" to this contract, the deceptive conduct was not consumer-oriented and this case is nothing more than a "private contractual dispute."  *See, e.g.*, A18–19 (conduct not consumer-oriented because "the alleged deception arises out of a private contract").[8]  This is both legally and factually incorrect.

*First*, the District Court erred in relying on and making assumptions about a contract that was not even part of the record. Without reviewing a single term in that contract, the Court concluded that Plavin must be a third-party beneficiary to

---

[8] The District Court also relied on this contract in dismissing Plavin's unjust enrichment claim.  That issue is discussed in Section IV below.

the contract and therefore is not a consumer because his claims are incidental to a private third-party contract negotiated by sophisticated parties. A19-23. There is no basis for this conclusion.

A third-party beneficiary is a beneficiary with standing to sue under a contract to which it is not a party. *See, e.g.*, *Dormitory Auth. v. Samson Constr. Co.*, 94 N.E.3d 456, 459 (N.Y. 2018). The New York Court of Appeals has held that such right exists in only two situations: "when the third party is the only one who could recover for the breach of contract or when it is otherwise clear from the language of the contract that there was 'an intent to permit enforcement by the third party.'" *Id.* (quoting *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 485 N.E.2d 208, 212 (N.Y. 1985)). Neither circumstance is satisfied here. Plavin has no greater right to sue under the City's contract with GHI than a City resident would have to sue a waste management company for breach of its contract with the City. Indeed, the absence of such a right, coupled with GHI's failure to ever send GHI Plan members policies or other contracts, is precisely why Plavin is alleging a claim for unjust enrichment: there is no express contract that Plavin has to enforce against GHI for anything.

In concluding otherwise, the District Court made assumptions about a contract that it has not even seen. This is improper at any stage of the litigation, and particularly on a motion to dismiss, when courts are confined to the four

corners of the complaint (with limited exceptions).  *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record.") (internal quotation marks omitted).

**Second**, the distinction between private contract disputes and "consumer-oriented" conduct is not whether a contract lurks in the background of the parties' relationship.  Rather, the question is whether the plaintiff's claim arises from a "single shot transaction" and bears solely on the specific terms of his insurance policy or interaction with the insurer, or whether the claim concerns the insurer's conduct that does or could affect similarly situated insureds.  *Compare Genesco Entm't v. Koch*, 593 F. Supp. 743, 752 (S.D.N.Y. 1984) (dispute over "single shot transaction" regarding sophisticated party's rental of a municipal stadium was the type of individualized, complex contract distinct from average consumers paying modest sums for a good or service), *with Kurschner v. Mass. Cas. Ins. Co.*, No. 08-0011, 2009 WL 537504, at *13–14 (E.D.N.Y. Mar. 3, 2009) (finding plaintiff alleged consumer-oriented activity where the dispute was "not limited to a challenge regarding coverage made on the basis of facts unique to a single insured" but rather concerned defendant's "actions in its dealings with multiple insureds") (internal quotation marks and alterations omitted).[9]

---

[9] *See Karlin v. IVF Am., Inc.*, 712 N.E.2d 662, 667 (N.Y. 1999) (GBL §§ 349 and

This case is not about a "single shot transaction," but rather broad deceptive conduct directed at hundreds of thousands of insureds. Indeed, that is precisely the reason why this case was filed as a class action. Plavin's claims here are about GHI's misleading advertisements to Plavin and similarly situated consumers who were in the market to purchase insurance—not the terms of GHI's contract with the City. Because a defendant's acts are "consumer oriented" if they "have an impact broader than the particular plaintiffs, as opposed to a private contract dispute," *U.S. ex rel. Krahling v. Merck & Co.*, 44 F. Supp. 3d 581, 605 (E.D. Pa. 2014), the terms of GHI's contract with the City are irrelevant to Plavin's GBL claims. Whatever those terms, GHI was not permitted to then mislead hundreds of thousands of City employees and retirees regarding out-of-network reimbursements. *See Gaidon*, 725 N.E.2d at 604, (merger provision in contract is "not determinative of plaintiffs' section 349 claims, which are based on deceptive business *practices*, not on deceptive contracts") (emphasis in original).

Courts regularly find that insurers' standardized practices towards multiple prospective or current insureds may subject them to GBL liability, just like any other seller in the market. The Court does not need to look further than *Gaidon*, which held that GBL claims alleging an insurer provided deceptive insurance

350 claims not viable for "victims of deception in a single transaction in which the only parties truly affected by the alleged misrepresentations were plaintiffs and defendants").

illustrations to prospective policyholders "involved an extensive marketing scheme that had a broader impact on consumers at large," and therefore was not a "private contract dispute as to policy coverage." *Id.* (internal quotation marks omitted); *see Autobahn*, 953 N.Y.S.2d at 102 (rejecting insurer's argument that plaintiffs' claims were based on a "private contract dispute" or "single shot transaction" where defendant's standard practice was to "misle[a]d [insureds] . . . into believing that they must have their vehicles repaired at [authorized] repair shops" rather than independent shops of their choosing).[10]

For these reasons, the District Court's reliance on the *New York University* (A19–20) and *Sichel* (A23) cases was misplaced. *New York University* involved a dispute over the university's claim under its private, tailored commercial crime insurance policy. *New York Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 770 (N.Y. 1995). By contrast here, Plavin is not a sophisticated party with a unique insurance policy, the City is not the insured, this is not commercial insurance, and Plavin's claims have nothing to do with the terms of or negotiation surrounding the contract between the City and GHI.

Like *New York University*, *Sichel* involved an insured's private dispute with

---

[10] *See also Wilner v. Allstate Ins. Co.*, 893 N.Y.S.2d 208, 213, 216 (N.Y. App. Div. 2010) (collecting cases and concluding that allegations of insurer's deceptive policy effectively requiring insureds to litigate a claim on the insurer's behalf satisfied consumer-oriented standard where the disputed provision "is not unique to the plaintiffs, but is contained in every [homeowners' policy issued by defendant]").

his disability insurers, rather than consumer-oriented conduct, where he contested the diagnosis of a physician hired by the insurers to evaluate his ability to work following an injury. *Sichel v. UNUM Provident Corp.*, 230 F. Supp. 2d 325, 330 (S.D.N.Y. 2002). As the Court in *Sichel* recognized, an insurer's handling of unique claim processing disputes like the one in *New York University* is not comparable to a uniform marketing scheme directed at thousands of consumers, as was the case in *Gaidon* (and here). *Id.* at 330 (comparing *Gaidon*, 725 N.E.2d at 603–04, *with New York Univ.*, 662 N.E.2d at 770–71).

In this case, while the City's contract with GHI may have been the product of private contract negotiations between sophisticated parties, Plavin's relationship with GHI was not. It was the product of Plavin—along with 311,880 other NYC employees and non-Medicare retirees—receiving GHI's deceptive marketing materials touting its "comprehensive" out of network coverage, electing the GHI Plan, never receiving a policy or reimbursement schedule, and then finding out that GHI was reimbursing, on average, 23% of out-of-network costs, and for some procedures as low as 9%. A60–63 (Compl. ¶¶ 20–29).

***Third,*** even if Plavin were a third-party beneficiary—which he is not—the Court did not identify a single case holding that third-party beneficiaries of a contract cannot also be consumers for purposes of the GBL or cannot bring GBL claims. Case law confirms there are no such restrictions on GBL lawsuits. *See*

*Hart v. Moore*, 587 N.Y.S.2d 477, 478–80 (N.Y. Sup. Ct. 1992) (concluding that a "third party beneficiary to an insurance policy may sue the insurance company for deceptive acts and practices under [GBL] 349" based on the "broad application" and "remedial" purpose of the statute, and permitting plaintiff, who was injured at a friend's home, to pursue GBL claims against friend's homeowners policy insurer based on "company-wide" practice of requiring general claim releases); *cf. Am. Med. Assoc. v. United Healthcare Corp.*, No. 00-2800, 2003 WL 22004877, at *1, *6 (S.D.N.Y. Aug. 22, 2003) (permitting New York public employees' unions to intervene in a lawsuit against United Healthcare to assert GBL claims on behalf of their United-insured members—"approximately two million New York State and municipal employees"—for deceptive conduct related to the insurer's out-of-network charge determinations). Reaching a different result here would impermissibly narrow New York's broad consumer protection laws.

> **3.    The New York Attorney General's Investigation and Assurance of Discontinuance Support a Finding that Plavin Adequately Alleged Consumer-Oriented Conduct**

The NYAG found that GHI engaged in "repeated" violations of GBL §§ 349 and 350 in marketing its insurance plan to City employees and retirees. A66 (Compl. ¶ 39); A174 (AOD ¶ 26). The District Court discounted the NYAG's finding by emphasizing that GHI admitted no wrongdoing, *see* A24–25, instead of construing this finding in the light most favorable to Plavin. Had the District Court

applied the correct standard, the NYAG's finding supports the plausibility of Plavin's allegations that GHI engaged in "consumer oriented" conduct. A66–67 (Compl. ¶¶ 39–40).[11]

These findings were predicated on a determination that Defendant's conduct was "consumer-oriented"—a necessary element of the GBL claims.[12]  *See People ex rel. Schneiderman v. Orbital Pub. Grp., Inc.*, 21 N.Y.S.3d 573, 585–86 (N.Y. Sup. Ct. 2015) ("In order to make a prima face case under GBL § 349, the State must show that the respondents have engaged in a 'deceptive act or practice that is consumer oriented.'") (quoting *Gaidon*, 725 N.E.2d at 603).  The District Court failed to acknowledge that NYAG applies the standard GBL elements in investigating claims pursuant to Article 22-A of the GBL, which includes §§ 349 and 350.

---

[11] *See, e.g.*, *Kucher v. Domino's Pizza, Inc.*, No. 16-2492, 2017 WL 2987214, at *3, *6–7 (S.D.N.Y. Feb. 13, 2017) (granting conditional certification in FLSA case based in part on finding that "material in the [New York Attorney General's] assurance of discontinuance . . . add[s] some credence to the Plaintiffs' allegations" and "at least undermine[s]" defendants' claims that Plaintiffs fail to identify a policy or practice of requiring workers at multiple restaurants to clock out before the end of their shifts).

[12] The NYAG repeatedly identified City employees and retirees as "consumers" in determining that GHI violated GBL §§ 349 and 350.  A168–77 (AOD ¶¶ 7, 13, 19, 20, 27, 34, 35).

**B.    The District Court Ignored Binding New York Law and Prejudged the Merits in Concluding that GHI's Marketing Materials are Not Materially Misleading**

A deceptive act or practice is misleading if it is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (quoting *Oswego*, 647 N.E.2d at 745).    Both affirmative representations and omissions are actionable under the GBL. *Gaidon*, 725 N.E.2d at 604, 610; *see In re Evergreen Mut. Funds Fee Litig.*, 423 F. Supp. 2d 249, 264 (S.D.N.Y. 2006) ("Omissions, as well as acts, may form the basis of a deceptive practices claim" under the GBL) (citing *Stutman v. Chemical Bank*, 731 N.E.2d 608, 611 (N.Y. 2000)).    Whether a deceptive act or practice is materially misleading is almost always a question of fact that cannot be resolved on a motion to dismiss. *See Buonasera v. Honest Co.*, 208 F. Supp. 3d 555, 566 (S.D.N.Y. 2016) ("Courts have generally held that since this second factor requires a reasonableness analysis, it cannot be resolved on a motion to dismiss.").    Dismissal is proper only when the "impressions that a reasonable consumer might draw are 'patently implausible' or 'unrealistic,'" meaning that, as a matter of law, *no* reasonable consumer could be misled. *Eidelman v. Sun Prods. Corp.*, No. 16-3914, 2017 WL 4277187, at *4 (S.D.N.Y. Sept. 25, 2017) (denying motion to dismiss because "the Court cannot conclude as a matter of law . . . that no reasonable consumer could be misled" by statements on a laundry detergent

32

bottle that the brand was recommended by dermatologists for sensitive skin when only other detergents within the brand, and not that particular formula, were recommended).

### 1. The District Court Erred in Deciding GHI's Conduct Was Not "Materially Misleading" as a Matter of Law Based on Disclaimers

In deciding that the Complaint failed to allege materially misleading conduct as a matter of law, the District Court principally relied on the presence of purported disclaimers in GHI's marketing materials. *See generally* A23–33 (weighing misrepresentations against disclaimers). The Court determined that GHI's statements that insureds "may" have to pay more for out-of-network services than shown in the coverage examples, that the examples were not "cost estimators," and that the optional Rider provided increased coverage only for "certain" services, meant that no reasonable consumer could rely on the coverage examples to accurately reflect levels of reimbursement. *See* A23–35.

New York's highest court has held that the presence of warnings or disclaimers in marketing materials or advertisements "do not bar plaintiffs' claims for deceptive trade practices at this stage of the proceedings [i.e., on a motion to dismiss], as they do not establish a defense as a matter of law." *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 676 (N.Y. 2012) (reversing dismissal of GBL claims based on "disclaimers set forth in defendant's catalogs"); *Gaidon*, 725

33

N.E.2d at 604–05, 608 (reversing dismissal of GBL claims based on disclaimer because insurance illustrations can create "unrealistic expectations," notwithstanding the presence of a disclaimer); *see Orbital Pub. Grp., Inc.*, 21 N.Y.S.3d at 586 (presence of disclaimer "does not justify dismissal," but rather "raises a question of fact" about misleading nature of deceptive statements). Accordingly, the District Court's dismissal of Plavin's GBL claims based on the purported disclaimers in GHI's marketing materials was error.

Even if the disclaimers were properly considered, the fact that the misleading examples of out-of-network coverage are qualified by boilerplate language that says "this is not a cost estimator" or that says reimbursements "may be less than the fee charged by the non-participating provider" does not mean as a matter of law that no reasonable insured could have been misled into thinking reimbursement rates would be higher than they actually were.[13]    A27-31.    *See*

---

[13] Just the opposite, when the NYAG analyzed GHI's deceptive practices, the presence of these purported "disclaimers" did not affect its conclusion that GHI plainly engaged in materially misleading conduct. Indeed, the NYAG found one of the disclaimers relied upon by the District Court to ***itself*** be a misleading statement: A169–70 (AOD ¶¶ 12–13) ("Documents prepared for prospective and current GHI Plan members merely suggest that it is only a possibility that members will be required to pay for out-of-network services. For example, the Summary Program Description states that '[t]he reimbursement levels as provided by the schedule, may be less than the fee charged by the non-participating provider.' . . . . However, it is highly likely that GHI Plan members will be required to pay for out-of-network services. The reimbursement amounts in the Schedule are in most, if not all, circumstances less – and in many instances, *far less* – than the actual fees charged by out-of-network providers. Thus, in many instances, the small

*Gaidon*, 725 N.E.2d at 604–05 ("Consumers vary in their level of sophistication and their ability to perceive the connection" between various statements in insurance marketing materials).   Whether the disclaimers defeat Plavin's GBL claims on the merits is a fact question that the District Court prematurely decided at the pleadings stage, before discovery into GHI's practices has been completed or put before the Court.   *Id.* (the "prospect" that "reasonable consumers could be misled in a material way . . . is enough to create a question of fact" where "[t]he very goal of the marketing scheme was to convince prospective purchasers" that the insurance illustrations were realistic).

### 2.   The District Court Erred in Suggesting that Reliance is an Element of a GBL Claim and that Omissions are Not Actionable

Compounding the above errors, the District Court's Opinion also suggested that (a) reliance is an element of a GBL claim and that (b) omissions are not actionable.   On reliance, the Opinion faulted Plavin for failing to allege he would not have chosen GHI's insurance plan had he known the truth about the out-of-network reimbursements.   A30–32.   But, under controlling New York law, Plavin is not required to allege or prove reliance.   New York's highest court has made

---

reimbursement amount will result in substantial out-of-pocket costs for the consumer.   GHI's materials do not accurately set forth the potentially wide gap between the out-of-network reimbursement and out-of-network charges, and potentially substantial out-of-pocket amounts for which GHI Plan members will be responsible.") (emphasis in original).

clear that there is no "reliance requirement [for] General Business Law §§ 349 and 350 claims." *Koch*, 967 N.E.2d at 676 (reversing dismissal of GBL claims).[14]

On omissions, the Opinion stated that "Plavin does not allege any *explicit* misrepresentations so much as complain that the marketing materials should have contained more information about out-of-network coverage." A25. But, under New York law, both representations *and* omissions are actionable under the GBL. *Gaidon*, 725 N.E.2d at 604 ("This Court has defined a 'deceptive act or practice' as a representation or omission . . .."). The gravamen of Plavin's claims is that GHI portrayed the GHI Plan as a normal PPO that provides comprehensive coverage for out-of-network services, but failed to disclose highly unfavorable information about its out-of-network reimbursements prior to plan selection or renewal. These allegations fit squarely within *Gaidon*'s rubric.

### 3.    As Confirmed by *Gaidon*, the Allegations are Sufficient to Support a Claim of "Materially Misleading" Statements

Plavin alleges that GHI's marketing materials deceived potential insureds into believing that the plan would provide "comprehensive" out-of-network coverage at reasonable levels of reimbursement that were consistent with GHI's coverage examples. A60–62 (Compl. ¶¶ 19–20, 25).

---

[14] Moreover, the only case cited by the District Court on this point analyzes a claim under Insurance Law § 4226, not GBL §§ 349 or 350. *See* A31.

Plavin alleges the following misrepresentations and omissions in GHI's materials: (a) GHI's illustrations, or coverage examples, showing a 66% reimbursement rate for a sample service, were nowhere near the average reimbursement rate of 23% and failed to apprise consumers that reimbursement rates for certain services could be as low as 9%; (b) GHI failed to disclose that the 1983 Schedule had effectively not been updated and did not provide reimbursement levels even close to the amounts reflected in the marketing materials; (c) GHI failed to disclose that the statement that reimbursement amounts "may be less" than the fee charged by the non-participating provider actually means "will be substantially less"; (d) GHI failed to disclose that the optional Rider excluded all out-patient out-of-network services; and (e) GHI touted the benefits of its "additional 'Catastrophic Coverage,'" when the coverage was not actually additional, did not provide what is commonly referred to as Catastrophic Coverage, and GHI's promise to pay "100% of the Catastrophic Allowed Charge" was meaningless because that was simply the same as the normal allowance. A55–58 (*Id.* ¶¶ 4–12), A62–67 (*Id.* ¶¶ 27–40). Considering the totality of these detailed allegations, the Complaint satisfies the plausibility standard applicable on a motion to dismiss.

These allegations are a far cry from the GBL claims—usually in the consumer goods context—that "border on fantasy" and do not raise a question of

fact sufficient to withstand dismissal. *In re Frito Lay N. Am., Inc. All Nat. Litig.*, No. 12-2413, 2013 WL 4647512, at *15-16 (E.D.N.Y. Aug. 29, 2013). The types of claims courts have dismissed as a matter of law include a plaintiff's claims he believed the net weight printed on a package of seasoned shrimp referenced only the shrimp and not the other ingredients listed on the label, *see Verzani v. Costco Wholesale Corp.*, No. 09-2117, 2010 WL 3911499, at *2 (S.D.N.Y. Sept. 28, 2010) ("net weight means the weight of an item exclusive of its packaging," not exclusive of the other listed ingredients), or a plaintiff's claims he believed a bottle of Advil had more pills in it based on the size of the bottle despite the front label listing the number of pills, *see Fermin v. Pfizer, Inc.*, 215 F. Supp. 3d 209, 210–11 (E.D.N.Y. 2016).

For its part, the District Court relied on a consumer goods GBL case that follows the same pattern and is readily distinguishable. A32. This case, where consumers were presented with insurance marketing materials that were designed to overstate the extent of out-of-network coverage *and which have already been found deceptive by the New York Attorney General*, cannot plausibly be compared to the District Court's example, involving consumers who should know that the Yankees do not directly sell tickets on the ticket *resale* site StubHub.com. *Id.* (citing *Weinstein v. eBay Inc.*, 819 F. Supp. 2d 219, 228 (S.D.N.Y. 2011)).

Instead, Plavin's claims are on all fours with *Gaidon*, the leading GBL

insurance marketing case, where New York's highest court concluded that plaintiff sufficiently alleged defendant insurer's conduct was materially misleading because it falsely advertised vanishing premium life insurance policies "by using illustrations that created unrealistic expectations" of future premium payments. *Gaidon*, 725 N.E.2d at 604.

### 4.    The District Court's Opinion Failed to Draw Reasonable Inferences in Plavin's Favor

In addition to misconstruing the applicable law, the District Court's Opinion repeatedly erred in declining to draw reasonable inferences in Plavin's favor, and, instead, drawing all inferences in the light most favorable to GHI.  This is evident throughout the District Court's "materially misleading" analysis.

For example, in considering Plavin's allegations about the optional Rider, the Court substituted its own judgment for that of a reasonable consumer and failed to construe the allegations in the light most favorable to Plavin.  A29–30.  GHI touted the Rider as an "enhanced schedule for certain services [that] increases the reimbursement of the basic program's non-participating provider fee schedule, on average, by 75%."  A65 (Compl. ¶ 36).  Plavin alleges that GHI failed to disclose that the Rider applied only to in-patient out-of-network services and excluded all out-patient out-of-network services—which accounted for 65% of out-of-network costs.  A65–66 (*Id.* ¶¶ 36–38).  The Court concluded that GHI "already disclosed" this information by stating that the Rider only covered "certain services."  A29–30.

By far the most reasonable inference to draw from this language is that a reasonable consumer would expect that the Rider excludes particular medical treatments, not that it excludes the entire *category* of out-patient out-of-network services. At the pleading stage, the Court should have accepted this reasonable inference.

Similarly, the Court erred in suggesting that Plavin should have known that GHI's plan was too good to be true since it was the only PPO offered to NYC workers that did not require out-of-pocket payment of additional premiums (beyond the premiums the City paid on Plavin's behalf as part of his compensation). A26–27. But many employer-sponsored health plans do not require payment of premiums, including normal PPOs that pay reasonable amounts of reimbursement. And, like many other public employees, health insurance was an integral part of Plaintiff's compensation package. *See* n.2. Once again, the District Court's reasoning failed to construe the allegations in the light most favorable to Plavin, which is that "[t]he very goal of the marketing scheme was to convince prospective purchasers" that GHI's representations of comprehensive out-of-network coverage were realistic. *Gaidon*, 725 N.E.2d at 604–05.

And the District Court went to great lengths to discount the significance of the NYAG's findings, construing them as applying only to the unsophisticated consumer—the "ignorant, the unthinking and the credulous"—rather than the

reasonable consumer.  A24.  (quoting *People ex rel. Spitzer v. Applied Card Sys., Inc.*, 805 N.Y.S.2d 175, 177 (N.Y. App. Div. 2005)).  But *Spitzer* addressed only the standard for investigations under New York Executive Law § 63—which, unlike the GBL, does not have a reasonable consumer limitation.  805 N.Y.S.2d at 177.  *Spitzer* expressly recognized this; the court went on to explain in the same paragraph that the GBL requires a showing that a "reasonable consumer" would have been misled.  *Id.* at 178 (citing *People ex rel. Spitzer v. Gen. Elec. Co.*, 756 N.Y.S.2d 520, 523 (N.Y. App. Div. 2003) ("Executive Law § 63(12) was meant to protect not only the average consumer, but also the ignorant, the unthinking and the credulous, . . . . In contrast, under [GBL] § 349, the plaintiff must prove that . . . the deceptive practice must be likely to mislead a reasonable consumer acting reasonably under the circumstances.") (internal quotation marks and citations omitted)).

The District Court's Opinion ignores that the NYAG's investigation was also authorized under Article 22-A of the GBL, and its findings of repeated violations of GBL §§ 349 and 350 by GHI were necessarily based on the "reasonable consumer" standard.  *See Orbital Pub. Grp.*, 21 N.Y.S.3d at 585–86 (in a special proceeding brought under § 63 and Article 22-A, stating that GBL §§ 349 and 350 require the conduct to be deceptive to a "reasonable consumer"

and that the State "raise[d] a question of fact as to whether reasonable consumers would be materially misled").

In sum, the District Court repeatedly and consistently drew inferences in GHI's favor, going so far as to advance arguments and reach conclusions that GHI did not even advocate.  This was error.  *See Phillips*, 515 F.3d at 231 (appellate court's role in reviewing dismissal on a Rule 12(b)(6) motion is to "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief") (internal quotation marks omitted).

## III.   The District Court Erred in Dismissing the New York Insurance Law Section 4226 Claim

New York Insurance Law § 4226 permits "any person aggrieved" by an insurer (like Defendant) who "knowingly" circulates or causes to be circulated any statement "misrepresenting the terms, benefits or advantages of any of its policies or contracts."  N.Y. Ins. Law § 4226(a)(1), (d).  Section 4226(a)(1) "reflects State policy that insurers deal fairly with their insureds and the public at large."  *Unibell Anesthesia, P.C. v. Guardian Life Ins. Co. of Am.*, 658 N.Y.S.2d 14, 15 (N.Y. App. Div. 1997).  Plavin alleges that he was "aggrieved" within the meaning of § 4226 when his expectations were not met and he had to pay substantial out-of-network costs as a result of GHI's conduct.  A67 (Compl. ¶ 41).

As with the GBL claims, the District Court dismissed Plavin's § 4226 claim based on the presence of purported disclaimers, and based on the Court's resolution of disputed issues of fact against Plavin.  A33–34.  For the reasons described *supra* Section II.B, this Court also should reverse the District Court's dismissal of the § 4226 claim.

The District Court also held that Plavin's allegations failed to satisfy § 4226's purported "scienter" element.  *See* A34–35 (concluding that the Complaint lacks allegations of "nefarious intent" based on Court's reading of the purported disclosures in Defendant's marketing materials).  This too was incorrect. Section 4226 on its face requires only a showing that an insurer knowingly mispresented the terms, benefits, or advantages of a policy.  Accordingly, "[a]s with a General Business Law § 349 claim, no proof of fraudulent intent is required to sustain an Insurance Law § 4226 violation." *Russo v. Mass. Mut. Life Ins. Co.*, 711 N.Y.S.2d 254, 256 (N.Y. App. Div. 2000), *rev'd in part on other grounds sub nom.*, *Gaidon v. Guardian Life Ins. Co. of Am.* (*Gaidon II*), 750 N.E.2d 1078 (N.Y. 2001).  The District Court's conjuring of a "nefarious intent" scienter requirement was contrary to law.

Further, there is no basis to impose a Rule 9(b) pleading standard for the type of § 4226 claim alleged here.  Similar to GBL § 349 claims, which are not subject to Rule 9(b)'s heightened pleading requirement, *see Pelman ex rel. Pelman*

43

*v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) (GBL § 349 claims are

subject only to Rule 8(a)'s pleading requirements), § 4226 claims do not require

fraudulent intent and are not required to be pleaded as fraud claims. *Cf. Russo*, 711

N.Y.S.2d at 256 (like GBL § 349 claims, § 4226 "contemplates actionable conduct

that does not necessarily rise to the level of fraud") (internal quotation marks

omitted).[15]    Nonetheless, Plavin alleged the who, when, where, and what of how

GHI "misrepresent[ed] the terms, benefits or advantages of any of its policies or

contracts," § 4226(a)(1), and it is well established that "[m]alice, intent,

knowledge, and other conditions of a person's mind may be alleged generally."

Fed. R. Civ. P. 9(b); *see* A73 (Compl. ¶ 69).

Indeed, Plavin's allegations of GHI's knowledge go well beyond general

allegations that GHI engaged in knowing and willful behavior. A55–58, A61–62,

A65 (Compl. ¶¶ 4–11, 25, 35) (deceptive promotion to foster enrollment in GHI

---

[15] In *Brach Family Found., Inc. v. AXA Equitable Life Ins. Co.*, No. 16-740, 2016 WL 7351675, at *4–5 (S.D.N.Y. Dec. 19, 2016), the court concluded the particular § 4226 claim in that case was subject to Rule 9(b) where it sounded in fraud; the court granted leave to amend to identify specific misleading statements, but found that the complaint already adequately pled scienter. The § 4226 claim ultimately survived once Plaintiff alleged specific misleading statements. *Brach Family Found., Inc. v. AXA Equitable Life Ins. Co.*, 2017 WL 5151357, at *1–2 (S.D.N.Y. Nov. 3, 2017), *reconsideration denied*, 2018 WL 3632500 (S.D.N.Y. July 30, 2018). Here, there is no question that specific misleading statements are identified, the claim does not sound in fraud, and the District Court's requirement of a specific allegation of "nefarious intent" has no basis in the statute or caselaw. On the contrary, it violates Rule 9(b)'s mandate that conditions of mind may be alleged "generally."

Plan over others while hiding truth about out-of-network reimbursement); A62–65 (*Id.* ¶¶ 27–35) (deception and concealment of reimbursement schedule and empty promises of "Catastrophic Coverage"); A65–66 (*Id.* ¶¶ 36–38) (marketing of worthless Rider); A54–55, 66 (*Id.* ¶¶ 1, 3, 39) (history of violating New York law in marketing and administration of the Plan). And if the District Court had granted leave to amend, Plavin could have added additional allegations establishing GHI's knowledge.

Finally, the District Court erred to the extent it ruled that reliance is an element of a § 4226 claim. *See* A31.[16] The plain text of § 4226 requires only that the plaintiff show a knowing misrepresentation, and New York courts have declined to write a reasonable reliance requirement into the statute. *See, e.g.*, *Cilente v. Phoenix Life Ins. Co.*, No. 600313/08, 2014 WL 70336 (N.Y. Sup. Ct. 2014) (dismissing claims for fraud on "reasonable reliance" grounds but permitting claims under § 4226 to proceed), *aff'd as modified*, 134 A.D.3d 505, 507 (N.Y. App. Div. 2015) (dismissing § 4226 claim because defendants established that their conduct was "inadvertent and not knowing"). Section 4226 does not require reliance for the same reason that New York courts have found that similar statutes, like GBL §§ 349 and 350, do not require reliance: for "General Business Law

---

[16] The case cited in the District Court's Opinion did not impose a reliance standard on § 4226 claims; rather, it discussed whether the plaintiff had alleged injury-in-fact sufficient to establish Article III standing.

§§ 349 and 350 claims . . .[,] [j]ustifiable reliance by the plaintiff is not an element of the statutory claim." *Koch*, 967 N.E.2d at 676. In the alternative, the District Court erred in dismissing this claim with prejudice rather than granting leave to amend to allege facts supporting reliance.

## IV.    The District Court Erred in Dismissing the Unjust Enrichment Claim

Unjust enrichment is an equitable claim that may be pled where the existence, validity, or scope of a contract is disputed—or where no contract at all governs the plaintiff's claims. *See, e.g.*, *Dervan v. Gordian Grp. LLC*, No. 16-1694, 2017 WL 819494, at *12 (S.D.N.Y. Feb. 28, 2017) ("[C]ourts . . . have routinely allowed plaintiffs to advance past the pleading stage on an alternate theory of unjust enrichment" when the existence of a contract is disputed). The mere existence of a contract, even on the same subject matter, does not automatically foreclose an unjust enrichment claim. Instead, the contract must "clearly cover" the dispute in question. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 483 (S.D.N.Y. 2014) ("[T]he predicate for dismissing quasi-contract claims is that [an enforceable] contract at issue clearly covers the dispute between the parties.") (internal quotation marks omitted). The District Court dismissed Plavin's unjust enrichment claim on the grounds that Plavin must be the third-party beneficiary of the contract between the City and GHI and the contract must cover the dispute between the parties regarding GHI's

deceptive marketing practices.  This was error, for at least two reasons.

*First*, the Court principally relied on a contract it has never seen between GHI and the City.  *Supra* Section II.A.  Plavin did not bring a contract claim based on this or any other contract.  More importantly, GHI did not attach this contract to its motion or rely on it as a basis for dismissal of the unjust enrichment claim.[17]  As explained above, before assuming that Plavin is a third-party beneficiary of the contract, and that Plavin has standing to enforce the terms of the contract, the Court would have to analyze the contract itself.  *E.g.*, *Dormitory Auth.*, 94 N.E.3d at 460.

*Second*, without reviewing the terms of the contract, the District Court could not have reasonably concluded that the contract covers the subject matter of the dispute.  Plavin disputes both that he is a third-party beneficiary of the City's contract and that the contract covers GHI's deceptive marketing of its insurance plan.  A62–67 (Compl. ¶¶ 27–40).  That is why he brought an unjust enrichment claim; there is no express contract that Plavin has to enforce against GHI for anything.[18]  Moreover, Plavin alleges that he never received a copy of the policy, let alone GHI's contract with the City.  A60–61 (*Id.* ¶¶ 22–24).  In light of these

---

[17] GHI attached only a Certificate of Insurance (COI) purportedly for the GHI Plan, *see* A191–234, which GHI claims is a valid contract between Plavin and GHI but which Plavin alleges he never received.  A61 (Compl. ¶ 24).

[18] If the District Court believed otherwise, it should have granted leave to amend to assert a contract claim.  It did not.  Plavin does not request that relief because, for the reasons stated, there simply is no contract that governs Plavin's claims.

allegations, dismissal of the unjust enrichment claim was error.  *See Nat'l Convention Servs., L.L.C. v. Applied Underwriters Captive Risk Assur. Co.*, 239 F. Supp. 3d 761, 794–95 (S.D.N.Y. 2017) ("Because the scope of the contractual obligations and further factual developments regarding the conduct of the parties have yet to be determined, dismissing the plaintiffs' unjust enrichment claim at this stage would be premature.") (internal quotation marks omitted).

## V.    The District Court Erred in Dismissing the Class Claims

The District Court concluded that the class claims fail because Plavin failed to adequately plead the underlying elements of the GBL and unjust enrichment claims.  A40.  For the reasons outlined above in Sections II-IV, the District Court erred in analyzing the elements of Plavin's claims, and therefore Plavin should be permitted to proceed with these claims on an individual and class basis.

## VI.   The District Court Erred in Concluding Amendment Would Be Futile

### A.    Standard of Review

This Court reviews for abuse of discretion the District Court's conclusion that amendment of the Complaint would be futile.  *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).

### B.    Argument

Under Fed. R. Civ. P. 15(a)(3), "[t]he court should freely give leave when justice so requires."  Here, the District Court dismissed all of Plavin's claims with prejudice.

Plavin agrees that amendment would be futile for certain claims if the District Court's legal determinations were upheld. For example, if no member of an employer-sponsored insurance plan could ever bring a GBL claim, then there is obviously no GBL claim that Plavin could plead. However, for the reasons stated above, those rulings are plainly contrary to New York law and should be reversed.

For other purported deficiencies, leave to amend should be granted even if the District Court's determinations are upheld (which they should not be). For example, the District Court's Opinion appears to assume that GHI's coverage examples were factually accurate for the services depicted, and that cherry-picking coverage examples is not by itself deceptive. A27–28. If granted leave to amend, Plavin would plead that in addition to misrepresenting average levels of reimbursement, the coverage examples were themselves false and entirely fabricated. *Compare* A87 (Summary of Benefits representing that pregnant insureds' "cost if you use a non-participating provider" will be "0% co-insurance" for out-of-network delivery and inpatient services, as well as prenatal and postnatal care) *with* A56–57, A63–64 (Compl. ¶¶ 8–9, 31–32) (alleging that GHI only reimbursed 15.25% of out-of-network maternity care and delivery costs, saddling insureds with a $7,661 bill); *see also Millennium Health*, 240 F. Supp. 3d at 286–87 (granting leave to amend to more specifically allege materially misleading representations under GBL § 349). This allegation, and others, would also bolster

Plavin's allegations that GHI knowingly misrepresented facts in violation of Insurance Law § 4226, which the District Court found deficient.

Further, if the District Court was going to rely on and make assumptions about a contract with the City of New York that was not part of the record, it should have granted leave to amend so Plavin could obtain and attach that contract and plead allegations showing that (a) he is not a third-party beneficiary and (b) the contract does not cover Plavin's claims.

## CONCLUSION

For the foregoing reasons, Plavin respectfully submits that the opinion and order of the District Court dismissing his GBL §§ 349 and 350, Insurance Law § 4226, and unjust enrichment claims, as well as the class claims, should be reversed.

Dated:     New York, New York
           October 10, 2018

                              Respectfully submitted,

                              SUSMAN GODFREY L.L.P.

                         By: *s/ William Christopher Carmody*
                              William Christopher Carmody
                              Arun Subramanian
                              Halley W. Josephs
                              SUSMAN GODFREY L.L.P.
                              1301 Avenue of the Americas, 32nd Floor
                              New York, NY  10019-6023
                              Tel.: 212-336-8330
                              Fax: 212-336-8340
                              bcarmody@susmangodfrey.com
                              asubramanian@susmangodfrey.com
                              hjosephs@susmangodfrey.com

                              J. Timothy Hinton, Jr., Esq. (PA ID 61981)
                              Michael F. Cosgrove, Esq. (PA ID 47349)
                              HAGGERTY HINTON & COSGROVE LLP
                              203 Franklin Avenue
                              Scranton, PA 18503
                              Tel: (570) 344-9845
                              timhinton@haggertylaw.net
                              mikecosgrove@haggertylaw.net

                              *Attorneys for Plaintiff-Appellant and the
                              Class*

51

# CERTIFICATION OF COUNSEL

I, William Christopher Carmody, hereby certify that:

1.     I am a member of the bar of this court;

2.     This brief complies with the type-volume limitation of Fed. R App. P. 32(a)(7)(B) because this brief contains 12,115 words, including parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii);

3.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman (14 point font);

4.     The electronic version of this brief is identical to the text version in the paper copies filed with the court. This document was scanned using Bit Defender Version 6.2.23.932 (with updated definition file as of October 10, 2018) and that no viruses were detected.

5.     On this date, Seven hard copies of the foregoing Brief for Plaintiff-Appellant and Joint Appendix Volume I of II were sent to the Clerk's Office.  Pursuant to Local Appellate Rules 31.1(d) and 113.4(a), I caused the foregoing  to be served on counsel for Defendant-Appellee via the Notice of Docket Activity generated by the Court's electronic filing system (i.e., CM/ECF) and via electronic mail.

Dated:      New York, New York
             October 10, 2018

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: *s/ William Christopher Carmody*
William Christopher Carmody
Arun Subramanian
Halley W. Josephs
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY  10019-6023
Tel.: 212-336-8330
Fax: 212-336-8340
bcarmody@susmangodfrey.com
asubramanian@susmangodfrey.com
hjosephs@susmangodfrey.com

J. Timothy Hinton, Jr., Esq. (PA ID 61981)
Michael F. Cosgrove, Esq. (PA ID 47349)
HAGGERTY HINTON & COSGROVE LLP
203 Franklin Avenue
Scranton, PA 18503
Tel: (570) 344-9845
timhinton@haggertylaw.net
mikecosgrove@haggertylaw.net

*Attorneys for Plaintiff-Appellant and the Class*

**JOINT APPENDIX, VOLUME I OF II**

# TABLE OF CONTENTS

PAGE

## Volume I of II
### (Bound with Appellant's Brief)

Memorandum Opinion of the Honorable Robert D. Mariani,
dated June 22, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1

Order of the Honorable Robert D. Mariani Appealed From,
dated June 22, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A42

Plaintiff's Notice of Appeal, dated July 5, 2018 . . . . . . . . . . . . . . . . . . . . . . A43

## Volume II of II

Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A46

Complaint, dated August 16, 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A54

Plaintiff's Notice of Errata, dated September 6, 2017 . . . . . . . . . . . . . . . . . . A77

Exhibit A—
GHI - Comprehensive Benefits Plan (GHI-CBP) . . . . . . . . . . . . . . . . . . . . A80

Exhibit B—
EmblemHealth Summary of Benefits and Coverage . . . . . . . . . . . . . . . . . A84

Exhibit C—
Fiscal Year 2013 NYC CBP Non-Senior Medical Service Benefit
Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A100

Defendant Group Health Incorporated's Motion to Dismiss the
Complaint for Failure to State a Claim Upon Which Relief Can
Be Granted, dated October 6, 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A102

ii

PAGE

Memorandum of Law in Support of Defendant Group Health
    Incorporated's Motion to Dismiss the Complaint for Failure to
    State a Claim Upon Which Relief Can Be Granted,
    dated October 6, 2017........................................... A106

    Exhibit 1—
    Real Solutions for Real New Yorkers Health Care Bureau Annual
    Report 2016 .................................................... A145

Declaration of Carlos Manalansan in Support of Defendant Group
    Health Incorporated's Motion to Dismiss the Complaint for
    Failure to State a Claim Upon Which Relief Can Be Granted,
    dated October 6, 2017........................................... A162

    Exhibit 1 to Manalansan Declaration—
    Assurance of Discontinuance Number 14-181, entered into on
    September 8, 2014 between GHI and the Attorney General of the
    State of New York .............................................. A165

    Exhibit 2 to Manalansan Declaration—
    Certificate of Insurance of GHI's Comprehensive Benefits Plan.... A184

    Exhibit 3 to Manalansan Declaration—
    New York City Summary Program Description of the Health
    Benefits Program .............................................. A325

[Proposed] Order on Defendant's Motion to Dismiss the Complaint
    for Failure to State a Claim Upon Which Relief Can Be Granted ... A376

Plaintiff's Response in Opposition to Defendant's Motion to
    Dismiss, dated November 17, 2017 .............................. A377

[Proposed] Order on Defendant's Motion to Dismiss and Plaintiff's
    Opposition .................................................... A417

Reply Memorandum of Law in Further Support of Defendant Group
    Health Incorporated's Motion to Dismiss the Complaint for
    Failure to State a Claim Upon Which Relief Can Be Granted,
    dated December 8, 2017......................................... A418

iii

PAGE

Plaintiff's Motion for Leave to File a Surreply in Response to
    Defendant's Reply in Support of Its Motion to Dismiss,
    dated December 22, 2017 ........................................ A445

Plaintiff's Surreply in Response to Defendant's Reply in Support of
    Its Motion to Dismiss, dated December 22, 2017 .................. A451

[Proposed] Order on Plaintiff's Motion for Leave to File a Surreply .... A456

Defendant's Opposition to Plaintiff's Motion for Leave to File a
    Surreply, dated January 3, 2018 .................................. A457

[Proposed] Order on Plaintiff's Motion for Leave to File a Surreply
    in Response to Defendant's Reply in Support of its Motion to
    Dismiss ....................................................... A462

Order of the Honorable Robert D. Mariani, dated January 4, 2018 ...... A463

**A1**

## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEVEN PLAVIN, on behalf of himself  :
and all others similarly situated,    :
                                      :
        **Plaintiff,**                :
   **v.**                             :   **3:17-CV-1462**
                                      :   **(JUDGE MARIANI)**
**GROUP HEALTH INCORPORATED,**        :
                                      :
        **Defendant.**               :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

This case is a putative class action against Defendant Group Health Incorporated ("Group Health") brought by Plaintiff Steven Plavin, alleging unjust enrichment and violations of New York's General Business Law and Insurance Law based on Group Health's marketing statements about coverage benefits for its health insurance plan, which was bargained for and sponsored by Plavin's employer, the City of New York. Group Health moved for dismissal of the Complaint, arguing that all claims are time barred, and in the alternative, that the General Business Law claims fail to allege consumer-oriented conduct or material misrepresentations, that the Insurance Law claim fails to allege material misrepresentations, and that the unjust enrichment claim should be precluded because it is quasi-contractual, duplicative of other claims, and fails to adequately allege the requisite elements. Doc. 31. For the reasons that follow, Defendant's motion will be granted.

1

**A2**

## II. Factual Allegations

Group Health is a not-for-profit corporation that offers health insurance plans to consumers through their employers. Doc. 1 ¶ 14. Plavin is a retired New York City police officer and a current resident of Pennsylvania. *Id.* ¶ 13. Prior to retirement, he was offered a choice of eleven health plans by his employer. *Id.* ¶¶ 19-20. Plavin enrolled in Group Health's preferred provider organization ("PPO") plan in 1984 and has chosen to re-enroll in the same plan since then. *Id.* ¶ 13. The Group Health plan did not require payment of out-of-pocket premiums from members, and it provided coverage for out-of-network services as well as in-network services. *Id.* ¶ 20. Plavin alleges that "[c]osts being equal, PPO plans are generally preferred by consumers because they provide coverage for services rendered by almost any provider, whether in-network or out-of-network." *Id.* Plavin alleges that "[b]y promoting itself as a PPO plan providing comprehensive in-network and out-of-network coverage that also did not require out-of-pocket premiums," the Group Health plan appeared to be an attractive plan to New York City employees, and as a result, the plan "had the highest enrollment of any health plan offered to NYC employees and retirees." *Id.* ¶ 25.

The open enrollment period for current New York City ("NYC") workers occurs every year, and the period for NYC retirees is every two years. *Id.* ¶ 21. Prior to open enrollment, New York City employees and retirees receive the NYC Summary Program Description, which includes a summary of each of the eleven plans offered, as drafted by the respective

insurers. *Id.* ¶ 22.  Plavin alleges that the "Summary Program Description (the

"Description") is the only document distributed to NYC employees and retirees" prior to

enrollment. *Id.* ¶ 24.  In addition to the Description, Group Health also offered a Summary

of Benefits & Coverage on its website. *Id.* ¶ 24.  Besides these two documents,

"[p]rospective members were not provided with any certificate of insurance or schedule of

reimbursement rates, and such documents were not available on [Group Health's] (or its

parent EmblemHealth's) website." *Id.*

Plavin alleges that both the Description and the Summary of Benefits & Coverage

misled members by suggesting that it offered substantial reimbursement rates for out-of-

network services, and that there is only a "mere possibility that reimbursements might be

less than the actual fee charged by out-of-network providers." *Id.* ¶¶ 4-5.  The materials

disclosed that reimbursements for out-of-network services would be made according to the

"NYC Non-Participating Provider Schedule of Allowable Charges" (the "Schedule"), which

states, in relevant part:

> The rate at which you will be reimbursed for particular service is contained
> within the Schedule.  These reimbursement rates were originally based on
> 1983 procedure allowances and some have been increased periodically. *The
> reimbursement levels as provided by the Schedule may be less than the fee
> charged by the non-participating provider*.  Please note that certain non-
> participating provider reimbursement levels may be increased if you have the
> optional rider. *The subscriber is responsible for any difference between the
> fee charged and the reimbursement as provided by the Schedule*.  A copy of
> the Schedule is available for inspection at [Group Health].

3

**A4**

Doc. 13-1 (Complaint Exhibit A) at 1 (emphasis added).  Plavin alleges that "[n]othing in the two documents indicated that reimbursement rates for virtually every out-of-network service would be a fraction of the actual cost of that service."  Doc. 1 ¶ 5.  The Complaint concedes that the Description disclosed that reimbursement levels "may be less than the fee charged by the [out-of-network] provider," but alleges that it was presented as "a mere possibility—not a certainty—that members would be required to pay out-of-pocket for out-of-service services."  *Id.* ¶ 31.  The Complaint further alleges that Group Health "did not explain that the reimbursement rates were extraordinarily low when measured against other reimbursement methodologies typically used by PPOs."  *Id.* ¶ 32.  In addition, Plavin alleges that the Description's statements about the 1983 Schedule were misleading, because "out of thousands of procedures and services listed [in the Schedule], only a tiny number had been adjusted."  *Id.*  Finally, Plavin alleges that contrary to Group Health's representations, the Schedule was never made available to its members.  *Id.* ¶ 7.

In addition to alleging misrepresentations regarding the reimbursement rates, Plavin also alleges that Group Health misleadingly touted the plan's "Catastrophic Coverage" feature.  The Complaint alleges that the feature is advertised as covering "100% of the Catastrophic Allowed Charge as determined by [Group Health]" for out-of-network expenses in excess of $1500.  *Id.* ¶ 6.  *Compare* Doc. 13-1 at 1 (Description describing Catastrophic Coverage as follows: "If you choose non-participating providers for predominantly in-hospital care and incur $1,500 or more in covered expenses[,] you are eligible for additional

4

Catastrophic Coverage"). However, Plavin alleges that the term "Catastrophic Allowed Charge" simply meant "the same thing as 'Allowed Charge' does," that is, it "provides for reimbursement of the exact same Allowed Amount set forth in the Schedule that [Group Health] was already required to pay regardless of whether the member was above or below the $1,500 'Catastrophic Coverage' threshold." *Id.* ¶ 10. Plavin claims that labeling the "Catastrophic Coverage" as a key benefit was misleading, because it "provides for reimbursement of the exact same Allowed Amount set forth in the Schedule that [Group Health] was already required to pay regardless of whether the member was above or below the $1,500 'Catastrophic Coverage' threshold"; in other words, it "added literally nothing to the basic coverage." *Id.*

The Complaint also alleges that there were misleading examples set forth in the Summary of Benefits & Coverage, which was made available on Group Health's website, including examples of out-of-network procedures that required "0% co-insurance" and a hypothetical illustrating how coverage might be calculated. *Id.* ¶¶ 31-32. Plavin alleges that the coverage calculation hypothetical was misleading because it showed a 66% reimbursement rate, while the actual "[r]eimbursement rates across all services averaged roughly 23% of actual cost ... [and] for some types of services, reimbursement rates were as low as 9% of actual cost" *Id.* ¶ 19. Finally, the Complaint takes issue with the optional rider, which was offered for an additional fee under the plan, under which reimbursement rates would be based on an "enhanced schedule for certain services [that] increases the

reimbursement of the basic program's non-participating provider fee schedule, on average, by 75%." *Id.* ¶ 7. Plavin has purchased the optional rider since he became a member of the Group Health plan in 1984. *Id.* ¶¶ 13, 41. He alleges that Group Health failed to disclose that the rider only applied to in-patient services, not out-patient services, when the latter category accounted for "65% of total out-of-network charges." *Id.* ¶ 11.

Most of the Complaint's misrepresentation allegations are based on a settlement agreement arising out of the New York Attorney General's investigation, i.e. an Assurance of Discontinuance. According to the Complaint, the Attorney General's Office found that Group Health failed to "accurately describe limitations of out-of-network reimbursement" rates, misrepresented "the frequency with which the Schedule was updated," failed to "sufficiently describe the circumstances by which members unknowingly encounter out-of-network providers," and failed "to make the Schedule available to members." *Id.* ¶ 39. The Complaint also alleges that the Attorney General found that Group Health's materials "do not accurately set forth the potentially wide gap between the out-of-network reimbursement and out-of-network charges, and potentially substantial out-of-pocket amounts for which [Group Health] Plan members will be responsible," and that "it was deceptive for [Group Health] to merely suggest that it is only a possibility that members will be required to pay for out of network services." *Id.* ¶ 9.

With respect to Plavin's personal injuries, the Complaint alleges that he submitted four out-of-network medical services received by his wife from February 2013 to July 2014.

**A7**

*Id.* ¶ 41. For a July 2014 procedure, Group Health "did not pay Mr. Plavin until February 2015," when it "ultimately paid just $32" for a medical treatment billed at $98. *Id.* Plavin does not allege when the other three procedures were ultimately reimbursed. Based on these four concrete injuries, Plavin brings claims against Group Health for unjust enrichment (Count I), violations of New York's General Business Law ("GBL") §§ 349 and 350 (Counts II and III), and New York Insurance Law § 4226 (Count IV). Plavin filed this action on behalf of himself and "[a]ll persons who were members of Group Health Incorporated's Comprehensive Benefit Plan from 2011 to 2015." *Id.* ¶ 42. On October 6, 2017, Group Health filed a motion to dismiss all claims, arguing that all the claims are time barred, and that in the alternative, Plavin failed to state a claim as to all causes of action. Doc. 31-1.

### III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations, alterations, and quotations marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted). Thus, "the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal,* 556 U.S. at 678). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 786-87 (quoting *Iqbal,* 556 U.S. 679).

**A9**

## IV. ANALYSIS

### A. Plavin's GBL Claims Are Not Conclusively Time-Barred

Group Health argues that all of Plavin's claims are time-barred because they "accrued when he first subscribed to the [Group Health] plan in 1984." Doc. 31-1 at 10. . Doc. 31-1 at 9-14. Alternatively, Group Health argues that the claims could have accrued in 2004, when Plavin first started submitting claims for out-of-network services, "which put him on additional notice of the obvious fact that reimbursement rates under the [Group Health] Plan were a 'fraction' of the providers' bills for those services." *Id.* at 14. In support, Group Health attached an affidavit from a company representative to its motion, which avers that "[s]ince May of 2004, individuals under Mr. Plavin's plan [i.e. Plavin and his family members] have submitted hundreds of claims for out-of-network services for which they have received reimbursement." Doc. 31-3 ¶ 6. Group Health contends that the Court may consider the affidavit because it is "integral to or explicitly replied upon in the complaint," citing to a case involving a motion for judgment on the pleadings. *See* Doc. 31-1 at 14 (citing *Yatsonsky v. State Farm Fire & Cas. Co.*, 2016 WL 1660863, at *4 (M.D. Pa. Apr. 27, 2016)).

However, the instant motion is a motion to dismiss, not one for judgment on the pleadings. It is well established that "[a]s a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings" unless they are "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). Plavin's alleged injuries arise from four medical claims

9

submitted by him in 2013 and 2014.  The Complaint makes no references to any claims

Plavin submitted in 2004.  Furthermore, the type of assertions contained in the affidavit—

details regarding the Plaintiff's medical claims and whether or how much he was

reimbursed—is exactly the type of subject matter that should properly be explored during

discovery.  The document is therefore neither integral to nor explicitly relied upon in the

Complaint.  Thus, the Court will not consider when Plavin first started submitting out-of-

network claims to Group Health based on the extraneous affidavit.  Instead, for statute of

limitations purposes, the proper inquiry before the Court is whether Plavin's claims accrued

in 1984, when he first enrolled in the Group Health policy, i.e. 1984, or in or after 2014,

when he submitted specific claims to Group Health and received lower reimbursement rates

than expected.  On the face of the Complaint, Plavin alleged four specific instances of claim

submissions, only one of which may be timely—he alleges that pursuant to a medical claim

he submitted for a July 2014 procedure, he was not reimbursed by Group Health until

February 2015, which would be within three years of August 2017, when the instant suit was

filed.  Doc. 1 ¶ 41.

The statute of limitations for GBL claims is three years.  *Gaidon v. Guardian Life Ins.*

*Co. of Am.*, 96 N.Y.2d 201, 210 (2001); *see also Gristede's Foods, Inc. v. Unkechauge*

*Nation*, 532 F. Supp.2d 439, 452 (E.D.N.Y.2007) ("Since *Gaidon* [], New York courts have

uniformly applied a three-year statute of limitations to section 349 and section 350 [of the

GBL] cases.").  While the accrual of GBL claims "is not dependent upon any date when

discovery of the alleged deceptive practice is said to occur," it is dependent on "when a plaintiff is *injured* by the actions alleged to have violated the Statute." *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 461 (S.D.N.Y. 2014) (internal citations omitted).  Pursuant to *Gaidon*, the seminal New York Court of Appeals case on this issue, accrual of GBL claims' statute of limitations "first occurs when plaintiff has been injured by a deceptive act or practice violating section 349 [of the GBL]." *Id.* at 210.  Plavin argues that even though he enrolled in the same Group Health policy year after year since 1984, his claim did not accrue until his "expectations were actually not met" because the suit involves allegations "that a defendant deceptively marketed a benefit so as to give a consumer false expectations."  Doc. 41 at 9 (quoting *Enzinna v. D'Youville College*, 922 N.Y.S.2d 729, 730 (N.Y. App. Div. 2011)).  Plavin argues that in one of the four claim submissions specifically pled in the Complaint, his expectations were not met until he was informed of the reimbursement rate of his claim until February 2015, and "that is when he suffered injury under the GBL." *Id.* at 11.

In *Gaidon*, the Court of Appeals stated that where "the gravamen of the complaints of General Business Law § 349 violations was not false guarantees of policy terms, but deceptive practices inducing unrealistic expectations … plaintiffs suffered no measurable damage until the point in time when those expectations were actually not met." *Gaidon*, 96 N.Y.2d at 211-12.  *Gaidon* dealt with a particular type of insurance contracts: so-called "vanishing premiums," which were advertised as policies that, after a certain period of time,

11

**A12**

would no longer require premium payments because the policy's "continuing interest/ dividend rate performance [would] fully offset premiums at the projected date." *Id.* at 211. The *Gaidon* court held that because the plaintiffs' claims were not premised on any false statements apparent in the policies themselves, but on "deceptive practices inducing unrealistic expectations" about the plan's benefits, they did not suffer injury until "they were *first called upon* to pay additional premiums beyond the date by which they were led to believe that policy dividends would be sufficient to cover all premium costs." *Id.*

Based on the distinction delineated by *Gaidon*, Plavin's claims cannot be defeated on statute of limitations grounds because he does not allege a "false guarantee of policy terms," but rather, that Group Health created "unrealistic expectations" regarding the benefits of its reimbursement coverage of out-of-network expenses. Viewing the facts in a light most favorable to the Plavin, the Complaint does not allege any false statements in the policy itself. In fact, the Complaint alleges that Plavin never received a copy of the policy. Doc. 1 ¶¶ 7, 24. Rather, the "gravamen" of Plavin's claims is that he was provided with misleading marketing statements by Group Health, which, while not false on their face, nevertheless induced him into believing that reimbursement levels for out-of-network claims would be higher than the ones he ultimately received. *See, e.g., id.* ¶¶ 31, 32 (alleging that while the Description stated that "[t]he reimbursement levels, as provided by the Schedule, *may* be less than the fee charged by the non-participating provider," it "did not explain that the reimbursement rates were extraordinarily low when measured against other

**A13**

reimbursement methodologies typically used by PPOs"); *id.* ¶¶ 5, 7, 32 (alleging that the Description stated the Schedule would be "updated periodically" when in fact it "had been left virtually untouched since1983" and that "that, out of thousands of procedures and services listed therein, only a tiny number had been adjusted [since 1983]").

To be sure, this case presents more nebulous allegations than those found in *Gaidon*. In the case of "vanishing premium" policies, plaintiffs are injured at the specified time when the premiums would allegedly "vanish" but did not. Here, the alleged deception only induced general expectations about the policy's overall reimbursement benefits. Thus, rather than being associated with a "date certain", Plavin's expectations would neither be confirmed or disavowed until he submits an out-of-network claim for reimbursement, for which he receives less coverage than he expected. However, this case is more analogous to cases involving the "induc[ement of] unrealistic expectations" rather than cases involving "false guarantees of policy terms," especially since no policy terms have been alleged to be demonstrably false on their face. *Gaidon*, 96 N.Y.2d at 211-12. Thus, Plavin's claim did not accrue on the date he enrolled in the plan because he is not alleging facially misleading statements from Group Health, but rather, misrepresentations about the nature and scope of the benefits that he would receive if and when he decides to submit an out-of-network claim.

Group Health relies heavily on *Schandler v. New York Life Ins. Co.*, 2011 WL 1642574 (S.D.N.Y. Apr. 26, 2011). But *Schandler*, unlike here, concerned false statements

13

on the face of the policy. There, the promotional materials explicitly promised that the plan would provide "convalescent care and home health care available to you and your spouse *regardless of your age*," when in fact, the plan "did not provide broad convalescent facility benefits' regardless of age and specifically, the Plan restricted nursing home benefits based on the insured's age." *Id.* at *2, *4 (emphasis added). The plaintiff in *Schandler* further alleged that the policy "was delivered to her" and that it "'*expressly* contradicted' Defendants' marketing claims." *Id.* (emphasis added). Based on the allegations, the court found that "the gravamen of Schandler's complaint is that she was falsely promised certain policy terms and thus, Schandler's injury occurred when she was delivered a policy without these terms." *Id. See also Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 461 (S.D.N.Y. 2014) (holding that plaintiff's GBL claim accrued at the time he purchased the vehicle with allegedly defective brake systems, because "Defendant's misrepresentations or omissions were about the *nature of the product itself*, rather than a benefit from purchasing the product separate from the product's inherent function") (emphasis added).

Here, to the contrary, Plavin does not allege that he was delivered a policy that contradicted Group Health's marketing claims. Indeed, he claims to have never received the policy. Doc. 1 ¶ 7. Furthermore, Plavin presumably received marketing statements from Group Health since he first enrolled in the policy in 1984, but he would not have been able to learn that Group Health's out-of-network coverage was not as comprehensive as he had expected until he submitted out-of-network claims. The Complaint alleges that the

14

**A15**

marketing materials suggested that there was only "a mere possibility that members would be subject to reimbursement shortfalls for out-of-network services," when in reality, "it was a virtual certainty that reimbursements would be *dramatically less* than the actual fees charged by out-of-network providers *in all cases.*" *Id.* ¶ 9 (emphasis added).  Thus, the marketing materials are not alleged to contain any express falsities—in fact, the Description is undoubtedly correct in its statement that reimbursement levels "may be less than the fee charged by the non-participating provider." Doc. 13-1 at 1.  Rather, Plavin alleges that the marketing materials, though notionally correct, created unrealistic expectations as to what the out-of-network coverage may entail.

Putting aside the contents of Group Health's extraneous affidavit, it is not apparent on the face of the Complaint when—or how many times—Plavin was forced to pay substantial out-of-pocket amounts to make up for the Group Health plan's reimbursement shortfalls.  As stated above, only *one* of the four claim submissions specifically pled in the Complaint included the time when Group Health ultimately reimbursed Plavin.  Coincidentally, the time of reimbursement for that claim would fall just within the statute of limitations period.  *See id.* ¶ 41 (alleging that for a $98 procedure, Group Health "did not pay Mr. Plavin until February 2015," when it "ultimately paid just $32").  At least with respect to this procedure, it is plausible that Plavin could not have known that his expectations about out-of-network reimbursements were unrealistic until Group Health reimbursed his claim.  Following *Gaidon*, courts have held that plaintiffs' injuries occur when defendants'

15

representations "proved false," that is, when plaintiffs were first called upon to do something contrary to their expectations, not when "plaintiffs *could have known* defendants' representations might have been false," that is, when they first received the representations from defendants. *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 2007 WL 1601491, at *15 (S.D.N.Y. June 4, 2007) (holding that "plaintiffs here were injured for purposes of section 349 [of the GBL] when they learned—contrary to defendants' representations—that [a gasoline additive] was present in their wells at a level plaintiffs knew or should have known was hazardous"), *reconsideration granted on other grds. See also Enzinna*, 922 N.Y.S.2d at 730 (holding that "plaintiffs were not injured when they initially enrolled in defendant's Doctor of Chiropractic program and began paying tuition. Rather, the injury occurred when plaintiffs graduated and allegedly learned that their degrees did not render them 'eligible for licensure examination in all states,' as stated in defendant's promotional catalog").

The Court maintains reservations that the February 2015 reimbursement would have been the first time Plavin learned that his expectations regarding reimbursement levels were not met. Nevertheless, it is the *only* claim for which the Complaint not only pleaded when claim was first submitted, but also when it was ultimately reimbursed by Group Health. On this allegation, it is plausible that Plavin first learned that the plan's out-of-network coverage would be less than he had expected in February 2015. Thus, the Complaint has plausibly

16

pleaded a timely GBL claim.[1]

### B. While Timely, the GBL Claims Fail to Allege Consumer-Oriented Conduct.

However, while timely, the Complaint has not adequately pled consumer-oriented

conduct by Group Health.  Thus, Plavin has failed to plead a claim under Sections 349 and

350 of the GBL.  Section 349 of the GBL prohibits "[d]eceptive acts or practices in the

conduct of any business, trade or commerce or in the furnishing of any service in this state."

N.Y. G.B.L. § 349.  Similarly, Section 350 provides that "[f]alse advertising in the conduct of

any business, trade or commerce or in the furnishing of any service in this state is hereby

declared unlawful."  N.Y. G.B.L. § 350.  "The Second Circuit has applied the same

interpretation to section 350 [as section 349].  Indeed, courts have noted that the standards

under both sections are substantively identical."  *Gristede's Foods, Inc. v. Unkechauge*

*Nation*, 532 F. Supp. 2d 439, 450–51 (E.D.N.Y. 2007) (internal citation omitted).  *See also*

*Goshen v. Mut. Life Ins. Co. of New York*, 98 N.Y.2d 314, 324 (2002) ("The standard for

recovery under General Business Law § 350, while specific to false advertising, is otherwise

identical to section 349.").

---

[1] Group Health argues that the New York Insurance Law § 4226 claim is similarly time-barred under the theory that Plavin's injury accrued in 1984.  For the same reasons discussed above, Plavin's injury did not necessarily arise when he first enrolled in the plan, but rather, when his expectations based on the marketing materials' representations were not met.  *Compare Russo v. Mass. Mut. Life Ins. Co.*, 711 N.Y.S.2d 254, 255–56 (N.Y. App. Div. 2000) (a pre-*Gaidon* case holding that limitations period accrued at time of plaintiff received the policy for both GBL and Insurance Law § 4226 claims), *with Gaidon* (reversing *Russo's* accrual analysis and holding that the limitations period only began to accrue when plaintiffs' unrealistic expectations were not met).  Though *Gaidon* only addressed the GBL claims, it was because they were the only claims remaining on appeal.  Thus, it is reasonably inferred from *Gaidon* that its accrual analysis would apply with equal force to Insurance Law § 4226 claims.

In order to assert a claim under the GBL, "'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" *Hu v. Herr Foods, Inc.*, 251 F. Supp. 3d 813, 819 (E.D. Pa. 2017) (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015)). The element of "consumer-oriented conduct" aims to reflect the original purpose of GBL, which "is directed at wrongs against the consuming public." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 24 (1995). A plaintiff "need not show that the defendant committed the complained-of acts repeatedly…but instead must demonstrate that the acts or practices have a *broader impact on consumers at large.*" *Id.* at 25 (emphasis added). "Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute." *Id.*

Here, the alleged deception arises out of a private contract negotiated between Group Health, a health insurance company, and the City of New York, Plavin's former employer. Doc. 1 ¶ 2. Group Health's benefits plan was "one of 11 health plans that New York City offers to its 600,000 employees and retirees." *Id.* Plavin cites the sheer number of employees affected as support for his argument that the conduct is "consumer-oriented." Doc. 41 at 15 ("[Group Health's] practice of misrepresenting the benefits of its health plan to hundreds of thousands of City employees and retirees indisputably has a broad impact on the public interest in New York.") (internal quotation marks omitted). But the fact that a

18

large class of members is affected does not automatically transform the plan into something

that has "a broader impact on consumers at large." *Oswego*, 85 N.Y.2d at 25. Plavin was

only able to receive the benefits of Group Health's plan by virtue of being an employee of

the City of the New York, which bargained with Group Health on behalf of its employees—

and *only* its employees—on the terms of employee benefit plans. Indeed, the fact that the

City had a large number of employees only suggests that the City would have been a

powerful party in negotiations with insurance companies such as Group Health. Though

Plavin himself was not a party to the contract at issue, he was a third-party beneficiary of a

contract between two sophisticated institutions in this case, not a mere consumer of the

public. In *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308 (1995), the Court of Appeals

distinguished between such a sophisticated contractual policy and generic transactions that

provide standard services "supplied to the consuming public at large, and in which the

parties occupied disparate bargaining positions":

> The case before us involves complex insurance coverage and proof of loss in
> which each side was knowledgeable and received expert representation and
> advice…Although relief under the statute is not necessarily foreclosed by the
> fact that the transaction involved an insurance policy, this was not the
> 'modest' type of transaction the statute was primarily intended to reach. It is
> essentially a 'private' contract dispute over policy coverage and the
> processing of a claim which is unique to these parties, not conduct which
> affects the consuming public at large.

*Id.* at 321 (internal citations omitted). *Cf. Oswego*, 85 N.Y.2d at 26 (finding

consumer-oriented conduct when "defendant Bank dealt with plaintiffs' representative *as

any customer entering the bank* to open a savings account, furnishing the Funds with

standard documents presented to customers upon the opening of accounts") (emphasis added).

It is true that the plaintiff in *New York University* happened to be party to the contract at issue, whereas here, there is the added wrinkle that Plavin was not a direct party to the policy, but rather, an intended beneficiary while the City of New York contracted with Group Health on his behalf. The contract was aimed to benefit only a circumscribed class of individuals. *See* Doc. 1 ¶¶ 19, 26 (alleging that "[i]ndividuals and their families are eligible for this City-sponsored health insurance based *solely* on their employment with the City," and that "[t]he insurance at issue was and is issued *exclusively* to NYC employees and retirees pursuant to contracts with the City") (emphasis added). Put another way, a member of the public cannot approach Group Health and gain membership in the same plan that Plavin received. Indeed, according to the NYC Administrative Code, public employers of New York City *must* negotiate the terms of their employees' wages and benefits with employees' unions. *See* New York City Code § 12-307(a) ("public employers and certified or designated employee organizations *shall* have the duty to bargain in good faith on wages (including but not limited to wage rates, pensions, *health and welfare benefits,* uniform allowances and shift premiums), hours (including but not limited to overtime and time and leave benefits), [and] working conditions…") (emphasis added). This provision would obligate the City to bargain in good faith to attempt to reach an agreement with employees' unions on wages and health benefits, which occurred here, as manifested by the City's

making available 11 different health plans for selection by its employees and retirees. *See*

Doc. 1 ¶¶ 2, 20. Thus, the Group Health plan cannot have been intended to be available to

the public at large, because it is an exclusive plan that is the product of negotiations

between the City and Group Health covering only City employees, retirees, and their eligible

dependents.

Plavin cites several insurance cases that hold to the contrary, but all of those cases

involved insurance policies that were offered directly to the public generally. *See Wilner v.*

*Allstate Ins. Co.*, 893 N.Y.S.2d 208, 216 (2010) (finding consumer-oriented conduct when

plaintiffs alleged that the provision at issue "is not unique to the plaintiffs, but is contained in

every Allstate Deluxe Plus Homeowners' Policy," which was available to purchase for all

members of the public); *Riordan v. Nationwide Mut. Fire Ins. Co.*, 756 F. Supp. 732, 739

(S.D.N.Y. 1990) (finding that a homeowners policy plaintiffs purchased directly from

Nationwide, which was offered to the public, may be subject to a GBL claim, and noting that

the allegations involve "the services Nationwide provides to the public on a grand scale");

*Icahn Sch. of Med. at Mount Sinai v. Health Care Serv. Corp.*, 234 F. Supp. 3d 580, 586–87

(S.D.N.Y. 2017) (finding consumer-oriented conduct when plaintiff-hospital, which was not

in a contractual relationship with defendant-insurer, pleaded that it passed on defendant's

alleged misrepresentations to all patients insured under defendant's health plans "so that

patients could consider this [payment] information in determining whether to proceed with

treatment").

Plavin also relies on *Krahling v. Merck & Co.*, 44 F. Supp. 3d 581 (E.D. Pa. 2014), a case that does not concern insurance policies, for the proposition that Group Health's alleged misrepresentations "to hundreds of thousands of City employees and retirees indisputably has a 'broad impact' on the 'public interest' in New York." Doc. 41 at 15 (quoting *Krahling*, 44 F. Supp. 3d at 605). However, *Krahling* illustrates precisely why Plavin's allegations do not fall within the ambit of conduct directed to the "public at large." *Krahling* was a qui tam action in which a vaccine manufacturer was alleged to have misled the government regarding the efficacy of its mumps vaccine. Significantly, it was "the sole manufacturer licensed by the FDA to sell Mumps Vaccine…in the United States." *Krahling*, 44 F. Supp. 3d at 587. In holding that such fraudulent conduct to be consumer-oriented, the court noted that defendant allegedly made false representations to both public consumers and government agencies, and "[t]he fact that the deception concerns a matter of public health—the state's ability to protect against Mumps outbreaks—further magnifies New York's interest." *Id.* at 605. Unlike a vital vaccine that is provided to almost all children of the nation,[2] the Group Health plan in this case was the result of a privately bargained-for contract negotiated not for the benefit of the public at large, but only for a certain class of individuals. Because there is no indication in the Complaint that the plan would have been available to anyone who was not an employee of the City of New York, and because it is

---

[2] *See* Centers for Disease Control and Prevention, MEASLES, MUMPS, AND RUBELLA (MMR) VACCINATION ("All 50 states and the District of Columbia (DC) have state laws that require children entering childcare or public schools to have certain vaccinations."), available at https://www.cdc.gov/vaccines/vpd/mmr/public/index.html (last visited June 7, 2018).

undisputed that Plavin's receipt of benefits from Group Health arises from a contractual policy, Plavin's GBL claims fail to plead consumer-oriented conduct. *See, e.g., Sichel v. Unum Provident Corp.*, 230 F. Supp. 2d 325, 330 (S.D.N.Y. 2002) (finding that plaintiff failed to allege consumer-oriented conduct when the case was "essentially a private contract dispute over policy coverage and the processing of a claim," and noting that the "Complaint does not include any facts tending to establish a national policy, or an extensive scheme that had a broad impact on consumers at large") (internal citations omitted).

### C. The GBL Claims Separately Fail to Allege Materially Misleading Statements

Not only has the Complaint failed to allege consumer-oriented conduct, but it has also failed to allege a material deception actionable under the GBL. As stated above, the second and third elements of a GBL claim requires a showing that the defendant's statements were "materially misleading" and that "plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Hu*, 251 F. Supp. 3d at 819. Whether a statement is misleading within the definition GBL § 349 is an "objective" standard, under which the statement must be "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (quoting *Oswego*, 85 N.Y.2d at 26). "There can be no claim for deceptive acts or practices, however, when the alleged deceptive practice was fully disclosed." *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 404 (S.D.N.Y. 2010) (quoting *Watts v. Jackson Hewitt Tax Serv. Inc.*, 579 F.Supp.2d 334, 346 (E.D.N.Y.2008)).

23

**A24**

Plavin alleges four categories of misleading statements by Group Health: (1) that the Description did not adequately explain that out-of-network reimbursements levels would only be at "a fraction of actual costs"; (2) that the examples used in the Summary of Benefits & Coverage to illustrate coverage calculation showed a higher reimbursement rate than the plan's actual average reimbursement rates; (3) that the Catastrophic Coverage featured in the plan was meaningless because it purported to provide coverage that Group Health "had already agreed to reimburse"; and (4) that the optional rider did not significantly increase reimbursement rates. *See* Doc. 1 *generally.*

Many of these allegations are virtually the same as those found in the New York Attorney General Office's 2014 Assurance of Discontinuance with Group Health.  At the outset, the Court notes that the objective standard of "a reasonable consumer acting reasonably under the circumstances" cannot be equated to the consumer that the Attorney General is charged to protect.  *See People ex rel. Spitzer v. Applied Card Sys., Inc.*, 27 A.D.3d 104, 106 (N.Y. App. Div. 2005) (noting that New York Executive Law provision empowering the Attorney General to investigate deceptive business conduct "was meant to protect not only the average consumer, but also 'the ignorant, the unthinking and the credulous'") (quoting *People v General Elec. Co.*, 302 A.D.2d 314, 314 (N.Y. App. Div. 2003)).  Additionally, over-reliance on the Assurance of Discontinuance would be imprudent given that it specifically states that Group Health "neither admits nor denies the [Attorney

General's] findings." Doc. 31-4 at 9.[3]

Applying the proper standard to the allegations, the reasonable consumer would not have been materially misled by Group Health's statements about out-of-network coverage. While Plavin bemoans that out-of-network reimbursement rates were "a fraction of actual costs" and averaged only "23% of actual costs[s]" for out-of-network services (Doc. 1 ¶ 29), the marketing materials never purported to state *how much* reimbursement the insured would receive, or even provided a general range of reimbursement rates for the reader. Instead, the Description states that "[t]he reimbursement levels…may be less than the fee charged by the nonparticipating provider" and that "[t]he subscriber is responsible for any difference between the fee charged and the reimbursement." Doc. 13-1 at 1.

Thus, Plavin does not allege any *explicit* misrepresentations so much as complain that the marketing materials should have contained more information about out-of-network coverage. *See, e.g.,* Doc. 1 ¶ 39 (alleging that Group Health did not "*sufficiently describe* the circumstances by which members unknowingly encounter out-of-network providers") (emphasis added). Plavin stresses the fact that the Schedule, on which out-of-network reimbursement rates would be based, was "left virtually untouched since 1983" even though it was advertised as "updated periodically." *Id.* ¶¶ 5, 7. However, this characterization does

---

[3] Unlike Group Health's attached affidavit from a company representative, the Assurance of Discontinuance is explicitly relied upon and quoted extensively by the Complaint, especially with respect to the alleged misrepresentations at the core of Plaintiffs' claims. *See, e.g.,* Doc. 1 ¶¶ 1, 3, 39-40. Thus, the Assurance may be properly considered by the Court at this stage of proceedings. *In re Burlington Coat Factory*, 114 F.3d at 1426 (the problem "raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated '[w]here plaintiff has actual notice ... and has relied upon these documents in framing the complaint.'") (quoting *Watterson v. Page*, 987 F.2d 1, 3–4 (1st Cir.1993)).

**A26**

not accurately reflect the actual text of the Description, which disclosed that "[t]he rate at which you will be reimbursed for a particular service is contained within the Schedule. These reimbursement rates were originally based on 1983 procedure allowances and *some* have been increased periodically." Doc. 13-1 at 1. Thus, the Description clearly states that reimbursement rates would be based on "1983 procedure allowances" and that only some, not all, procedure rates would be increased. Tellingly, the Complaint never alleges what Plavin *personally expected* the reimbursement rates to be, but only laments that the plan covered "a fraction of actual costs of services." Doc. 1 ¶ 29. *See Weinstein v. eBay, Inc.*, 819 F. Supp. 2d 219, 228 (S.D.N.Y. 2011) (dismissing GBL claim and noting that "[t]ellingly, Plaintiff does not allege that she *personally believed* she was purchasing tickets directly from the Yankees online box office or that she did not understand that Stubhub [a resale website] is an online marketplace for the resale of tickets by other fans") (emphasis added). Reading between the lines of the Complaint, it appears that Plavin personally expected that Group Health to cover a substantial amount (if not all) of out-of-network expenses on a PPO plan for which he paid zero dollars in out-of-pocket premiums since he first enrolled in 1984. *Id.* ¶ 2.

First, the Court notes that this is an unreasonable assumption. No reasonable consumer would have assumed that a PPO plan, which provided coverage for both in-network and out-of-network services, yet did not require any out-of-pocket premiums from members, would be so generous as to provide substantial coverage for out-of-network

expenses without more explicit language to that effect.  According to the Complaint,

prospective members did not choose the Group Health plan primarily due to promises of

substantial or total reimbursement of out-of-network  claims, but because it was "one of only

two PPO plans offered and the only one of those [two PPO plans] that did not require out-of-

pocket premiums."  Doc. 1 ¶ 20; *see also id.* ¶ 25 (alleging that the plan "had the highest

enrollment of any health plan offered to NYC employees and retirees" because of these

benefits).  More to the point, such an assumption is not a reasonable interpretation of the

Description's actual statements, which disclosed that reimbursement levels "may be less

than the fee charged by the non-participating provider"; that they would be pegged to

procedure allowances from more than thirty years ago; and that only "some [of the

allowances] have been increased periodically."[4]  Doc. 13-1 at 1.

Next, the Complaint takes issue with the fact that some examples in the Summary of

Benefits & Coverage listed specific medical events that require "0% co-insurance" for non-

participating providers, and the fact that the hypothetical calculation example in the

Summary illustration how coverage would be calculated showed "a 66% reimbursement,"

---

[4] The Complaint also alleges that Group Health "lied to members and prospective members in stating that the Schedule was available for inspection at [Group Health's] offices and further denied access when requested via email and phone." Doc. 1 ¶ 27.  This allegation appears to be wholly lifted from Assurance of Discontinuance. *See* Doc. 31-4 at 4.  Notably, the Complaint does not allege anywhere that Plavin *personally* sought to inspect the Schedule, nor does it allege anything Plavin would have done differently (or what other members would have done differently, for that matter) if the Schedule had been available.  In any event, the unavailability of the Schedule is not central to Plavin's GBL claims, which chiefly complains of the fact that Group Health unduly suggested that its plan offered higher levels of reimbursement rates despite never promising or otherwise referring to a specific range of reimbursement rates in its marketing materials.

when in practice, "the average reimbursement was 23%." Doc. 1 ¶ 32.  The Court cannot

countenance such a twisted reading of the Summary.  These "0% co-insurance" examples

are displayed in a table showing certain select medical procedures detailing how much

costs are incurred by members for both participating providers (in network providers) and

non-participating providers (out-of-network providers).  In fact, the Complaint fails to

mention that a majority of the treatment examples are either listed as "not covered," or as

"20% co-insurance [needed]," or listed the various co-pay or deductible requirements for

non-participating providers.  Doc. 13-2 at 10-12.  Indeed, only a fraction of the treatment

examples list "0% co-insurance".  Nowhere does the Summary state that *all* out-of-network

medical procedures would require 0% co-insurance.  In fact, such a belief would be

demonstrably baseless, as the table contains many example treatments that are either not

covered or require additional out-of-pocket payment.

Further, the calculation example in the Summary (showing a 66% reimbursement

rate) cannot be imputed to the actual average cost of out-of-network expenses across the

spectrum of all potential services.  It is clearly a hypothetical designed to illustrate how

coverage may be calculated.  Doc. 1¶ 32 (alleging the example was misleading because it

states: "For example, if an out-of-network hospital charges $1,500 for an overnight stay and

the allowed amount is $1,000, you may have to pay the $500 difference" and alleging that

the "decision to use a single example showing a 66% reimbursement when the average

reimbursement was 23% was deceptive and misleading").  No reasonable person would

read this theoretical example about an overnight stay in a hospital to mean that the actual reimbursement rates for all medical services would average to around 66%.

In addition, along the side of coverage examples, the Summary states in bold "**This is not a cost estimator.**" Doc. 13-2 at 7, 15 (emphasis in original). On the following page, titled "Questions and answers about the Coverage Examples," the questions "Does the Coverage Example predict my own care needs?" and "Does the Coverage Example Predict my future expenses?" appear at the center of the page. *Id.* at 16. Both are answered by a resounding "**No,**" stated in bold and underlined, followed by explanations that "[t]treatments shown are just examples" that that "Coverage Examples are **not** cost estimators," respectively. *Id.* (emphasis in original). A reasonable prospective member would not extrapolate from these statements the idea that the coverage examples reflected actual average reimbursements costs across all medical expenses.

Similarly, the allegations regarding the optional rider do not amount to materially misleading statements. The Complaint alleges that Group Health should have disclosed that the optional rider "applied only to in-patient out-of-network services, not out-patient services." Doc. 1 ¶ 37. However, the Description already disclosed that "*certain* non-participating provider reimbursement levels may be increased if you have the optional rider" and that the rider provides coverage based on an "[e]nhanced schedule for *certain services* [which] increases the reimbursement of the basic program's non-participating provider fee schedule, on average, by 75%." Doc. 1 ¶ 36 (emphasis added). Inherent in these

**A30**

statements is the caveat that only certain services, not all services, would increase

reimbursement levels for out-of-network expenses.

As for the allegations regarding Catastrophic Coverage, the Complaint chastises

Group Health for not disclosing the fact that it "added literally nothing to the basic coverage,

despite being one of six key benefits highlighted on the Summary Program Description."

Doc. 1 ¶ 10; *see also id.* ¶ 34 (alleging that "[t]here was nothing 'additional' about this

coverage and it did not provide any protection against catastrophic situations"). This

allegation is unavailing. The Description does not hold out "Catastrophic Coverage" as

conferring *additional* benefits to the plan. It is, as the Complaint concedes, an integral

feature of the plan itself. Furthermore, the Description states that "Catastrophic Coverage"

is only applicable to expenses over $1,500 for "non-participating providers for predominantly

in-hospital care," which is a narrowly defined category of expenses. Doc. 13-1 at 1. The

Complaint fails to demonstrate how this fairly narrow feature could "confuse NYC

employees and retirees, induce them to select the [Group Health] Plan, and cause them to

incur substantial out-of-pocket costs that [Group Health] led them to believe they were

protected against." Doc. 1 ¶ 35.

In sum, the Complaint has not plausibly alleged how the statements from the

Description and the Summary would be *materially* misleading to the reasonable prospective

member choosing among the eleven plans offered by the City of New York. *Id.* ¶ 2. "The

mere fact that an insurer may make a misleading representation does not require or even

**A31**

lead to the necessary conclusion that the misleading representation is material or even likely to cause harm." *Ross v. AXA Equitable Life Ins. Co.*, 680 F. App'x 41, 45 (2d Cir. 2017) (holding that insureds failed to plead injury-in-fact because they "fail[ed] to allege that they would not have purchased the life insurance and annuity riders provided by AXA and MLIC had they known of AXA's and MLIC's alleged shadow insurance practices. Appellants also fail to allege, or even suggest, that consumers generally would not have purchased AXA's and MLIC's life insurance and annuity riders had they known about the alleged shadow insurance practices").

The lack of materiality in the alleged misrepresentations is evidenced by the Complaint's allegations regarding the Assurance of Discontinuance. The Complaint touts the Assurance of Discontinuance's settlement terms as support for the argument that the statements at issue were misleading, and alleges that as part of the settlement with the Attorney General, Group Health agreed to make certain changes to its marketing materials, including that:

> (a) it now expressly states that reimbursement rates "are not related to usual and customary rates or to what the provider may charge but are set at a fixed amount based on GHI's 1983 reimbursement rates"; (b) GHI deleted statement[s] that certain rates had been updated periodically and replaced it with a statement that "[m]ost of the reimbursement rates have not increased since that time"; (c) GHI deleted the statement that the reimbursement rates "may be less than the fee charged" and replaced it with a statement that reimbursement rates "will likely be less (and in many instances much less) than the fee charged by the out-of-network provider"; (d) GHI added multiple examples of what members would typically pay out-of-pocket for out-of-network services, each showing very low reimbursement rates and substantial out-of-pocket costs; (e) GHI specified that the Enhanced OON

Rider applies only to some surgical and in-hospital services; (f) GHI
announced set forth new rules and procedures for surprise billings; and (g)
GHI eliminated the deceptive description of Catastrophic Coverage.

Doc. 1 ¶ 40.  Compared to the marketing materials' original statements, which are

discussed above, the changes hardly alter the meaning of the statements in a significant,

material way.  The Court does not find that reasonable people would have found these

changes so meaningful that they would not have been "induced" into choosing the plan had

they been provided these slightly altered statements.  This is especially true given the

Complaint's own allegation that most members chose Group Health's plan not primarily due

to these selective statements and examples, but because it was "one of only two PPO plans

offered and the only one of those two that did not require the payment of out-of-pocket

premiums." *Id.* ¶ 20.

While more farfetched interpretations of the marketing materials could have

supported the reading advocated by the Complaint, "the applicable legal standard is

whether a reasonable consumer, not the least sophisticated consumer, would be misled by

Defendants' actions." *Weinstein*, 819 F. Supp. 2d at 228 (holding that "no reasonable

consumer could plausibly think that StubHub tickets [for Yankees games] come directly from

the Yankees" when plaintiff "went to the Yankees website and followed a hyperlink to the

StubHub website [and in] so doing, she left the Yankees website and was redirected to an

entirely new website with a different URL").  Thus, GBL claims separately fail because the

Complaint has not alleged materially misleading statements.

Because the Complaint forecloses the theory that the conduct is "consumer-oriented"
given its allegation that members "are eligible for this City-sponsored health insurance
based *solely* on their employment with the City" (Doc. 1 ¶ 19), and because it has not
demonstrated the materially misleading nature of any of the documents at issue, whose
validity are uncontested, the Court finds that leave to amend would be futile.  The GBL
claims will be dismissed with prejudice.

### D.  The Insurance Law Claim Fails to Plead Misleading Statements

Count III of the Complaint alleges a claim under New York Insurance Law § 4226,
which provides in relevant part:

> (a) No insurer authorized to do in this state the business of life, or accident
> and health insurance, or to make annuity contracts shall:

> (1) issue or circulate, or cause or permit to be issued or circulated on its
> behalf, any illustration, circular, statement or memorandum
> misrepresenting the terms, benefits or advantages of any of its policies or
> contracts.

N.Y. Ins. Law § 4226.  The parties devoted little independent analysis to the claim.
*See, e.g.,* Doc. 31-1 at 23 n. 5 (Group Health's brief relegating the claim to a footnote,
arguing that dismissal is warranted "[f]or the same reasons" that the Complaint fails to plead
a GBL claim); Doc. 41 (Plavin's response brief failing to address the claim altogether aside
from statute of limitations arguments).  This is presumably due to the dearth of case law
analyzing the provision.  However, it appears that the parties agree that the requisite
"misrepresentations" would be subject to the same "objective" standard as that of the GBL

claims.  This is consistent with the few cases that address the substantive elements of

§ 4226.  *See, e.g., Phillips v. Am. Int'l Grp., Inc.*, 498 F. Supp. 2d 690, 699 (S.D.N.Y. 2007)

(dismissing GBL § 349 and N.Y. Ins. Law § 4226 on the same grounds that plaintiff failed to

allege any specific statements that were misleading).  Thus, for the same reasons that

Plavin failed to plead any materially misleading statements sufficient to sustain a GBL claim,

the Insurance Law § 4226 claim also fails.

Furthermore, some courts have found that § 4226 requires the added element of

*scienter* absent in the GBL statutory provisions.  *See* N.Y. Ins. Law § 4226(d) ("Any such

insurer that knowingly violates any provision of this section...shall, in addition to any other

penalty provided in this chapter, be liable to a penalty ...[which] may be sued for and

recovered by any person aggrieved for his own use and benefit.").  *See also Brach Family*

*Found., Inc. v. AXA Equitable Life Ins. Co.*, 2016 WL 7351675, at *4 (S.D.N.Y. Dec. 19,

2016) (applying the "heightened pleading requirements of Rule 9(b)" to the claim because

"the statute does require knowledge of the falsity of its representation" and because the

"allegations here sound in fraud").  There are no allegations in the Complaint that support a

theory that Group Health acted with nefarious intent.  As discussed above, the Description

and the Summary fully discloses that reimbursement levels may be "less than the fee

charged by the non-participating provider"; that the coverage examples were not "cost

estimators"; that the Catastrophic Coverage only applied to expenses over $1,500 for "non-

participating providers for predominantly in-hospital care"; and that the optional rider only

increased "certain" out-of-network reimbursement levels.  These disclosures undermine the

notion that Group Health knowingly and willfully violated New York Insurance Law by

presenting misleading statements in its marketing materials.  Accordingly, the Insurance

Law claim will be also be dismissed with prejudice. [5]

### E. The Unjust Enrichment Claim Cannot Lie When the Allegations Arise from Contractual Obligations

Finally, the unjust enrichment claim must fail because its allegations are premised on

benefits that Group Health is *contractually obligated* to provide under the policy negotiated

by his employer.  Before delving into the elements of the claim, the Court notes that the

parties have not addressed any potential choice of law issues.  While New York GBL and

New York Insurance Law claims clearly require application of New York law, unjust

enrichment, a claim in equity, does not necessitate the application of New York law simply

because the other claims are based on New York statutes.

"[T]he first step in a choice of law analysis under Pennsylvania law is to determine

whether an actual conflict exists between the laws of the competing states." *Aqua*

*Pharmaceuticals, LLC v. Park Irmat Drug Corp*, 2018 WL 2288287, at *5 (E.D. Pa. May 17,

2018).  "An actual conflict exists if 'there are relevant differences between the laws.'" *Id.*

---

[5] Group Health also moved to strike the "Complaint's requests for 'treble damages pursuant to [the GBL Claims] and for a 'penalty in the amount of all premiums paid to [Group Health] for the insurance that was in effect during the Class Period'" pursuant to GBL § 349 and Insurance Law § 4226.  Doc. 31-1 at 29-30.  Because the GBL and Insurance Law claims will be dismissed, Group Health's motion to strike certain damages requested under those same claims will be dismissed as moot.  In any event, the Court notes that as a general matter, a motion to dismiss is a judicial device used to eliminate causes of action, not types of damages.

(quoting *McDonald v. Whitewater Challengers, Inc.*, 116 A.3d 99, 106 (Pa. Super Ct. 2015). "If two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary. Thus, the first part of the choice of law inquiry is best understood as determining if there is an actual or real conflict between the potentially applicable laws." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007). "If there is no conflict, then the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply." *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006).

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (internal quotation marks omitted). "The essence of such a claim is that one party has received money or a benefit at the expense of another." *Id.* (internal quotation marks omitted). "To establish a claim for unjust enrichment under Pennsylvania law, a plaintiff must allege facts demonstrating (1) a benefit conferred on the defendant by the plaintiff, (2) appreciation of such benefit by the defendant, and (3) acceptance and retention of such benefit under circumstances such that it would be inequitable for the defendant to retain the benefit without payment to the plaintiff." *iRecycleNow.com v. Starr Indem. & Liab. Co.*, 674 F. App'x 161, 162 (3d Cir. 2017) (internal quotation marks omitted). Thus, both standards require the plaintiff having conferred a benefit on the defendant, in such a way that defendant's retention of the benefit would be inequitable.

In addition, both New York and Pennsylvania law hold that an unjust enrichment claim, which is a law in equity, will be "precluded by the existence of a valid and enforceable written contract governing the particular subject matter." *Bristol Vill., Inc. v. Louisiana-Pac. Corp.*, 916 F. Supp. 2d 357, 366–67 (W.D.N.Y. 2013) (collecting cases). *See also Lomma v. Ohio Nat'l Life Assurance Corp.*, 283 F. Supp. 3d 240, 265 (M.D. Pa. 2017) ("Because it is undisputed that the relationship between the parties is governed by an express written contract, Plaintiffs' claims for unjust enrichment and promissory estoppel must necessarily fail."). Accordingly, no true conflict exists because there is no appreciable difference between the relevant New York and Pennsylvania law on the unjust enrichment claim. Under both states' case law, the unjust enrichment claim must fail because an express contract governs the parties' relationship in this case.

Plavin argues that the claim is not precluded because he never expressly "executed any contract with [Group Health]." Doc. 41 at 21. In his brief, Plavin cites to a statement contained in the plan's Certificate of Insurance, which is an exhibit attached to Group Health's opening brief, which states "[t]his booklet is your Certificate of Insurance. It is evidence of your coverage *under the Group Contract between [Group Health] and the City of New York*. It is not a contract between you and [Group Health]." *Id.* (emphasis added). Not only is this an extraneous document not properly before the Court, but even if the Court were to rely on the document, its reference to Plavin's "coverage under the Group Contract between [Group Health] and the City of New York" only reinforces the fact that Plavin is an

**A38**

intended third-party beneficiary of an existing contract.  Contrary to Plavin's argument, the relevant inquiry is not whether Plavin has *personally* executed a contract with Group Health, but rather, whether there exists a valid contract that governs Plavin and Group Health's relationship.  "[T]he existence of a valid and binding contract governing the subject matter at issue in a particular case *does* act to preclude a claim for unjust enrichment even against a third party non-signatory to the agreement." *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 166 (E.D.N.Y. 2012) (dismissing unjust enrichment claim when "[t]here is no dispute whatsoever as to whether a valid and enforceable contract in this case exists. Rather, the dispute is whether Family may be liable as a non-signatory. This alone is insufficient to sustain the unjust enrichment claim").

Neither party disputes that the policy at issue is the result of a contract negotiated between Plavin's employer and Group Health.  Plavin, by virtue of having been an employee of New York City, enjoyed health benefits as a third party beneficiary to the City's contract with Group Health.  In fact, the Complaint alleges that the City paid all premiums on Plavin's policy and that employees were "eligible for this City-sponsored health insurance based solely on their employment with the City." Doc. 1 ¶¶ 2, 19.  Thus, Plavin is a third-party beneficiary of a contract between his employer and Group Health, and as such, has recourse as a matter of law without having to resort to claims in equity. *See Benefit Tr. Life Ins. Co. v. Union Nat. Bank of Pittsburgh*, 776 F.2d 1174, 1177 (3d Cir. 1985) ("Plaintiffs in this case have a direct contractual relationship with the insurance company.  They are the

third party beneficiaries of the policies which establish the carrier's obligation to pay ...

Therefore, under Pennsylvania law no basis exists for an action of unjust enrichment in

these circumstances."); *Nat'l Westminster Bank PLC v. Grant Prideco, Inc.*, 261 F. Supp. 2d

265, 273, 275 (S.D.N.Y. 2003) (finding plaintiff to be "an intended third-party beneficiary of

the agreement" and holding that "Plaintiff's unjust enrichment claim against the GPI

Defendants and Active fails because [t]he existence of a valid and enforceable written

contract governing a particular subject matter ordinarily precludes recovery... for events

arising out of the same subject matter").

Where "there is a relationship in the form of a promise to, or for the benefit of, the

plaintiff, he 'has a right to recover on the promise .... [t]he existence of that right, however,

precludes a claim of unjust enrichment.'" *Benefit Tr. Life Ins.*, 776 F.2d at 1177(quoting *Gee

v. Eberle*, 420 A.2d 1050, 1060 (Pa. Super. Ct. 1980). The unjust enrichment claim is

therefore precluded due to the existence of a contract for the benefit of the Plaintiff.

Because the Complaint concedes that Plavin was only eligible for the plan by virtue of

having been a New York City employee, and because it is undisputed that the contract

between the City and Group Health intended to confer a benefit to the City's class of

employees, leave to amend the Complaint would be futile as to this claim. Thus, the unjust

enrichment claim will be dismissed with prejudice.[6]

---

[6] Group Health also argues that Plavin failed to state an unjust enrichment claim because it is duplicative of other claims and because he has failed to plead the requisite elements of the claim. Because the unjust enrichment claim will be dismissed on other grounds, the Court declines to reach Group Health's alternative arguments on unjust enrichment.

**A40**

### F. The Class Claims Fail

Because Plavin is the only named Plaintiff in this case, and having ruled that his claims must be dismissed, the putative class action claims must also fail. *See Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline*, 263 F.R.D. 205, 210 (E.D. Pa. 2009) ("[W]hen the named plaintiff lacks a cause of action, the Court should dismiss the action before proceeding to class certification.") (citing *Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163, 1169–70 (3d Cir.1987); *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 634 (3d Cir. 2017) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.") (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

### V. Conclusion

For the reasons stated above, Defendant's motions to dismiss the Complaint (Doc. 31) will be granted.  As discussed above, given that the purportedly misleading statements underlying Plaintiff's GBL, Insurance Law, and unjust enrichment claims are apparent on the face of the Complaint and its exhibits, and the fact that Plaintiff's claims are based on Defendant's contractual obligations arising from a policy negotiated between his employer and Defendant, the Court finds that an amendment would be futile. *Turner v. Spaley*, 501 F. App'x 101, 103 n. 1 (3d Cir. 2012) ("We conclude that the District Court did not err in declining to allow Turner an opportunity to amend her complaint because, as discussed

below, Turner's underlying claims lack merit."); *In re New Jersey Title Ins. Litig.*, 683 F.3d

451, 462 (3d Cir. 2012) (finding that the District Court did not abuse its discretion by denying

Appellants leave to amend their complaint when amendment would have been futile).  A

separate Order shall issue.

Robert D. Mariani
United States District Judge

**A42**

## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVEN PLAVIN, on behalf of himself and all others similarly situated, | : : : | |
| Plaintiff, | : : | |
| v. | : : | 3:17-CV-1462 (JUDGE MARIANI) |
| GROUP HEALTH INCORPORATED, | : : | |
| Defendant. | : : | |

## ORDER

AND NOW, THIS _22nd_ DAY OF JUNE, **2018**, for the reasons set forth in this

Court's accompanying memorandum opinion, **IT IS HEREBY ORDERED THAT**:

1. The Defendant's Motion to Dismiss Plaintiff's Complaint (Doc. 31) is **GRANTED.**

2. The Complaint (Doc. 1) **is DISMISSED WITH PREJUDICE**.

3. The Clerk of the Court is directed to **CLOSE** the case.

Robert D. Mariani
United States District Judge

1

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEVEN PLAVIN, on behalf of himself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) <u>3:17-cv-01462</u> ) (Hon. Robert D. Mariani) |
| v. | ) ) |
| GROUP HEALTH INCORPORATED, | ) ) |
| Defendant. | ) ) ) |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Plaintiff, Steven Plavin, in the above-named case, appeals to the United States Court of Appeals for the Third Circuit from the June 22, 2018 opinion and order of Judge Robert D. Mariani granting Defendant's motion to dismiss Plaintiff's Complaint with prejudice.

Dated: July 5, 2018

<u>/s/ William Christopher Carmody</u>
William Christopher Carmody (*Pro Hac Vice*)
(NY4539276)
Arun Subramanian (*Pro Hac Vice*)
(NY4611869)
Halley W. Josephs (*Pro Hac Vice*)
(NY5348214)
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Floor
New York, NY  10019-6023
Tel.: 212-336-8330

1

Fax: 212-336-8340
bcarmody@susmangodfrey.com
asubramanian@susmangodfrey.com
hjosephs@susmangodfrey.com

Steve Cohen (*Pro Hac Vice*)
(NY5159587)
15 Broad St., Suite 2412
New York, NY 10005
Tel.: (212) 255-4944
Steve.Cohen@SteveCohenEsq.com

J. Timothy Hinton, Jr., Esq. (PA ID 61981)
Michael F. Cosgrove, Esq. (PA ID 47349)
HAGGERTY  HINTON  &  COSGROVE
LLP
203 Franklin Avenue
Scranton, PA 18503
Tel: (570) 344-9845
timhinton@haggertylaw.net
mikecosgrove@haggertylaw.net

*Attorneys for Plaintiff and the Class*

**A45**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has

been served via electronic means on the following counsel of record, this 5th day

of July, 2018, as indicated below:

DEBEVOISE & PLIMPTON LLP
919 Third Ave.
New York, NY 10022
(212) 909-6000
John Gleeson
jgleeson@debevoise.com
Maura K. Monaghan
mmonaghan@debevoise.com
Jared I. Kagan
jkagan@debevoise.com

LEVAN LAW GROUP LLC
One Logan Square – 27th Floor
18th & Cherry Streets
Philadelphia, PA 19103
(215) 561-1500
Peter H. LeVan, Jr.
plevan@levanlawgroup.com

*/s/ Halley W. Josephs*

*Attorneys for Plaintiff and the Class*